FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2008 JUL 29  AM 9: 47

CASE NO. 3:08-cv-750-J-25TEM   MIDDLE DISTRICT OF FLOR.
                                JACKSONVILLE, FLORIDA

SIERRA CLUB, INC.; MANASOTA-88, INC.;
GULF RESTORATION NETWORK, INC.; and
PEOPLE FOR PROTECTING PEACE RIVER,
INC.,

        Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS;
and COLONEL PAUL L. GROSSKRUGER,
Commanding District Engineer,
U.S. Army Corps of Engineers, Jacksonville District;

        Defendants.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs—Sierra Club, Inc.; Manasota-88, Inc.; Gulf Restoration Network, Inc.; and

People for Protecting Peace River, Inc.—bring the following complaint against the United States

Army Corps of Engineers and Colonel Paul L. Grosskruger for the issuance of a permit under

Section 404 of the Clean Water Act which violates the substantive and procedural requirements

of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, and the National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and was arbitrary, capricious, an abuse of discretion, and

otherwise not in accordance with the law in violation of the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 553, 706(2)(A).  This complaint seeks a declaratory judgment and

injunctive relief.

## INTRODUCTION

1.      This action challenges the United States Army Corps of Engineers' ("Corps") issuance of a dredge and fill permit authorizing Mosaic Phosphate Company to strip mine the Altman Tract, a 2367 acre tract of environmentally sensitive land in Northeast Manatee County, for phosphate.  The Permit authorizes the destruction of 480 acres of high-quality wetlands in the headwaters of Horse Creek, a major tributary of the Peace River.

2.      Open pit phosphate mining has a devastating impact on the local environment. Huge electrically powered draglines strip away all overlying vegetation, topsoil, and overburden (the sandy soils that overlay the phosphate deposit) down to the phosphate containing layer.  The result is the utter destruction of the local natural environment from ground surface down to a depth of approximately 50 feet.

3.      The challenged permit would allow the strip mining of 2000+ acres of land in the headwaters of Horse Creek.

4.      As explained in letters from the U.S. Environmental Protection Agency to the Corps of Engineers, what is at risk is a watershed used as a drinking water source for 250,000 people and one which is largely responsible for maintaining the ecological integrity of the Charlotte Harbor estuary.  (Letters from James D. Giattina, Director, Water Management Division, Region 4, USEPA to Colonel Paul L. Grosskruger, District Engineer dated July 26, 2007 and August 23, 2007 are attached to this complaint as Exhibits A and B.)

5.      The statutory requirements set forth in the CWA, NEPA and APA mandate that before the issuance of a permit, the Corps must provide an opportunity for informed public comment, disclose relevant environmental information to the public, avoid destruction to wetlands to the extent practicable, analyze all reasonable and practicable alternatives to the

proposed action, identify and analyze the individual and cumulative environmental impacts of the proposed action, and make a convincing case for a finding of no significant impact.

6.      Because the Corps has failed to comply with any of these requirements, Plaintiffs ask the Court to (1) declare that the Corps violated its statutory and regulatory duties under the CWA. NEPA and APA; (2) issue a preliminary injunction requiring the Corps to rescind the Altman Tract Mine permit; (3) enjoin the Corps from authorizing any further mining permits within the Peace River watershed until it demonstrates that there will be no unacceptable adverse impacts in accordance with the CWA, and until an Environmental Impact Statement has been prepared analyzing the project's individual and cumulative environmental impacts; and (4) award to the Plaintiffs their costs and expenses, including reasonable attorneys' and expert witness fees.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.*, including § 1344(b) (application of Corps guidelines in permit determinations) and § 1344(c) (prohibition of discharge of dredged or fill material that will have an unacceptable adverse effect); the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*; and the Administrative Procedure Act, 5 U.S.C. § 701-706.  Additionally, jurisdiction exists under 28 U.S.C § 1331 ("Federal question"); 28 U.S.C § 1361 ("Action to compel an officer of the United States to perform his duty"); and 28 U.S.C. §§ 2201-2202 ("Creation of remedy" and "Further relief" provisions establishing power to issue declaratory judgments in cases of actual controversy).

8.      Venue is proper in this judicial district and in this Court under 28 U.S.C § 1391(e) because no real property is involved in this action.  Two of the Plaintiffs reside in this district.

3

The Defendant resides or maintains its District Office in Jacksonville, Florida which is located in this District and a substantial part of the events or omissions giving rise to the claim occurred in the Jacksonville District Office, including the Corps' preparation of the Environmental Assessment ("EA"), the Finding of No Significant Impact ("FONSI"), and the dredge and fill permit which are challenged in this case.

## THE PARTIES

9.      Plaintiff Sierra Club, Inc. ("Sierra Club") is a non-profit public benefit corporation with its principal place of business in San Francisco, California. Sierra Club consists of members living throughout the state and around the nation. There are approximately 30,000 members living in the State of Florida many of whom reside in the counties that lie within the Peace River watershed. The Sierra Club represents the interests of its members in state and federal litigation, public policy advocacy, administrative proceedings, and before state, local, and federal lawmakers. The Sierra Club is very involved in advocacy regarding issues related to preserving wetlands and improving water quality. All of these activities support Sierra Club's mission to explore, enjoy, and protect the wild places of the earth and educate and enlist humanity to protect and restore the quality of the natural and human environment.

10.      Plaintiff ManaSota-88, Inc. ("ManaSota-88") is a public interest conservation and environmental protection organization which is a Florida not-for-profit corporation and a citizen of the State of Florida. ManaSota-88's principal place of business is located in Nokomis, Florida. The corporate purposes of ManaSota-88 include the protection and preservation of water quality and wildlife habitat in Manatee and Sarasota Counties and, therefore, challenging the Corps's issuance of the Altman mine permit falls within ManaSota-88's general scope of interest and activity.

4

11. The Gulf Restoration Network ("GRN") is a gulf-wide network of conservation and community groups that works to protect and restore the Gulf of Mexico and the natural systems that feed and sustain the Gulf of Mexico. GRN has member groups and individual members in all five gulf coastal states including Florida. GRN's principal place of business is in New Orleans, Louisiana. GRN also maintains a Florida Office in Ridge Manor, Florida. It uses litigation, public education and outreach, grassroots and direct lobbying, research and policy analysis, and coalition and community outreach to protect the natural systems and human communities of the Gulf of Mexico. In Florida, GRN works to protect wetlands and river systems that are essential to healthy watersheds and estuaries along the gulf coast of Florida.

12. Members and staff of Sierra Club, Manasota-88 and GRN frequently use and enjoy the waters of the Peace River and its tributaries and the waters of the Charlotte Harbor estuary. These waters provide an environment for a variety activities which members of the Sierra Club, ManaSota-88 and GRN engage in, including, but not limited to, wading, walking, swimming, canoeing, sailing, sport boating, wildlife observation, photography, personal and commercial research, and sport fishing.

13. Phosphate mining has contributed significantly to the decreased stream flow in the Peace River which has declined by 20% since 1963. The challenged permit would allow the mining of an additional 2000+ acres of land in the headwaters of Horse Creek, a major tributary of the Peace. Mining of the Altman Tract will reduce stream flow in Horse Creek to some extent. The decline in freshwater flow is a primary cause for a the loss of approximately 20 fish species in the Peace River – species which had been abundant 20 years ago.

14. The Peace River is the major freshwater source for the Charlotte Harbor estuary which provides critical habitat for a variety of wildlife including endangered and threatened

5

species. It has been designated as an Outstanding Water and an Aquatic Preserve of the State of Florida and in 1995 it became the sixth estuary to be selected an Estuary of National Significance by the United States Environmental Protection Agency.

15.     The reduction in flow already experienced by the Peace River has caused a shift upstream of the salinity distribution in Charlotte Harbor. Loss of the remaining narrow estuarine habitat in the tidal Peace River would be detrimental to the continued propagation of many of the fish species found in the tidal Peace River and Charlotte Harbor. Predicted long term habitat losses caused by cumulative losses from existing and proposed phosphate mines will also result in a declining long-term trend for productivity and abundances of estuarine resources dependent on this nursery area.

16.     The adverse environmental effects caused by loss of downstream flows from the Peace River and the destruction of the wetlands in the headwaters of its tributaries adversely affect the Plaintiffs' members' use and enjoyment of the Peace River and the Charlotte Harbor estuary.

17.     People for Protecting Peace River, Inc. ("3PR") is a Florida not-for-profit corporation with its principal place of business in Wachula. Florida. 3PR was originally incorporated under the name Desoto Citizens Against Pollution. Inc. to "promote and protect the health and safety of the general public and the environment, and to increase public awareness of potential environmental hazards and to discourage activities that may be hazardous to public health or the environment." As the threat of phosphate mining is mainly in Hardee County, DCAP briefly changed its name to HARDCAP and then, in 2007 changed its name to People for Protecting Peace River, Inc. reflecting the regional character of the threat to the Peace River

watershed, and emphasizing the affirmative nature of their mission.  Membership is mainly drawn from communities of Bowling Green, Wauchula, and Lily in Hardee County.

18.     Members of 3PR use the Peace River for recreational purposes including fishing, swimming, canoeing, and camping.  Other members own property, reside and have businesses on Horse Creek which has begun to show signs of degradation following the mine expansions in the headwaters of the Horse Creek watershed.

19.     Each of the Plaintiffs files this action on its own behalf and on behalf of its members in an effort to protect their health, economic, recreational, aesthetic, scientific and conservation interests in the waters and lands of the Peace River basin and the Charlotte Harbor estuary.

20.     Plaintiffs Sierra Club, Manasota-88, and 3PR (as "HARDCAP") submitted comments in response to the proposed mining application expressing their concerns associated with mining the Altman Tract and have actively sought to be involved in the Corps' decision making process.

21.     The above described interests of Plaintiffs and their respective members will be adversely affected and irreparably injured by Defendants' issuance of the Altman mine permit unless the relief prayed for herein is granted.

22.     Defendant United States Army Corps of Engineers is the federal agency charged with administering permits under § 404 of the Clean Water Act for discharge of dredged or fill material into the waters of the United States.  The Corps is headquartered in Washington, D.C.

23.     Defendant Colonel Paul L. Grosskruger is the District Engineer in charge of the Jacksonville District office of the U.S. Army Corps of Engineers in Jacksonville, Florida and is designated to act for the Secretary of the Army.  The Jacksonville District office is responsible

for issuing permits for the discharges of dredged and fill material in Florida under Section 404 of the Clean Water Act, including the proposed discharges at issue in this case.

## STATUTORY AND REGULATORY BACKGROUND

### CLEAN WATER ACT

24.     The Clean Water Act was enacted by Congress in 1972 to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C § 1251(a).  To achieve this goal, section 404 of the CWA prohibits the discharge of any pollutant, including dredged spoil or other fill material, into navigable waters unless authorized by a permit.  *Id.* § 1344.

25.     The Corps oversees the § 404 permit process and must comply with guidelines promulgated by the EPA, which are incorporated into the Corps' own regulations. *Id.* § 1344(b)(1); 33 C.R.F. §§ 320.4(b)(4), 325.2(a)(6). "The underlying intent behind the . . . [g]uidelines is that dredged or fill material should not be discharged if it will result in an unacceptable impact on the aquatic ecosystem." 40 C.F.R. § 230.1(c).

26.     In general, the Corps' guidelines provide that no discharge of dredged or fill material shall be permitted: (1) if there is a practicable alternative to the proposed discharge; (2) if the discharge causes or contributes to violations of applicable state water quality standards; (3) if the discharge will cause or contribute to significant degradation of the environment; and (4) unless all appropriate steps have been taken to minimize potential adverse impacts. 40 C.F.R. § 230.10. In addition, the Corps' regulations require that destruction of wetlands is to be avoided to the extent practicable. 33 C.F.R. § 320.4(r).

27.     Corps guidelines also provide that "practicable alternatives" include "not discharging into the waters of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences." 40 C.F.R. §§ 230.5(c). 230.10(a).

## NATIONAL ENVIRONMENTAL POLICY ACT

28.     NEPA is a procedural statute requiring agencies to 1) examine environmental impacts by identifying and evaluating adverse environmental effects of a proposed action and 2) broadly disseminate relevant environmental information for public comment so that the general public may actively participate in the decision-making process.

29.     NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") on every proposal for a major federal action which will or may significantly affect the quality of the human environment.  42 U.S.C. § 4332(2)(C).

30.     The Council on Environmental Quality ("CEQ"), created by Congress to implement NEPA. has promulgated detailed regulations to assist federal agencies in complying with NEPA. 40 C.F.R. § 1500.3.  CEQ regulations require the Corps to prepare an Environmental Assessment ("EA") to determine whether or not to prepare an EIS for a permit issued under § 404 of the CWA.  40 C.F.R. §§ 1501.3-1501.4; 33 C.F.R. 230.7.  An Environmental Assessment is a "concise public document" containing the evidence and agency's analysis for its determination of whether an EIS is required.  40 C.F.R. § 1501.4.

31.     NEPA requires the Corps to consider the direct and indirect effects of its actions. and the cumulative impacts of past, present and reasonably foreseeable future actions, on the environment.  40 C.F.R. §§ 1508.25(c).  Also, NEPA requires the Corps to use "accurate scientific analysis" and "high quality" information in analyzing a proposed action.  40 C.F.R. §§

1500.1(b). Thus, the Corps must disclose scientific debate and convincingly explain why they adopted one view over another. 40 C.F.R. §§ 1502.24.

32.     If after examining the environmental impacts in its EA. the agency properly concludes that the action will not have a significant effect on the human environment. it may issue a Finding of No Significant Impact ("FONSI") and is not required to prepare an EIS. 40 C.F.R. § 1501.4(e).

## ADMINISTRATIVE PROCEDURE ACT

33.     The Administrative Procedure Act, 5 U.S.C. §§ 701-06. provides for judicial review of agency actions such as those at issue here. A reviewing court shall hold unlawful and set aside the Corps' actions. findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). In order to satisfy this standard, the Corps must 1) accurately identified the relevant environmental concerns; 2) take a 'hard look' at the environmental concerns in preparing the EA: and 3) if it issues an EA. make a convincing case for a finding of no significant impact on the environment.

## FACTUAL/PROCEDURAL BACKGROUND

34.     The original permit to mine the Altman Tract was submitted by Mosaic Phosphate (then known as IMC Phosphate) to the Corps and the Florida Department of Environmental Protection ("FDEP") in October, 2000. A draft permit with a FDEP Notice of Intent to Issue was published in June 2002. The draft permit allowed Mosaic to mine 686 acres of the 847 acres of jurisdictional wetlands on the site.

35.     Charlotte County petitioned for a formal administrative hearing in order to challenge the propriety of FDEP's issuance of the permit.

36.     In August, 2003. after a three week long administrative hearing, a Recommended

Order was issued by Administrative Law Judge Lawrence Johnston recommending that FDEP

deny the Altman mine permit application. [1]

**Findings of Recommended Order: Existing Site Conditions**

37.     On the question of the existing site conditions on the Altman Tract, the

Recommended Order accepted the testimony of the County's experts and determined as a matter

of fact that the Altman Tract: a) consists of a mosaic of high-quality interrelated wetlands and

uplands, all with high-quality native vegetation and only minor man-made impacts; b) that there

are deep marshes with extended hydroperiods. shallow marshes with moderate hydroperiods. wet

prairies with very short hydroperiods and bay swamps and mixed forested wetlands; c) that the

Central Marsh area of the Tract was overall a very high-quality, diverse, wetland system; d) that

the Tract contains 4.8 miles of first order streams (channel that continues from headwaters to

first confluence) which are important because they produce biological energy for system and

reduce downstream nutrient loading by sequestering and reducing movement of nutrients; e) that

water quality on the Tract is very good: f) that the Tract is utilized by listed species including the

Florida Scrub Jay, gopher tortoise. eastern indigo snake, Florida sandhill crane. Florida mouse,

and Southeastern American kestrel; and g) and that there were very few nuisance. exotic, or

problematic species on the Tract.

38.     The Recommended Order rejected the testimony of the applicant's experts who:

a) substantially and improperly understated the quality of the on-site wetlands; b) testified that

the Central Marsh was one, large "vegetative desert" that served no wetland functions; c)

testified that a large percentage of the tract was mixed rangeland when in fact there was no

---

[1] Charlotte County v. IMC-Phosphates Co., Altman Tract Administrative Hearing Recommended Order No. 02-4134 (August 1. 2003). The Recommended and Final Orders are part of the administrative record in this case.

mixed rangeland on the tract; and d) categorized native palmetto prairie, and native herbaceous and wet-prairie coverage as improved pasture.

**Findings of Recommended Order: Applicant's Ability to Recreate Wetlands**

39.     On the issue of whether the applicant had shown an ability to recreate wetlands that functioned as well as the natural wetlands in existence prior to mining, the Recommended Order accepted the testimony of the County's experts and found: a) none of the applicant's restoration sites were of a higher quality than the comparable cover types on the Altman Tract; b) that most were lower quality, and that most had problems with nuisance and exotic species; c) that the applicant demonstrated no ability to recreate wet prairies and that instead the restoration sites showed examples of wet pasture vegetated with pasture grass such as bahia or Bermuda; d) that the applicant demonstrated little if any ability to recreate either mixed wetland forest and only some ability to recreate a mixed wetland hardwoods; e) that the wetlands on the Altman Tract, overall, were higher quality than the fifteen recreated wetlands the County's expert visited and there was no reason to believe that the applicant's other 65 created wetlands were as good or better than the Altman Tract wetlands.

40.     The Recommended Order also found that the applicant: a) developed WRAP (Wetland Rapid Assessment Procedure) scores for existing wetlands on the Altman Tract that substantially and improperly understated their quality; b) developed WRAP scores for reclaimed wetland sites that were generally as high or higher than the scores the applicant gave to the wetlands on the Altman Tract; c) had only demonstrated the consistent ability to recreate deep marshes and some ability to create shrub marshes; d) demonstrated no ability to recreate shallower marshes or wet prairie; and e) had not demonstrated the ability to create the kind of

diversity existing on the Tract resulting from the existence of high quality uplands adjacent to the high-quality wetlands.

**Findings of Recommended Order: Cumulative Impacts**

41.     On the question of cumulative impacts, the Recommended Order found that the cumulative impacts analysis performed by the applicant's expert was "superfluous."

42.     Furthermore, the analysis only "purported to examine cumulative water quantity impacts on the Altman Tract and downstream: it did not address the cumulative impacts from the loss of other wetland functions. fish and wildlife functions."

43.     Although it was called a "cumulative impact" analysis, it actually compared flow impacts from mining during 1978-2002 with expected impacts during 2003-2027 and therefore did not examine the cumulative impact of phosphate mining and reclamation beginning in 1978. The analysis also did not take into account that, due to differing soil conditions in the upper and lower Peace River basin, more water will be lost due to capture per acre mined than the applicant's expert predicted.

44.     Unlike federal statutes. Florida statutes deem that there is no cumulative impact so long as the adverse impacts to be mitigated and the mitigation offsets for these adverse impacts lie within the same drainage basin.  § 373.414(8)(a). Fla. Stat.

**Denial of the State Permit**

45.     Subsequent to the issuance of the Recommended Order the applicant attempted to "stipulate" to "additional permit conditions" it would be willing to accept in order to "facilitate issuance of its permit."

46.     On September 15. 2003. a Final Order was issued by FDEP which rejected the applicant's attempt to modify its permit post-hearing, and denied the permit.

**Resubmittal of State and Federal Permits**

47.     In January 2004, a new application for the Altman mine was submitted to FDEP but not the Corps.

48.     On October 17, 2005, the FDEP permit was deemed complete and on October 31, 2005, Mosaic sent a complete resubmittal to the Corps.

49.     FDEP noticed an intent to issue the permit on November 18, 2005.

50.     On December 19, 2005, Charlotte County again petitioned for a hearing challenging issuance of the FDEP permit.

51.     On January 30, 2006, the Corps issued Public Notice of the revised Altman application. The Public Notice described one of the predominant land uses as "mixed rangeland." It also stated the site has been the subject of "moderate anthropogenic disturbances including timbering, burning, clearing, ditching, and cattle grazing." The Corps indicated that "preliminary view of this application indicates that an Environmental Impact Statement will not be required."

52.     Charlotte County did not receive notice of the permit. A resident provided the county with the notice on February 16, 2006.

53.     Comments (all opposing issuance of the permit) were submitted by Charlotte County, environmental organizations, and individuals. The overriding concern in the public comments was the need for an analysis of the cumulative impacts of this mine added to past, present and reasonable foreseeable phosphate mines in the Peace River basin. The comments also raised concerns about the feasibility of the proposed mitigation scheme (i.e., whether reclaimed wetlands could actually replace natural wetlands), the need for an examination of

alternatives that might reduce wetland impacts, and the Corps' preliminary determination that no

Environmental Impact Statement needed to be prepared.

54.     The ability to provide meaningful comment was limited because, as Charlotte

County pointed out:

> The permit application applies the wrong standard of review, applying state ERP ("Environmental Resource Permit") standards rather than federal standards. The permit application fails to address any cumulative impacts of the proposed project or include information to allow the USACOE to properly consider cumulative impacts as required by both USACOE rules implementing Section 404 of the Clean Water Act ("CWA") and the National Environmental Policy Act ("NEPA").
>
> * * * *
>
> In fact, no information of any kind was included in the permit application [that] addresses the economic viability of the project and whether other alternatives or further reductions in wetland impacts are feasible.
>
> * * * *
>
> 33 CFR § 320.4(a) requires the following public interest review:
>
> **Public Interest Review:** (1) The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest . . . . All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.
>
> None of these public interest factors are addressed in the permit application or supporting documents. Section 8 of the permit application, titled "Public Interest Criteria," only addresses the conditions for issuance in the Southwest Florida Water Management District Rules and Basis for Review. The factors listed in 33 CFR 320.4(a)(1) are not addressed, and no analysis of the "cumulative effects" of these factors were described, documented, or evaluated in the permit application.

55.     On May 23, 2006, Charlotte County Board of County Commissioners and Mosaic

entered into a settlement agreement wherein Charlotte County agreed to withdraw its petition for

hearing on the FDEP permit and to withdraw its request for a public hearing on the Corps permit.

It did not agree to withdraw its comments which remain part of the record.  Pursuant to the settlement agreement the County also agrees not to challenge any federal permits.

56.     Subsequent to issuance of the Public Notice, the Corps made numerous requests to the applicant for additional information.  The first request was for a detailed discussion of 404(b)(1) guidelines (an Alternatives analysis), the public interest factors, and cumulative impacts, all of which deficiencies had been pointed out in the comment letters.

57.     The applicant later submitted a Draft Environmental Assessment, documents related to the applicant's WRAP assessments of the existing site, an Alternatives analysis, its mitigation plan along with support for its claim that it could successfully create wetlands, and the a Draft EIS for another phosphate mine in response to a third request for additional information as to cumulative and secondary effects.

**The Permit**

58.     On May 2, 2008, without ever holding a public hearing or making any of the new documents and analyses available to the public for public comment, the Corps issued a permit to Mosaic for mining phosphate on the Altman Tract accompanied by an Environmental Assessment finding no significant impact.

59.     The basis for this finding is that the impact of utterly destroying 480 acres of high-quality wetlands (and their biological and hydrological functions) will only be "temporary" because the applicant proposes to recreate 480 acres of wetlands that will function as well or better than the natural high quality wetlands currently existing on the Altman Tract.

60.     As to "General Environmental Concerns"—one of the public interest factors—the Corps found:

The proposed project will cause the short-term disruption of the existing ecosystem; however successful implementation of the proposed reclamation plan will result in long-term benefits through the restoration of native habitats.

61.    The Corps does not explain how the utter destruction of 480 acres of high-quality wetlands and an attempt at their reconstruction over the course of decades "benefits" the environment.

## GENERAL ALLEGATIONS

### A.  Failure To Provide The Public With An Adequate Pre-Decisional Opportunity For Informed Comment

62.    NEPA seeks informed decision-making through informed public participation.

63.    The Council on Environmental Quality ("CEQ") is charged by Congress to promulgate regulations to assist federal agencies in complying with NEPA. 42 U.S.C. § 4344; 40 C.F.R. § 1500.3. CEQ regulations include regulations governing an agency's public participation requirements.

64.    These regulations require a give and take between an agency and members of the public. *See* 40 C.F.R. §§ 1500.1(b) ("public scrutiny [is] essential"). § 1500.2(d) (the agency must "encourage and facilitate public involvement"). § 1506.6 (the agency must "make diligent efforts to involve the public" in preparing environmental documents, give "public notice of ... the availability of environmental documents so as to inform those persons ... who may be interested or affected." and "solicit appropriate information from the public.").

65.    Specifically, before the completion of an Environmental Assessment, CEQ regulations require federal agencies to give the public as much information as is practicable, so that the public has a sufficient basis to address those areas that the agency must consider in preparing the Environmental Assessment.   40 C.F.R. § 1501.4.

66.     Here, the scoping notice the Corps provided to the public for the Altman Tract was geared to meet state law requirements—much like the application—and, thus, was deficient (both in documentation and in analysis) in many areas that must be reviewed and analyzed under federal regulations.  Specifically, there was no discussion of cumulative impacts and no discussion of alternatives no doubt because state law does not require a review of these subjects.

67.     Because documentation and analyses required by federal regulations were absent, there was nothing on which the public could "meaningfully" comment.

68.     Not surprisingly, the public comments received by the Corps noted these failings, explained and reiterated their importance, and almost universally requested a public hearing.

69.     The Clean Water Act states that: "The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 USC § 1344(a).

70.     Corps regulations state: [A]ny person may request, in writing, ... that a public hearing be held .... Upon receipt of any such request, stating with particularity the reasons for holding a public hearing, the District Engineer shall promptly set a time and place for the public hearing .... Requests for a public hearing under this paragraph shall be granted, unless the District Engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing." 33 C.F.R. § 327.4(b).

71.     Comments on the draft permit application were filed by Charlotte County, Sierra Club, the Environmental Confederation of Southwest Florida, ManaSota-88, Hardee Citizens Against Pollution ("HARDCAP"), Conservancy of Southwest Florida, and several individuals.

72.     These comments (and extensive documentation submitted along with the comments) raised substantive factual issues regarding the uncertainty of the proposed mitigation

measures, the need for a basin wide cumulative impact study of phosphate mining in the Peace River basin, concerns that the action would represent a decision in principle concerning other pending and proposed mining permits, public health aspects related to the direct and indirect impacts of hazardous and radioactive mining waste, effects on salinity gradients in the Charlotte Harbor estuary, and potential impacts on biological characteristics of the aquatic ecosystem and particularly the proposed activity's effect on fish populations.

73.     The comments also pointed out that the application focused on state standards rather than on the federal standards. As a result, the application completely failed to address the Corps' public interest test in which the agency must undertake a careful weighing of factors to determine whether a permit should be granted or denied (33 CFR § 320.4(a)); completely failed to address cumulative impacts as required by both Corps and USEPA regulations (33 CFR § 230.10; 40 CFR 1508); and completely failed to detail an alternatives analysis as required by Corps and USEPA regulations.

74.     Subsequent to the scoping notice, and in response to the failings pointed out in the public comments, the Corps made numerous requests to the applicant for (among other things) additional information related to the federal requirements that the Corps obtain documentation and complete an independent analysis of: a) alternatives that might avoid or minimize wetland impacts; b) cumulative impacts caused by the proposed phosphate mine in combination with other past, present and reasonably foreseeable phosphate mines in the Peace River Basin in the future; and c) the high degree of uncertainty associated with the applicant's proposed reclamation plan.

19

75.    Over the course of two years, numerous documents and analyses were submitted by the applicant in support of its application along with a draft Environmental Assessment that the Corps pointed out needed improvement.

76.    Although these documents and analyses were addressing factual concerns and failings raised in the public comment letters, the Corps neither provided the information to the public for its comment nor conducted a public hearing before it issued a 141 page Environmental Assessment finding no significant impact to the environment.

77.    Therefore, the public was never given the opportunity to "meaningfully" review and comment on the Environmental Assessment's analyses or the documents underlying that analysis.

78.    As to the public hearing, the Corps stated that: "The applicant has addressed the issues raised by the parties. . . .The Corps has determined it has sufficient information to make a decision on this application and that no new information would be obtained which would assist in the decision making process."

**B. Failure to disclose scientific uncertainty and controversy surrounding the applicant's proposed reclamation scheme**

79.    NEPA requires an agency to disclose and respond to evidence and opinions challenging the scientific basis upon which an Environmental Assessment rests.

80.    The open strip mining authorized by this permit will result in the utter destruction of the local natural environment from ground surface down to a depth of approximately fifty feet and will result in the total elimination of 480.1 acres of jurisdictional wetlands in the headwaters of a major tributary stream of the Peace River.

81.    The EA's finding of no significant impact rests upon the Corp's acceptance of the applicant's claim that out of the excavated remains of a fifty foot deep pit, it can create wetlands that function just as well (biologically and hydrologically) as natural ones.

82.    However, in conducting its analysis of the applicant's claim the Corps never discloses the serious scientific debate over the reasonableness or the accuracy of the applicant's claims regarding numerous issues relevant to this question.  Nor does it disclose that at almost every possible turn, the findings in the administrative order reject the claims and testimony of the applicant's experts on these issues.

83.    Relevant issues over which there was substantial scientific debate include the following:

**The character of the existing site:**

84.    If the wetlands on the site are already degraded, then all the applicant need do is recreate degraded wetlands.  Not surprisingly, at the administrative hearing, the applicant emphasized the agricultural uses of the tract, claimed the Central Marsh was a "vegetated desert," claimed that the predominant land use was "mixed rangeland," claimed that the site included improved pasture, and, when conducting wetland assessments, developed scores for existing wetlands on Tract that substantially and improperly understated their quality.

85.    The ALJ rejected all these claims and accepted the testimony of the County's experts and described site conditions as follows:

> The area to be mined consists of a mosaic of high-quality interrelated wetlands and uplands, all with high-quality native vegetation and only minor man-made impacts. There are deep marshes with extended hydroperiods, shallow marshes with moderate hydroperiods, wet prairies with very short hydroperiods and bay swamps and mixed forested wetlands.  There are also 4.8 miles of first order streams on the tract—a channel that continues from headwaters to a first confluence—which are important because they produce biological energy for the system and reduce downstream nutrient loading by sequestering and reducing movement of nutrients.

86.     In the EA, the Corps adopts the applicant's assessment of the site. It describes one of the predominate land uses as mixed rangeland and describes the entire tract as having been subjected to moderate anthropogenic disturbances including timbering, burning, clearing, ditching and cattle grazing. It describes much of the land as having been "ditched and drained in association with agricultural activities," and at one point goes so far as to state that "the wetlands to be disturbed have all been substantially affected by previous mining, roadway construction, or agriculture." It does so without disclosing or analyzing the contrary scientific view which was the view adopted in the Recommended Order.

**Applicant's ability to reclaim wetlands**

87.     If an applicant cannot establish that its mitigation can be justifiably relied upon to restore full wetland functions and values, then mitigation cannot reliably be used as the basis for a conclusion that the destruction of the wetlands will not result in any significant environmental impact.

88.     On this issue, the ALJ rejected the testimony of the applicant's expert and made the following factual findings: a) the applicant demonstrated a consistent ability to recreate deep marshes and some ability to create shrub marshes but there was no demonstration of ability to successfully create shallower marshes or wet prairie or mixed forested wetlands; b) there was no demonstration of the ability to create the kind of diversity the natural system exhibited: c) mitigation takes longer than expected and the reclaimed wetlands identified by the applicant as successful examples do not provide full wetland function despite the fact most of them have been in existence more than fifteen years: d) the wetlands on the Altman Tract were of higher quality than the fifteen recreated wetlands put forward by the applicant and there was no reason to

believe that the applicant's other sixty-five recreated wetlands were as good or better than the Altman wetlands.

89.     However, the Corps, without disclosing the ALJ's findings, relied upon information from the identical expert whose testimony the ALJ rejected and even cites to the same reclamation projects the ALJ found failed to provide the full wetland function as the existing high-quality wetlands on the Altman Tract.

90.     The only additional support for the Corps' assertion that the reclaimed wetlands will replace the full functions of the existing high-quality wetlands is a list of eight "mitigation/reclamation" awards from various entities. The value of these awards is suspect given the fact that one of them is for "Morrow Swamp" which was offered by the applicant at the state hearing as an example of a successful reclamation of a mixed hardwood forest. In fact, when the opposing expert visited the site, what he found was that the hardwoods no longer existed—all that remained were cypress trees in deep water—a fact which supported the ALJ's factual conclusion that the applicant failed to prove it could successfully recreate a fully functioning mixed wetland forest.

91.     The Sierra Club also pointed out the uncertainty surrounding the proposed mitigation in its public comments and submitted information from a Draft EIS for another mine in which the applicant was also proposing to mitigate away the effects of its mining. That Draft EIS states:

> Certain vegetative communities that [the applicant] proposes to create in the post-reclamation landscape at the Ona site (wet prairie, bay swamp, gum swamp, stream swamp, pine flatwoods, and palmetto prairie) have not been, to date, created on reclaimed lands elsewhere to the satisfaction of certain regulatory agency/workgroup members.

92.     The mitigation plan for the Altman Tract requires the applicant to recreate substantial acreage of at least three of these categories (wet prairie, pine flatwoods, and palmetto prairie).

93.     As of August 23, 2007, during the time when the Altman Tract permit was under active consideration, the USEPA, in connection with the proposed permitting of yet another phosphate mine in the Peace River basin, informed the Corps that it was of the view that "mitigation in the form of recreated wetland and tributary systems is rarely able to replace the full range of functions and values of the impacted aquatic resources." As a result, the Corps recommended that:

> All wetlands adjacent to and tributaries contributing to the Peace River should be avoided. Additional wetland impact avoidance can prevent the worst impacts to the overall Peace River System.

94.     The Corps neither discloses nor evaluates these substantial scientific debates. Instead it simply states that additional studies will be required to determine whether the soil will provide a long-term nutrient base for the wetland community and whether the microbial assemblage commonly associated with wetland communities will provide the long term conditioning to the soil needed to benefit both plants and wildlife, *i.e.*, whether the reclaimed wetlands are really functioning like natural wetlands.

95.     However, future studies with unknown outcomes cannot be used to support a finding that the reclaimed wetland will, in fact, function at the same level as a high-quality natural system and thus eliminate all significant impacts to the environment.

96.     Disclosure and some reasoned evaluation of the criticisms raised by the public (and found credible) at the state administrative hearing, by USEPA, and by the agency's own experts is essential for a finding that the Corps complied with its obligations under NEPA.

97.     The lack of this analysis establishes that the agency failed to take a hard look at the critical question of whether mitigation would, in fact, render the environmental impacts of the strip mining insignificant.

## C. Failure to conduct an analysis of whether the applicant avoided the destruction of wetlands to the extent practicable

98.     Under Corps regulations, "consideration of mitigation will occur throughout the permit application process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses. *Losses are to be avoided to the extent practicable*." 33 C.F.R. § 320.4(r) (emphasis added).

99.     As USEPA has informed the Corps: "Avoidance of wetlands [in the Peace River watershed] is important because mitigation in the form of recreating wetland and tributary systems is rarely able to replace the full range of functions and values of the impacted aquatic resource."

100.    The applicant's proposal—in which it avoids the destruction of Central Marsh but still proposes to destroy 480 acres of wetlands—was not the result of the Corps' consideration of mitigation but the result of the applicant losing the challenge to the state permit that was brought by Charlotte County.

101.    Nothing in the Environmental Assessment suggests the Corps ever independently examined the applicant's proposal that arose from this lawsuit (and subsequent settlement) in order to determine whether it was practicable for the applicant to avoid the destruction of additional wetlands.

102.    Thus, contrary to Corps regulations, the Corps never examined the applicant's proposal—which will result in the destruction of 480 acres of high-quality jurisdictional

wetlands—to determine if avoidance of wetlands beyond that proposed in its application was practicable.

103.   According to the applicant. the determination of whether it is economically feasible to mine a particular parcel is an economic decision that is market driven, and hinges on many factors such as ore richness. product grades. overburden ratios, pumping distances. reclamation type, and fertilizer demand/price.

104.   None of these factors were examined by the Corps to determine whether less intensive mining of the Altman Tract was practicable.

105.   Given the current status of the demand for fertilizer. the fertilizer demand/price factor is of particular interest.  By letter dated January 15, 2008. the applicant states:

> [O]ver the past two years ethanol has transformed the phosphate rock demand picture, giving farmers an incentive to grow more corn. which in turn requires soil supplements of phosphate based fertilizers.  The applicant stated that they expect demand for phosphate to exceed production over the same period last year.  A year ago. one ton of processed phosphate sold for S251 metric ton.  Today. the price is over S600 metric ton."

106.   The project was proposed three years ago.  The dramatic change in the fertilizer/demand price factor alone requires a hard look at whether the avoidance of additional wetlands is practicable.

**D. Failure to conduct an analysis of all reasonable/practicable alternatives.**

107.   The Corps failure to analyze whether additional avoidance of wetlands was practicable led directly to its failure to conduct an analysis of all reasonable/practicable alternatives.

108.   Under section 404(b)(1) of the Clean Water Act and the Corps implementing 404 Guidelines: "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic

ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 33 U.S.C. § 1344(a); 40 C.F.R. § 230.10(a)

109.    An alternative is considered "practicable" if it is "available and capable of being done after taking into consideration cost. existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

110.    Where an activity would involve destruction of wetlands and where said activity is not "water dependent," the regulations create a presumption that practicable alternatives not involving wetlands are available. unless clearly demonstrated otherwise. 40 C.F.R. § 230.10(a)(3).

111.    An activity is not water dependent if the project need not be sited within an aquatic site to fulfill its basic purpose. 40 C.F.R. § 230.10(a)(3).

112.    The Corps determined that the phosphate mining at issue is not a water dependent activity.

113.    When the proposed activity is not "water dependent." the burden of proving that a given alternative to the proposed project is not practicable remains on the applicant.

114.    The Corps duty under NEPA and its implementing regulations is to consider and discuss all alternatives reasonably related to the purposes of the project in reasonable detail.

115.    The Project Purpose as described by the Corps in the Environmental Assessment is: a) to extract phosphate ore; and b) to extract phosphate ore from a parcel of land within the existing Four Corners Mine and Lonesome Mine in proximity to existing mining infrastructure such as clay settling areas, beneficiation plants. and transportation corridors located within Manatee County, Florida.

116.    The applicant proffered six alternatives that were considered by the Corps: 1) use of an offshore site; 2) use of an out-of-state site: 3) use of an alternative site in Florida; 4) use of an upland site which would provide the equivalent reserve tonnage as the Altman Tract within a practicable distance from the existing and permitted infrastructure (*i.e.*, within a ten mile radius of the Four Corners Plant); 5) use of the Altman Tract but avoiding all wetland impacts and mining only uplands; and 6) the no-action alternative.

117.    The Corps agreed with the applicant's analysis that there was no reasonable alternative other than the mining of the Altman Tract as proposed which requires the destruction of 480 acres of high quality uplands.  It rejected the alternatives for the following reasons:

a)  The use of offshore phosphate deposits was rejected because no technology exists to mine it:

b) The use of out-of-state sites was rejected due to transportation costs and technological issues:

c)  The use of an upland site which would provide the equivalent reserve tonnage as the Altman Tract within a practicable distance from the existing and permitted infrastructure (within a ten mile radius of the Four Corners Plant) was rejected because not such site existed – all sites analyzed either had low tonnage or were not available – all of which was known to Mosaic at the time this alternative was proposed;

d) The use of the Altman Tract but avoiding all wetland impacts and mining only uplands was rejected because there are high quality phosphate deposits on the tract. the Altman Tract is a very significant part of Mosiac's mining plans. and wetland impacts cannot be avoided altogether:

6)  The no-action alternative was rejected because "there is no available substitute for phosphate."

118.    The Corps failed to examine the most obvious reasonable and practicable alternative which was to permit the mining of the Altman Tract in a less intensive manner.

119.    Because it never considered whether additional avoidance was practicable, the Corps failed to consider the alternative of permitting mining of the Altman Tract when it conducted its analysis of alternatives pursuant to the 404(b) Guidelines.

120.    The applicant bears the burden of clearly demonstrating this alternative is not available and its has failed to carry this burden.

121.    The applicant has stated that the determination of whether it is economically feasible to mine a particular parcel is an economic decision that is market driven, and hinges on many factors such as ore richness, product grades, overburden ratios, pumping distances, reclamation type, and fertilizer demand/price.

122.    None of these factors were examined by the Corps to determine whether less intensive mining of the Altman Tract was a practicable alternative.

123.    As stated above, given the current status of the demand for fertilizer, the fertilizer demand/price factor is of particular interest. By letter dated January 15, 2008, the applicant states:

> [O]ver the past two years ethanol has transformed the phosphate rock demand picture, giving farmers an incentive to grow more corn, which in turn requires soil supplements of phosphate based fertilizers. The applicant stated that they expect demand for phosphate to exceed production over the same period last year. A year ago, one ton of processed phosphate sold for $251 metric ton. Today, the price is over $600 metric ton."

124.    The project was proposed three years ago. The dramatic change in the fertilizer/demand price factor alone requires a hard look at whether the project purpose can be achieved through a less intensive but still economical, mining alternative.

### E.  Failure to adequately analyze the cumulative impact of phosphate mining on the Peace River basin.

125.    NEPA requires that the Corps examine the "cumulative impact" of mining the Altman Tract, meaning "the impact on the environment which results from the incremental

impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Thus cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

126.    Thus, under NEPA, the Corps has a duty to conduct an independent analysis to determine whether the cumulative impact of mining on the Altman Tract combined with the direct and indirect impacts of all past, present, and reasonably foreseeable mining will have a significant impact on the environment.

127.    Corps regulations require the Corps to perform a "case-by-case evaluation of a specific project" in accordance with certain procedures and "a determination that the proposed discharge is in the public interest." 33 C.F.R. § 323.2(g).

128.    This determination also requires an analysis of cumulative impacts because the Corps' determination of whether to issue a permit must be "based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4.

129.    The Corps must also: (1) make a determination that any damage to environmental resources is outweighed by benefits of altering those resources; (2) evaluate the cumulative effect of the alteration to a wetland in the context "that it may be part of a complete and interrelated wetland area;" and (3) give due consideration to the effect of the proposed activity on values associated with wild and scenic rivers and estuarine sanctuaries. See 33 C.F.R. § 320.4(a), (b), (e).

130.    Thus, under both the CWA and NEPA, the Corps must conduct an independent analysis of the cumulative impacts of mining the Altman Tract.

**Improper "Tiering" to a Non-NEPA Document**

131.    However, instead of performing an independent cumulative impact analysis, the Corps summarizes the cumulative impact analyses contained in the a 2002 Draft Environmental Impact Statement for Mosaic's Ona Mine in Hardee County.  By this means, the Corps attempts to "tier" the cumulative impact analysis in this documents and thus eliminate the need to conduct an independent cumulative impact analysis in the Environmental Assessment for the Altman Tract.

132.    "Tiering" refers to the coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analyses." 40 C.F.R. § 1508.28.  Tiering, or avoiding detailed discussion by referring to or summarizing another document containing the required discussion, is expressly permitted by federal regulation.  40 C.F.R. § 1502.20.

133.    What is not permitted, for obvious reasons, is for an agency to "tier" to a document that has not itself been subject to NEPA review.

134.    A Draft EIS—which as a draft document lacks legal effect—qualifies as a document that has been subjected to NEPA review.  The Corps' attempt to avoid its responsibility to perform an independent cumulative impact analysis by tiering to a non-NEPA documents is violative of CEQ rules.

**The Non-NEPA Documents Also Fail to Adequately Analyze Cumulative Impacts**

135.    The potential for cumulative impacts due to the past, present, and reasonably foreseeable future strip mining in both the Horse Creek watershed and in the Peace River basin is substantial.

136.    As pointed out in the public comments. the Altman Mine permit was proposed at a time when five other mine approvals were pending. representing as much as 100 square miles. A recent economic analysis on Mosaic's Ona Mine concludes that. over the course of the next several decades, 140.000 acres will be strip mined for phosphate in Hardee County alone.

137.    In the Horse Creek watershed there are approximately 20.000 acres of past and present mining projects, another 30.000 acres are in the permitting process. and another 30-50,000 acres of mines are reasonable foreseeable.

138.    The Altman Tract contains all that is left of the headwaters of Horse Creek.

139.    As explained by USEPA, what is at risk is a watershed used as a drinking water source for 250.000 people. and one which is largely responsible for maintaining the ecological integrity of the Charlotte Harbor estuary.

140.    However, rather than conduct the specific, case-by-case analysis required by Corps regulations, the Corps chose to rely upon the information in a six year-old Draft EIS for a different mine for its NEPA cumulative impacts analysis. The analysis in that Draft EIS is inadequate for the following reasons:

**Failure To Adequately Analyze Cumulative Impacts To Wetlands**

141.    The Draft EIS concludes that there will be minimal, if any. cumulative impacts to wetlands as a result of mitigation (*i.e.,* through reclamation) although it never describes the existing. pending. and reasonably foreseeable phosphate mines in the Peace River watershed.

142.    This conclusion that cumulative impacts will be minimal is fatally flawed by the Corps failure to disclose and discuss the scientific uncertainty surrounding the ability of the applicant to actually replicate the full functions and values of the natural wetlands.

143.     The Corps fails to report that Draft EIS also states that the applicant has failed to demonstrate the ability to recreate many categories of wetlands and uplands to the satisfaction of certain team/regulatory agency members.

144.     Disclosure and discussion of this scientific uncertainty is all the more important given that: 1) the entirety of reclamation efforts in the Horse Creek basin (and for that matter the Peace River watershed) is going to be conducted by this applicant; 2) that the lands involved in the permitted, proposed and reasonably foreseeable phosphate mining permits involve hundreds of thousands of acres.

145.     Since the Corps has admitted that future studies are needed to determine if replicated wetlands do more than simply look the part, the Corps can neither reasonably nor rationally rely on a cumulative impact analysis that bases its claim of minimal impacts on the conclusion that all reclaimed wetlands will function as well, or better, than natural ones.

146.     Nor, given this failing, can the Corps reasonably and rationally rely upon the Draft EIS's discussion of cumulative impacts to biological, and wildlife resources.

**Failure to Adequately Discuss Cumulative Impacts on Water Resources**

147.     The Corps 404(b)(1) Guidelines require a factual determination of cumulative impacts on water resources.

148.     For this analysis the Corps relied almost entirely on a report on a Florida Department of Environmental Protection's cumulative impact study.  The report examines the effects of past land use changes.  It contains no evaluation of cumulative impacts resulting from reasonably foreseeable future mining which has been estimated to encompass 140,000 acres of additional mines in Hardee County in areas which have never been subject to phosphate mining.

149.     The lands slated for mining in the future are south of the traditional phosphate mining lands and thus are closer to the Charlotte Harbor estuary.

150.     In the Recommended Order from the state hearing on the Altman Tract the ALJ finds that:

a)  phosphate mining has contributed to decreased flows in the Peace River;

b)  the proposed Altman Mine will decrease flows in Horse Creek to some extent;

c)  as mining moves south more runoff will be captured since unit rate of runoff is higher in the lower Peace River basin than Upper Peace basin due to different soil conditions

151.     Phosphate mining is a major user of groundwater.

152.     Surface flows depend on both rainfall and "base flow."—groundwater that enters surface water streams.

153.     On the cumulative effect of ground water impacts, the Environmental Assessment states: "The issue of water consumption has a short-term answer but will continue to be unanswered . . . until a means of measurement of all water is devised, the question of consumption will remain speculative."

154.     The Corps cannot reasonably and rationally make a finding that the phosphate industries' use of groundwater will have minimal cumulative impact on aquatic resources on the basis of a report which provides no analysis of future impacts and a finding that the phosphate industries' consumptive use of groundwater is speculative.

### E. Due to the Corps' inadequate analysis and arbitrary decision, an EIS is required by NEPA.

155.     NEPA requires federal agencies to prepare a detailed Environmental Impact Statement for every major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

156.    Significance of potential impacts from the Altman mine must be measured against ten specified criteria.  40 C.F.R. § 1508.27.

157.    If the impact of the proposed action is found to be significant according to any one of these factors, the agency must prepare an EIS before proceeding with the project.

158.    Under NEPA, the Corps is charged with making a "convincing case" for issuing a finding of no significant impact.

**The Degree to Which the Project Poses Unknown Risks**

159.    The Corps must examine the degree to which the possible effects on the human environment are highly uncertain or involve unknown risks.  40 C.F.R. § 1508.27(b)(5).

160.    As described above, the Corps failed to disclose the substantial scientific debate surrounding the ability of the applicant to recreate wetlands that provided the full functions and value of the impacted resource.

161.    The risk is to an ecologically critical area – the Charlotte Harbor estuary.  40 C.F.R. § 1508.27(b)(3).

162.    The Corps cannot make a convincing case that a project poses no unknown risk on the basis of an inadequate analysis as to whether such risks exist.

163.    Standing alone, the failure to address the uncertainty associated with the proposed reclamation plan and future reclamation plans warrants a full Environmental Impact Statement on the Altman project.

**Reasonable Anticipation of Cumulatively Significant Impacts**

164.    The Corps must determine whether there will be cumulatively significant impacts. Significance cannot be avoided by terming an action "temporary."  40 C.F.R. § 1508.27(b)(7).

165.    The Corps failed to disclose the substantial scientific debate surrounding the ability of the applicant to recreate wetlands that provided the full functions and value of the impacted resource.

166.    The Corps cannot make a convincing case that a project will not create cumulative impacts on the basis of an inadequate analysis of those impacts.

**The Degree to Which the Action May Establish Precedent for Future Actions**

167.    Numerous mine proposals are either pending or reasonably foreseeable in the Creek basin and the Peace River basin as a whole. These proposals involve well over a 100,000 acres of land, in the watershed of a river that serves a drinking water source for 250,000 people and as the major freshwater inflow to the Charlotte Harbor estuary.

168.    Each of these proposals will necessarily involve the identical issues presented in this permit application. The fact that the decision made in this application will set significant precedent for numerous future projects warrants a full Environmental Impact Statement.

## CLAIMS FOR RELIEF

### COUNT I

## VIOLATIONS OF THE NATIONAL POLICY ACT AND THE ADMINISTRATIVE PROCEDURE ACT

169.    Plaintiffs hereby incorporate all preceding paragraphs of this complaint and all allegations contained within them.

170.    The Corps violated NEPA and its implementing regulations. 40 C.F.R. § 1500, *et seq.*. and the Administrative Procedure Act ("APA"), because it:

a) Failed to give the public an adequate opportunity for informed comment:

b) Failed to disclose or examine scientific controversy and uncertainty surround the applicant's proposed reclamation scheme:

c) Failed to conduct an analysis of all reasonable alternatives

d) Failed to adequately analyze the cumulative impact of phosphate mining on the Peace River basin;

5) Failed to make a convincing case that the proposed project would not significantly impact the human environment

171.    Accordingly, the Defendant's failure to comply with NEPA and its implementing regulations and its finding of no significant impact is arbitrary, capricious, and not in accordance with the law, and thus violates the Administrative Procedure Act. 5 U.S.C.A. § 706.

## COUNT II

### VIOLATIONS OF THE CLEAN WATER ACT AND IMPLEMENTING REGULATIONS

172.    Plaintiffs hereby incorporate all preceding paragraphs of this complaint and all allegations contained within them.

173.    The Corps violated the CWA and its implementing regulations, 33 C.F.R. § 320, *et seq.*; and 40 C.F.R. § 230, *et seq.,* and the Administrative Procedure Act ("APA"), because it:

a) Failed to provide a public hearing.

b) Failed to conduct an analysis as to whether the project avoids the destruction to the extent practicable;

c) Failed to conduct an analysis of all practicable alternatives;

d) Failed to adequately analyze the cumulative impact of phosphate mining on the Peace River basin.

174.    These violations of the Clean Water Act and the APA by the Corps threaten the Plaintiffs with irreparable injury for which they have no adequate remedy at law.

175.   Therefore, Plaintiffs are entitled to injunctive relief set forth in the prayer to prevent injury to themselves and the public.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Sierra Club, Manasota-88, the Gulf Restoration Network, and People for Protecting Peace River, respectfully request this Honorable Court to enter the following relief:

> (1) a declaration that the U.S. Army Corps of Engineers violated the National Environmental Policy Act and the Administrative Procedure Act in its finding of no significant impact for the Altman Mine EA;

> (2) a declaration that the U.S. Army Corps of Engineers' failure to prepare an EIS on the Altman Mine Permit was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law in violation of the APA;

> (3) a declaration that the U.S. Army Corps of Engineers' issuance of a Clean Water Act permit to Mosaic Fertilizer, Inc. for fill and mitigation activities violates the CWA and was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law in violation of the APA;

> (4) an injunction stopping the Altman Mine Permit from being implemented until Defendants fully comply with requirements of the National Environmental Policy Act and the Clean Water Act;

> (3) an award of litigation costs, including reasonable attorneys' fees, incurred in connection with this action, as authorized in the Equal Access to Justice Act, 28 U.S.C.A. § 2412(d), and section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

(4) any other relief this Court deems necessary and just to effectuate a complete

resolution of the legal disputes between Plaintiffs and Defendants.

Respectfully submitted on this 28th day of July, 2008.

Monica K. Reimer
Fla. Bar. No. 0090069
TRIAL COUNSEL FOR PLAINTIFFS
David G. Guest
Fla. Bar No. 0267228
P. O. Box 1329
Tallahassee, Florida  32302
(850) 681-0031 (Telephone)
(850) 681-0020 (Facsimile)

COUNSEL FOR PLAINTIFFS