# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

SIERRA CLUB, INC., MANASOTA-88, INC.,
GULF RESTORATION NETWORK, INC.,
PEOPLE FOR PROTECTING PEACE
RIVER, INC., and ENVIRONMENTAL
CONFEDERATION OF SOUTHWEST
FLORIDA, INC.,

   Plaintiffs,

v.             Case No. 3:08-cv-750-J-25TEM

U.S. ARMY CORPS OF ENGINEERS, and
COLONEL ALFRED A. PANTANO, JR.
Commanding District Engineer,
U.S. Army Corps of Engineers,
Jacksonville District,

   Defendants,

and

MOSAIC FERTILIZER, LLC,

   Intervenor Defendant.

_____/

## INTERVENOR, MOSAIC FERTILIZER, LLC'S CROSS MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

   Intervening defendant, Mosaic Fertilizer, LLC ("Mosaic"), by counsel and pursuant to Federal Rule of Civil Procedure 56, respectfully moves for summary judgment on all of Plaintiffs' claims.  Based on the record evidence before this Court, there are no genuine issues of material fact in dispute and, therefore, Mosaic is entitled to a judgment as a matter of law.

## I.      INTRODUCTION

The United States Army Corps of Engineers (the "Corps") issued a permit (the "Altman Permit") to Mosaic under section 404 of the Clean Water Act ("CWA"), which authorized Mosaic to extract phosphate minerals from its 2,367-acre property in Manatee County, Florida (the "Altman Tract") to support the world's demand for essential phosphate-based crop and animal feed nutrients.  The Altman Permit was issued after a process that took over three years in which the Corps extensively analyzed the environmental impacts— not once, but twice—and concluded that Mosaic's mining operations would not have a significant environmental impact.  Under the Altman Permit, Mosaic has legal obligations to preserve key areas of the Altman Tract and comply with a comprehensive mitigation and reclamation claim, which imposes stringent conditions and requirements to ensure, among other things, that the wetlands will not be significantly impacted.

Plaintiffs nevertheless persist in arguing that the Corps' decision, which is entitled to great deference, is arbitrary and capricious.  There is no meritorious basis for this contention. The over 69,000 page administrative record clearly demonstrates that the Corps (i) engaged in the requisite review under the CWA and the National Environmental Policy Act ("NEPA"), (ii) considered extensive documentary and testimonial evidence pertaining to the environmental effects of phosphate mining in the Altman Tract, (iii) engaged Mosaic to thoroughly address the concerns raised by the public (including Plaintiffs); and (iv) correctly exercised the authority and discretion conferred on it by Congress in issuing the Altman Permit to Mosaic.

There is only one reason for Plaintiffs' unwavering persistence: they want to completely halt Mosaic's phosphate mining, which provides a fertilizer product that is essential for our agricultural industry.  In an attempt to achieve this objective, Plaintiffs have (i) improperly "cherry picked" isolated documents and findings in the massive administrative

Greenberg Traurig, P.A.

record in an effort to make it appear that the Corps failed to comply with its legal obligations, (ii) misstated the law, and (iii) ignored the deleterious effect that their requested relief would have on the agricultural industry, and, ultimately, the world's food supply. Plaintiffs' complaint is, therefore, nothing more than an ill-conceived invitation for this Court to overlook the deference that must be afforded to the Corps and, instead, improperly conduct its own investigation and substitute its judgment for that of the agency.

## II.     FACTUAL BACKGROUND

### A.     The Critical Role of Phosphate.

Phosphate—essential for plant growth, crop production, and livestock health—is a limited resource for which there is no substitute. [Administrative Record ("AR") 69017, 56976-77]. Most of the world's food supply is derived from crops that have been nourished with manufactured fertilizer, in which phosphate is the major component.[1] [AR 69017; 56976-77]. Mosaic—the world's leading producer and marketer of phosphate-based crop nutrients and animal feed ingredients—plays a vital role in this process. [AR 34224]. Without sufficient resources to mine, the United States supply of phosphate would be severely impacted ultimately resulting in food shortages or substantial increases in price. [AR 69018]. Moreover, dependence on foreign supply would render the U.S. chemical fertilizer industry noncompetitive in both the domestic and world markets. [AR 56978, 69018].

Only a limited number of mineable phosphate reserves have been identified. [AR 69012]. Importantly, Central Florida contains some of the most economically accessible phosphate reserves in the United States. [AR 56976-78; 69012]. The Florida Legislature

---

[1]     Nobel Peace Prize winner, Dr. Norman Borland, made the following comment regarding the importance of fertilizer, "This is a basic problem, to feed 6.6 billion people. Without chemical fertilizer, forget it. The Game is over." The Fertilizer Institute, Fertilizer's Role in World Food Production (June 2008). [AR 56976].

recognizes the global role of the phosphate market and has declared that "[t]he extraction of phosphate is important to the continued economic well-being of the state and to the needs of society." § 378.202, Fla. Stat.; [AR 56978].

Currently, Mosaic conducts the majority of its United States mining activities in Central Florida. [AR 69013]. In addition to providing thousands of jobs in this state, Mosaic's mining operations generate substantial revenue for Florida and its residents through taxes, salaries, and the purchase of goods and services. [AR 69018-19]. Allowing mining at the Altman Tract would, among other things, (i) maintain 520 jobs at the Four Corners plant with a payroll exceeding $23 million; and (ii) generate a total of approximately $17 million in severance taxes from mine associated properties owned by Mosaic in Manatee, Polk, and Hillsborough Counties. [AR 56978-79; 69045].

**B.      The Altman Tract.**

The Altman Tract is a proposed expansion of the Four Corners Mine in Manatee County, where Mosaic has been mining since the early 1980s. [AR 33424]. It consists of 1,477 acres of uplands and 890 acres of wetlands and is particularly valuable because it contains high-quality phosphate. [AR 69012-17; AR 04881]. Mining reserves at the Altman Tract will facilitate the operation of the Four Corners Mine over a 10-year period. [AR 56979; 69013]. Moreover, the Altman Tract is ideally situated adjacent to the Four Corners Mine, which allows Mosaic to avail itself of the draglines, processing sites, pipelines, plant, electrical transmission lines, clay settling areas, access roads, and other infrastructure already in place.[2] [AR 69013-16]. Ultimately, mined phosphate from the Altman Tract would

---

[2]      Conventional open cast strip mining, which would be employed on the Altman Tract, requires a costly and extensive infrastructure to operate efficiently. [AR 03592; AR 69013-16]. During this process, draglines excavate and stockpile the overburden on site. [AR 03592]. The underlying phosphate-bearing matrix is then "excavated, slurried with recycled water and pumped to a washer and/or beneficiation plant for processing." [AR 56980-81; 03592]. Mining at locations with no ready access to such infrastructure would present serious logistical problems and be prohibitively expensive. [AR 69014-16; AR 69021-22].

provide fertilizer for over 169 million acres of corn in the Midwestern United States.  [AR 33465].

### C.   The Permit Application.

#### 1.   The Four Corners and Lonesome Mine Project.

On an as-needed basis throughout the early 1990s, Mosaic applied for and received numerous permits from the Corps for phosphate mining.  [AR 33424].  In the late 1990s, the Corps altered its piecemeal application process and directed Mosaic to submit a cumulative review of all 30,000 acres remaining to be permitted at the Four Corners Mine (including the Altman Tract) and the adjacent Lonesome Mine.  [AR 33424].  Mosaic complied with this directive and, after conducting a two year review, the Corps issued the permits for the Four Corners Mine in February of 2002.  However, no permit was issued for the Altman Tract because the required Florida Department of Environmental Protection ("FDEP") permit had not yet been issued.  [AR 33424].  Accordingly, the Altman Permit was held in abeyance pending issuance of that permit.  [AR 33424].

#### 2.   The FDEP Permit Process

Mosaic submitted its permit application for the Altman Tract to the FDEP in 2000.  [AR 33425].  After a two year review, the FDEP published a Notice of Intent to Issue the permit.  [AR 33425].  Charlotte County challenged its issuance and after a three week administrative hearing, the Administrative Law Judge ("ALJ") recommended that the FDEP deny Mosaic's permit application.[3]  [AR 02343-516].  FDEP concurred and denied the permit on September 15, 2003.  [AR 33425].

In 2004, Mosaic submitted a revised application to FDEP, which significantly reduced the impacts to wetlands, included additional preservation measures, and modified the

---

[3]     The Peace River/Manasota Water Supply Authority ("PRMWSA") also challenged the permit. However, it subsequently reached an agreement with Mosaic that addressed its concerns and withdrew its petition.  [AR 33425].

Greenberg Traurig, P.A.

scope of the permit: a total of 526.9 acres would be left unmined (for which the state would receive a conservation easement) and impacts to herbaceous and forested wetlands were reduced by 34 and 22 percent, respectively.  [AR 03642].  Moreover, Mosaic will spend approximately $4.4 million to create 521.2 acres of jurisdictional mitigation wetlands and 41 acres of wetlands to compensate for isolated wetland impacts.  [AR 03642; 03577; 03597].  In addition, the revised application included (i) extensive additional wildlife surveys and fish sampling that provided assurances for preservation and availability of alternative habitats; (ii) a revised Wetland Rapid Assessment Procedure ("WRAP") to ensure that there would be no net loss in wetland acres or function; (iii) a thorough description of how water quantity, quality, hydroperiod, and habitat would be maintained in onsite wetlands and other surface waters would be preserved or remain undisturbed; and (iv) a comprehensive mitigation plan encompassing maintenance and protection of regional water resources, a balance of land uses and protection, and replacement of critical native plant and animal habitats.  [AR 03561-598].  After a comprehensive review of the revised application, FDEP issued the permit on June 13, 2006.  [AR 33427].

   **D.    The Corps' Review and Issuance of the CWA Permit.**

   On October 31, 2005, while the FDEP permit application was pending, Mosaic applied for the Altman Permit, seeking approval from the Corps to conduct phosphate mining operations on the Altman Tract over a 10-year period.  [AR 02688-03664].  The Corps issued a public notice, which stated that the "preliminary view of this application indicates that an Environmental Impact Statement will not be required."  [AR 04880-895].  In response to the public notice, Plaintiffs, as well as other organizations and individuals, submitted comments raising various concerns, and, in some cases, requesting a public hearing.  [AR 05025-30; 05484-89; 05491-28182; 28186-411; 28413-14; 28418-19].  Mosaic responded to these comments in detail.  [AR 28594-675].

Over the next two years, the Corps evaluated the materials submitted by Mosaic, including Mosaic's comprehensive mitigation and reclamation plan, and conducted a thorough analysis of the potential environmental impacts and possible reasonable cumulative impacts within the Peace River Basin.  [AR 33424-785].  During its review, the Corps requested additional information relating to environmental impacts, which Mosaic responded to in detail.  [AR 31693-33231].

On April 30, 2008, the Corps issued an Environmental Assessment and Statement of Finding for the Altman Tract, concluding that "this permit action will not have a significant impact on the quality of the human environment" and, as a result, an Environmental Impact Statement was not necessary.  [AR 33424-33785].  The Corps further concluded that a public hearing would not be necessary because Mosaic "successfully addressed the issues raised" by the parties seeking the hearing.  [AR 33561].  On May 2, 2008, the Corps issued the Altman Permit, which included seven pages of conditions setting forth compliance timelines and thresholds as an additional measure to ensure the success of the mitigation efforts.  [AR 33795-34122].

**E.    The Lawsuit and the Corps' Subsequent Review of the Permit.**

Plaintiffs subsequently filed this action against the Corps (and its Commanding District Engineer) for declaratory and injunctive relief, challenging the Corps' issuance of the Altman Permit and seeking to enjoin its implementation.  Shortly after the action was filed, the Corps determined that it was "in the public interest to revisit the analysis in support of the permit decision," and suspended the permit.  [AR 34220-23].  This action was stayed pending the Corps' review.  [Dkt. No. 22].

Over the next seven months, the Corps reevaluated its findings and analyzed additional information, which included three separate submittals by Mosaic, concerning four main areas:  (i) purpose and need of the proposed project; (ii) alternatives analysis; (iii)

Greenberg Traurig, P.A.

cumulative impact analysis; and (iv) reclamation standards and procedures.  [AR 34225-69102].   Among other things, the Corps (i) analyzed additional information "to independently judge the purpose and need of the proposed project and to effectively analyze the alternatives provided;" (ii) "provided a comprehensive discussion on the private and public need of the Altman Tract, which was lacking in the original 2008 EA/SOF;" (iii) gathered and evaluated extensive additional information regarding available alternatives (logistics, cost, and technology), which substantiated the Corps' finding that the Altman Tract was the "least environmentally damaging practicable alternative;" (iv) reevaluated the cumulative impact analysis, determining that the Horse Creek Basin (rather than the entire Peace River Basin) was the more appropriate geographical scope; and (v) reevaluated the reclamation process.  [AR 34225-69102].

The Corps detailed its findings in a comprehensive 62-page supplemental Environmental Assessment and Statement of Finding issued on May 1, 2009.  [AR 69008-102].  After its extensive analysis, the Corps again found that "this permit action will not have a significant impact on the quality of the human environment" and reinstated the Altman Permit, effective immediately and with no additional conditions or obligations.  [AR 69069].  Following the reinstatement of the Altman Permit, the stay of this action was lifted.  [Dkt. No. 26].  Plaintiffs then amended their complaint[4] and subsequently filed their motion for summary judgment requesting that the Court find that the Corps' issuance of the Altman Permit violated CWA, NEPA, and APA.

## III.    STANDARD OF REVIEW

The Administrative Procedures Act ("APA") only allows a reviewing court to set aside a Corps' decision if the granting of the permit was "arbitrary, capricious, an abuse of

---

[4]      The parties' cross motions for summary judgment are based on the allegations set forth in Plaintiffs' Third Amended Complaint.

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). A court cannot reweigh the evidence or "substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 542 (11th Cir. 1996). The Eleventh Circuit has held that this standard of review is "**exceedingly deferential**." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (emphasis added). This is because agencies charged by Congress with interpreting and enforcing particular statutes have expertise that the courts do not. *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 651-52 (1990). In fact, courts accord particular deference to an agency's informed decision where—as here—issues of science, technical expertise, or complex environmental statutes are involved. *Sierra Club v. U.S. Army Corps of Eng'rs,* 464 F.Supp.2d 1171 (M.D. Fla. 2006).

## IV.   OVERVIEW OF APPLICABLE STATUTES

### A.   Overview of NEPA.

The CWA prohibits the discharge of any dredged or fill material into navigable waters unless authorized by a permit. 33 U.S.C. § 1344. The Corps is charged with overseeing the CWA permit process to ensure that discharges will not have an unacceptable environmental impact. Therefore, before the Corps can take action with regard to a permit application, it is required to follow procedures established by NEPA. Importantly, NEPA only requires that the Corps follow specified procedures; it does not mandate a particular substantive result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Under NEPA, agencies are required to prepare an EA containing sufficient evidence and analysis to determine whether the project's effect on the human environment is significant. The EA will either (i) conclude that an Environmental Impact Statement ("EIS") is necessary because the proposed project significantly affects the quality of the human environment; or (ii) make a finding of no significant impact ("FONSI"), in which case, no

Greenberg Traurig, P.A.

further study of environmental consequences is necessary.  42 U.S.C. § 4332.  Here, the Corps determined that an EIS was not required.

**B.      Overview of the CWA**

The Court must consider Plaintiffs' CWA claims through the same deferential lens of the APA applicable to the NEPA analysis.  *Van Antwerp,* 526 F.3d at 1363.  The Corps may grant a permit to place fill in waters when, after considering a wide range of factors, it determines that the benefits of the project outweigh any harm to the resource.  33 C.F.R. § 320.4(a).  In making this "public interest" determination, the Corps' role is to balance the need for the project, as defined by the applicant, against the environmental harm.  *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989).  The agency is in the best position to determine which impacts are relevant to performing the balance.  *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).  Importantly, if the Corps finds that the permit application complies with the 404(b)(1) guidelines, the Corps must issue the permit "unless the district engineer determines that it would be contrary to the public interest."  33 C.F.R. § 320.4(a)(1).

**V.      ARGUMENT**

The Eleventh Circuit applies the following four-part test to determine whether the agency's decision not to prepare an EIS is arbitrary and capricious.  First, the agency must have accurately identified the relevant environmental concern.  Second, it must take a "hard look" at the problem.  Third, the agency must make a convincing case for a finding of no significant impact.  Fourth, if the agency does find an impact of true significance, preparation of an EIS can only be avoided if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.  *Hill v. Boy*, 144 F.3d 1446 (11th Cir. 1998).

Plaintiffs allege in their complaint that the Corps violated NEPA and APA (Count I) when it issued the Altman Permit because it (i) failed to take a hard look at the problem; (ii) failed to make a convincing case that the proposed project would not significantly impact the

Greenberg Traurig, P.A.

human environment, including an analysis of the cumulative impacts of phosphate mining; (iii) failed to consider and analyze reasonable alternatives; and (iv) failed to provide the public with an adequate pre-decisional opportunity for informed comment.   In addition, Plaintiffs claim that the Corps violated the CWA (Count II) by (i) failing to provide a public hearing; and (ii) failing to conduct an analysis of all practicable alternatives.   Plaintiffs have the burden of proof to demonstrate that the Corps failed to comply with these requirements. *See Georgia River Network v. U.S. Army Corps of Eng'rs*, 334 F.Supp.2d 1329 (N.D. Ga. 2003).   Plaintiffs failed to do so.   Accordingly, Defendants are entitled to a summary judgment on all of Plaintiffs' claims.

### A.    THE CORPS MET ITS HARD LOOK REQUIREMENT UNDER NEPA.

An agency meets its "hard look" requirement if it has examined the relevant data and articulated a satisfactory explanation for its action including a "rational connection between the facts found and choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto Ins. Co.,* 463 U.S. 29, 43 (1983); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002).   That is exactly what was done here.   Indeed, there are over 69,000 pages of record that substantiate the long process of fashioning the Altman Permit to maximize protection of wetlands and minimize other impacts.   *Sierra Club*, 464 F.Supp.2d at 1223 (M.D. Fla. 2006).

This Court cannot overturn the Corps' decision as arbitrary and capricious under "hard look" review unless it determines that (i) the decision does not rely on the factors that Congress intended the Corps to consider; (ii) the Corps failed entirely to consider an important aspect of the problem; (iii) the Corps offered an explanation which runs counter to the evidence; or (iv) the decision is so implausible that it cannot be the result of differing viewpoints or the result of the Corps' expertise.   *Id*.   None of these factors are present here.

11

In fact, Mosaic has undergone an almost 10 year process to obtain the necessary state and federal permits. During this time, both state and federal agencies have carefully evaluated Mosaic's mining plan to ensure that impacts would be minimal, including comprehensive review of scientific and other data, consideration of expert opinions, and response to public concerns. When Mosaic submitted its section 404 permit application, it had already participated in a lengthy state administrative hearing and made extensive revisions to its mining plan, including the proposed mitigation and reclamation plan, to satisfy the concerns of the reviewing agencies and public. The Corps then undertook a comprehensive review—not once, but twice—to ensure compliance with NEPA, APA, and CWA. Clearly, the Corps' actions were not arbitrary or capricious.

### B. THE CORPS MADE A CONVINCING CASE THAT THE PROJECT WOULD NOT SIGNIFICANTLY AFFECT THE ENVIRONMENT.

Plaintiffs contend that mining of high quality wetlands on the Altman Tract significantly affects the quality of the environment. This is not so. After comprehensive review of the mitigation and reclamation plan, and other relevant data, the Corps concluded that "there will be **no** net loss of wetland function."[5]   [AR 69043] (emphasis added). In reaching its determination, the Corps utilized its expertise to evaluate and consider highly technical and scientific data and made a well-supported decision. *Sierra Club*, 464 F. Supp. 2d at 1182 (courts accord particular deference to an agency's informed decision "where issues of science, technical expertise or complex environmental statutes are involved."). The Corps' findings must be afforded the substantial deference that the law requires.

---

[5]   Plaintiffs claim, citing to the EA, that "the Corps' regulations and the 'no net loss policy' require, at a minimum, a one to one acre "functional replacement" of destroyed wetlands. (Plaintiffs' Motion for Summary Judgment and Incorporated Memorandum of Law (Dkt. 43) ("Motion") at p. 7) (emphasis added). In actuality, the EA states that "[f]or wetlands the objective is to provide, at a minimum, one-to-one functional replacement," *i.e.*, no net loss. [AR 33527]. This is consistent with the Corps' policy, which is to "achieve a goal" of no overall net loss of values and functions to wetlands. 55 Fed. Reg. 9210 (March 12, 1990)] (emphasis added). Further, the regulations expressly state that "no net loss of wetlands functions and values may not be achieved in each and every permit action." *Id.* (emphasis added).

1.     **Plaintiffs' reliance on the CEQ regulations to establish that the project "significantly affects the quality of the environment" is a red herring.**

The regulations promulgated by the Council on Environmental Quality ("CEQ") provide guidance on what agencies should consider when deciding whether an action has significant environmental impacts.   However, the CEQ regulations alone are not determinative.   Instead, whether significant impacts will occur is a factual inquiry that depends on all the circumstances of the proposed action, including mitigation and reclamation.   *Sierra Club*, 464 F.Supp.2d at 1224-25 (NEPA permits consideration of whether mitigation ameliorates impacts to a level below the EIS threshold of significance). Here, the Corps relied on mitigation and other special conditions of the permit to reach the determination that the environmental effects will be minimal.   It did not act arbitrarily or capriciously in doing so.   Plaintiffs' reliance on the CEQ regulations is nothing more than a "red herring."   As Plaintiffs have admitted, a finding of significance under the CEQ regulations does not end the inquiry.   [Motion at p. 11].   To the contrary, even when such a finding has been made, an EIS will not be required if the agency makes a convincing case— as it did here—that safeguards in the project sufficiently reduce the impacts to a minimum.

Indeed, Plaintiffs have failed to provide any concrete evidence showing that (i) there is a "substantial dispute" regarding Mosaic's ability to reclaim wetlands on the Altman Tract,[6] or (ii) that the effects of mining on the Altman Tract are highly uncertain or involve unique or unknown risks.  40 C.F.R. § 1508.27(b)(4); 40 C.F.R. § 1508.27(b)(5).  First, to establish that mining on the Altman Tract is "highly controversial," *i.e.*, there is a substantial dispute about the size, nature, or effect of a federal action, Plaintiffs rely on completely irrelevant facts, including, (i) findings made by the state administrative law judge ("ALJ"),

---

[6]     Sierra Club submitted comments stating that the project was "highly controversial" purportedly because "controversy has swirled around this project from its inception, leading to a contested state administrative case."   [AR 28189-90].   There is, of course, no support for its contention that a state administrative proceeding causes the project to be "highly controversial."

13

which have no binding effect whatsoever on the Corps' analysis of this project,[7] (ii) comments from the EPA and Hardee County Staff related to Mosaic's CWA application submitted in connection with mining activities on a <u>different</u> property; and (iii) the phosphate region-wide impact study currently being conducted, which has no bearing on the reclamation planned for the Altman Tract.  Thus, Plaintiffs have not met their burden.

And, even if they had, the law nevertheless dispenses with their argument.  Courts hold that no substantial dispute exists—even if controversy is present—if the record demonstrates that the agency has considered the dispute and addressed the public concerns. *Indiana Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003) (no controversy where scientific data addressed concerns related to reclamation).  That was clearly done here.  The Corps thoroughly considered all the information on wetland impacts, responded to public concerns and, after taking a "hard look" at this issue, made the determination that the mitigation and reclamation plan would minimize the wetland impacts to an acceptable level.  [AR 57007-20; 57108-110; 58175-76; 58196-58204; 587108-58113]. No significant controversy exists under these facts.

<u>Second</u>, Plaintiffs claim that the effects of mining on the Altman Tract are highly uncertain or involve unique or unknown risks because "an agency cannot use lack of existing information as a basis for acting without preparing an EIS."  [Motion at p. 10].  This argument is disingenuous.  In fact, Plaintiffs cite <u>no</u> support in the record for this argument. That is because its claim of "lack of existing information" is false.  The Corps relied on overwhelming evidence to evaluate Mosaic's proposed mitigation and reclamation plan.  [AR 58171-206; 57007-20; 57108-113].

---

[7]     Sierra Club's comments state that the proposed wetland reclamation plan is "uncertain" relying on the ALJ's findings and a draft environmental impact statement for a different project.  [AR 28190].  This is, of course, completely irrelevant.  After the ALJ issued its findings, Mosaic submitted its revised application that significantly reduced impacts to the wetlands and included additional preservation measures as well as a comprehensive mitigation plan.  [AR 03577; 03597].

Greenberg Traurig, P.A.

2.      **The Corps made a convincing case that safeguards in the project will sufficiently reduce the individual impacts to a minimum.**

The law is settled in this Circuit that when mitigation measures compensate for otherwise adverse environmental impacts, the threshold level of significant impacts is not reached.  *C.A.R.E. Now*, *Inc. v. F.A.A.*, 844 F.2d 1569, 1575 (11th Cir. 1988).  Courts hold that the "[t]he Corps' assessment of impacts to wetlands is obviously a technical matter that is within that agency's expertise," and its determination must, therefore, be afforded substantial deference.  *Florida Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F.Supp.2d 1116, 1155 (S.D. Fla. 2005).  In the Eleventh Circuit, if the Corps has "considered the impact on wetlands, considered the [subject] mitigation plan, and reasonably concluded that impact would not be significant," its decision is not arbitrary and capricious.  *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1248 (11th Cir. 1996).  That is exactly what the Corps did in this case.

Here, the proposed mitigation and reclamation plan is extremely comprehensive, and after a review, which included scientific data and studies, the Corps determined that there would be no net loss of wetlands.  [AR 33470-75, 33484, 69037-38].  Under Mosaic's mining plan, it will disturb 480.1 acres of jurisdiction wetlands and 35 acres of non-jurisdictional wetlands.  To mitigate, however, Mosaic will create 521.2 acres of wetlands to replace the jurisdictional wetlands and create 41 acres of wetlands to replace the isolated wetlands.  [AR 33435; 56991].  Among other things, to ensure minimization of wetland impacts, the Corps concurred with Mosaic's plan, which follows the Corps' Wetland Rapid Assessment Procedure ("WRAP") and provides a functional capacity estimate for the wetlands to be mined and the proposed wetlands to be created.  [AR 05032-481; 33527-28; 33569-82].  *Florida Keys Citizens Coal., Inc.,* 374 F.Supp.2d at 1156-57 (Corps' assessment of wetland impacts was supported where it relied on Estuarine Wetland Rapid Assessment Procedure).  Moreover, Mosaic's mitigation plan must meet specified performance standards

Greenberg Traurig, P.A.

within a 10 year monitoring period.  [AR 56991-92].  Mosaic will also undertake an extensive stream restoration program within 5 years.  [AR 56991-92].  In addition, Mosaic is granting a perpetual conservation easement for 550 acres on wildlife corridors that interconnect in three counties.  [AR 56992; 57112].

Not only is the Corps' support for the mitigation strategy well-supported, but the Corps also imposed seven pages of special conditions specifying compliance timelines and thresholds as well as detailed criteria to determine the success of the mitigation efforts.  [AR 33797; 33804; 33515-21; AR 28434-40].  By doing so, the Corps took extra steps to ensure the success of the mitigation measures and cannot be found to have acted arbitrarily and capriciously in doing so.  *See Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993) (Corps did not act arbitrarily or capriciously when it required applicant to implement mitigation plan that would create new wetlands and also required monitoring and supplemental mitigation measures if goals were not met); *Wetlands Action Network v. U.S. Army Corp. of Eng'rs*, 222 F.3d 1105, 1121-22 (9th Cir. 2000) (noting that special conditions ensured mitigation goals would be met).  Plaintiffs, however, have taken the untenable position that the Corps cannot rely on these special conditions as "proof of the efficacy of plan."  [Motion at p. 13].  In essence, Plaintiffs—whose entire complaint is premised on the alleged damage caused by Mosaic's mining activities—are now attacking the Corps' effort to ensure success of the mitigation, and claiming that these steps demonstrate that the Corps acted in an arbitrary and capricious manner.  Their contention is baseless.

Finally, the mere fact that there is some conflicting information regarding the functional capacity of the reclaimed wetlands does not make the Corps' decision an abuse of its discretion.  The law is settled that "when an agency base[s] a finding of no significant impact upon relevant and substantial data, the fact that the record also contains evidence

Greenberg Traurig, P.A.

supporting a different scientific opinion does not render the agency's decision arbitrary and capricious." *Wetlands Action Network,* 222 F.3d at 1120-1121.  Plaintiffs ignore this law and isolate their criticism of the Corps' approval of Mosaic's mitigation plan based on its reliance on the state reclamation plans.  According to Plaintiffs, "there is serious doubt . . . that those plans either prevent the loss of wetlands post-mining or result in reclaimed wetlands on the mined out lands that are functional equivalent of the natural wetlands that were destroyed." [Motion at p. 12].  Plaintiffs miss the point.  The mere fact that there is information that questions the success of these state reclamation plans does not make the Corps' decision arbitrary and capricious, particularly when there is overwhelming evidence in support of the mitigation strategy and special conditions to ensure its success.  [AR 57007-20; 58108-113; 58196-204].   Here, the Corps conducted a "serious and thorough evaluation of the environmental mitigation options for the Project to allow its analysis to fulfill NEPA's process-oriented requirements" and thus to survive the arbitrary and capricious standard of review.  *See Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 177 (5th Cir. 2000).

> **3.     The Corps has made a convincing case that safeguards in the project will sufficiently reduce cumulative impacts to a minimum.**

A cumulative impact is the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."  40 C.F.R. § 1508.7.  "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  *Id.*  Thus, an agency's EA must evaluate the total impacts and cannot isolate a proposed project.  Here, the Corps undertook an extensive review of the potential cumulative impacts in the Horse Creek Basin[8] as a result of past, present, and planned future mining activities, and reasonably concluded

---

[8]     The Horse Creek Basin is part of the larger Peace River Basin.  The Peace River watershed covers an area of approximately 2,350 square miles in nine counties.  [AR 56992].

that the cumulative impacts would not be significant.   Indeed, both the original and supplemental EA fully evaluated this issue based on the considerable information submitted. [AR 33524-62; 31702-05; 69043-68].

Despite the thorough cumulative impact analysis in the original EA, the Corps revisited its analysis after the permit was suspended stating,

> [T]he Corps should not have solely relied upon the information contained in the PRCIS[9] and Ona DEIS for the cumulative impact analysis.

[AR 69010].  In addition, in the Supplemental EA, the Corps determined that, based upon the site location and past, present, and future activities, the Horse Creek Basin—not the entire Peace River Basin—provided the more appropriate geographic scope for the cumulative impact analysis.  [AR 69010].  Consequently, the Corps obtained additional information in order to further analyze possible cumulative impacts in the Horse Creek Basin.  This included scientific data from multiple sources, which analyzed impacts to wetlands, water quantity, groundwater, water quality, biological resources, land use, and related socioeconomics.  [AR 56992-57020].  Based on this information, which it independently verified by requiring and evaluating additional information, the Corps concluded that there would be no cumulative impacts.  [AR 69041-69056, 56975-76; 58171-206].

The record demonstrates, among other things, that Mosaic's post reclamation activities on the Altman Tract will increase the amount of streams, while reducing the amount of ditched and cut waterways.  [AR 56994-95].  In addition, water quality studies conducted in connection with the Horse Creek Stewardship Program ("HCSP")[10] concluded

---

[9]     In 2003, the Florida Legislature directed FDEP to study the cumulative impacts in the Peace River Basin.  The Peace River Cumulative Impact Statement ("PRCIS") is the result of this study.  The complete PRCIS is contained in the record.  [AR 28705-30949].

[10]     Beginning in 2003, Mosaic initiated the HCSP, which is an aggressive environmental water quality monitoring and reporting program.  [AR 31710-11].  Reports prepared in connection with the HCSP are contained in the record.  [AR 54372-918; 54996-55168].

that "there have been no deleterious cumulative impacts due to mining."  [AR 56999]. Moreover, multiple comprehensive studies performed by scientists have also confirmed that the disturbed wetlands on the Altman Tract could be successfully reclaimed.[11]  [AR 57007-20; 57108-111].  In fact, Mosaic has a history of being able to successfully reclaim wetlands, and has received numerous awards for its past successes.  [AR 57017-18].  Moreover, since 1998, the Corps has released 1,903 acres of mitigation wetlands reclaimed by Mosaic following its mining activities, which further demonstrates Mosaic's success.  [AR 57019].

In essence, the Corps considered the effects of relevant past and present activities in the Horse Creek Basin and the reasonably foreseeable future impacts, including all of Mosaic's projects planned within the Horse Creek watershed.[12]  [AR 69061].  While the Corps recognized the need for phosphate rock would "exert demands on water quality and fish and wildlife values," it concluded based on its comprehensive review and the planned mitigation and reclamation, that mining on the Altman Tract "should not contribute or result in cumulative adverse impacts to the aquatic environment or the human environment."  [AR 69064].

Notwithstanding these facts, Plaintiffs contend that the Corps "failed to make a convincing case" because it relied on state regulatory requirements as part of its cumulative impact analysis when the 2007 Peace River Cumulative Impact Study ("PRCIS") found the state regulatory system has "failed to minimize cumulative impacts."  [Motion at pp. 13-15]. Plaintiffs' argument distorts the facts and ignores the other significant information the Corps

---

[11]     Studies on wetland impacts are located throughout the record.  [*See, e.g.,* AR 03383-471; 31692; 41208-221; 42051-52; 44905-912; 45665-66; 47622-25; 48079-126; 48147-57; 48552-663; 49394-99; 49689-700; 49952-59; 49960-65; 49966-76; 49977-80; 49995-50002; 50003-374; 50798-924].

[12]     In addition, the Corps considered the analysis set forth in the Ona Mine Environmental Impact Statement that reviewed the mining and reclamation of lands within the Four Corners Mine through 2025, including the proposed mining on the Altman Tract.  [AR 33481].  These assessments included impacts on "ecological/biological resources (including aquatic ecosystems), water resources (including water quality, water quantity, and groundwater impacts), socioeconomics, and land use/urbanization impacts."  [AR 33482].

Greenberg Traurig, P.A.

considered to conclude that mining on the Altman Tract would not have adverse cumulative impacts.  Plaintiffs disingenuously quote a single sentence out of the 2,245 page PRCIS, without putting it in any, let alone proper, context.  The quoted sentence in the PRCIS is in the section titled, "Recommendations for the Peace River Watershed Management Plan and Future Actions," in which the following general recommendation is made:

- Monitor cumulative impacts at the watershed level, not the individual permit level, and adjust existing or develop new regulatory and non regulatory programs to minimize or eliminate cumulative impacts of continued development.

> The current regulatory framework has failed to minimize cumulative impacts.  One reason for this is undoubtedly the current practice of addressing cumulative impacts for each permit action.

[AR 29075] (emphasis added).  Taken in context—as it should be—the clear concern in the PRCIS is that current state regulations only allow for review of cumulative impacts on an individual permit basis.  That is not, however, what the Corps did here.  Instead, it analyzed overall cumulative impacts—including Mosaic's planned future mining projects within the watershed—as it must do under the CWA.  It did not—contrary to Plaintiffs' suggestion— rely on the state regulations in reaching its determination that mining on the Altman Tract would not result in cumulative adverse impacts.[13]  Plaintiffs are simply "grasping at straws" in an attempt to create an appearance that the Corps acted improperly when it did not.

## C.    THE CORPS DID NOT VIOLATE NEPA OR THE CWA WITH REGARD TO THE "NO ACTION" ALTERNATIVE.

Plaintiffs' entire argument is based on a faulty premise: that NEPA requires consideration of the "no action alternative" in an EA.  To support their contention, Plaintiffs erroneously cite to the regulation that addresses Environmental Impact Statements **not**

---

[13]     In conducting its overall cumulative impact analysis, the Corps did consider the fact that the adverse impacts in the Horse Creek watershed primarily occurred prior to the implementation of mandatory reclamation requirements under Florida law.  [AR 69065].  It did not err in doing so.

Greenberg Traurig, P.A.

Environmental Assessments.  Indeed, in contrast to an EIS, which expressly requires the agency to consider the "no action alternative," the regulation governing an EA does not <u>obligate</u> an agency to discuss the "no action alternative."[14]  40 C.F.R § 1502.14(d) (requiring discussion of no action alternative in an EIS).  Instead, when preparing an EA, the regulations only require a brief discussion of reasonable alternatives.  40 C.F.R § 1508.9(b).

Consistent with these regulations, courts have acknowledged that the requirement to consider alternatives in an EA is less rigorous than the analysis needed for an EIS.  *See Sierra Club*, 464 F.Supp.2d at 1226; *see also Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1246 (9th Cir. 2005) (citing cases from the Second, Fourth, and Fifth Circuits adopting same approach).  Importantly, the "reasonable alternatives" to be considered are entirely within the agency's discretion, and that discretion is governed only by the "rule of reason" given the scope and purpose of the project under consideration.  *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir. 1990).  The "rule of reason" governs both "*which* alternatives the agency must discuss, and the *extent* to which it must discuss them."  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (emphasis in original) (internal citations omitted).

> 1.  **The agency has a duty to take into consideration the applicant's project purpose in determining which alternatives to consider in its analysis.**

The Corps has a duty to evaluate whether practicable alternatives exist when a project—as here—will result in the filling of a jurisdictional wetland.  *Nat'l Wildlife Federation v. Norton*, 332 F.Supp.2d 170, 186 (D.D.C. 2004).  "An alternative is practicable, if it is available and capable of being done after taking into consideration costs, existing technology, and logistics in light of the **overall project purposes**."  *See* 40 C.F.R.

---

[14]     Despite the fact that there is no obligation in the regulations to consider the "no action alternative," a review of the case law indicates that agencies sometimes do consider the no action alternative in an EA.

Greenberg Traurig, P.A.

§ 230.10(a)(2) (emphasis added); *see also Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1270 (10th Cir. 2004) ("the Corps, in determining whether to issue a § 404 permit, 'has a duty to take into account the objectives of the applicant's project,' as long as this objective is 'legitimate'"); *La. Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985) ("not only is it permissible for the Corps to consider the applicant's objective; the Corps has a duty to take into account the objectives of the applicant's project").

Here, Plaintiffs argue that Mosaic should import phosphate rock and ignore the Corps' duty to consider Mosaic's overall project purpose, which is "to extend the life of the Four Corner Mine and related infrastructure—within the central Florida phosphate district— by adding mining reserves within a practicable pumping distance (10 miles) of the Four Corners facilities." [AR 69012]. Clearly, importing phosphate rock from Morocco—even if it was practicable, which it is not—would not satisfy the overall project purpose, and, consequently did not, as a threshold matter, need to be considered by the Corps.[15] *Native Ecosystems Council*, 428 F.3d at 1247 (alternatives that do not advance the project purpose will not be considered reasonable or appropriate).

Indeed, in factually similar circumstances, a district court rejected plaintiffs' claim that the Corps abused its discretion when the Corps failed to consider a "no action" alternative. In that case, plaintiffs contended that "Florida Rock could transport the [lime]stone from elsewhere" and, accordingly, "although the cost might be higher, [the Corps] should be forced to analyze that option." *Norton*, 332 F. Supp. 2d at 186. The court disagreed stating that the "Corps has a duty to take into account the *applicant's* objectives for the project" which was to "provide a source of limestone for its existing mining operations." *Id.* (emphasis added). The Corps has likewise properly exercised its discretion in its

---

[15]     In fact, in the Corps' Supplemental EA, the Corps expressly states that one of the criteria it utilized in evaluating practicable alternatives is that the alternative "meets Mosaic's project purpose." [AR 69021].

consideration of practicable alternatives related to extracting phosphate ore to extend the life of the Four Corners Mine.

### 2.        The Corps appropriately considered the no action alternative.

Because phosphate "is an essential requirement for life" for which "there is no substitute," it must be mined from an area that has sufficient deposits to be able to support the needs of the agricultural industry.  [AR 69017].  In fact, "most of the world's food supply comes from crops grown on land nourished with manufactured fertilizer, the major component of which is phosphate."  [AR 69017].  Therefore, "no mining" at all is simply not an alternative.  Plaintiffs clearly know this.  Nevertheless, they seek to prevent Mosaic from utilizing its existing infrastructure and instead depend on foreign governments—such as Morocco—to obtain the necessary amount of phosphate for processing at its existing fertilizer plants, an alternative that would result in closing the mine early and eliminating American jobs in favor of foreign ones.  [AR 31709].  Plaintiffs, however, have failed to adduce <u>any</u> record evidence establishing that a sufficient quantity and quality of phosphate rock could, in fact, be purchased from foreign suppliers to satisfy the global need for this life sustaining commodity.

Instead, Plaintiffs claim that the Corps acted arbitrarily and capriciously because it took "no look" at this "no action" alternative.  That statement is false.  Even assuming arguendo that the Corps was required to evaluate the "no action" alternative in connection with the EA, the Corps did consider in both the EA and Supplemental EA, Mosaic's ability to import phosphate from other countries.  In fact, Mosaic candidly acknowledged that areas outside of the United States have known deposits of phosphate rock, and that phosphate rock is sometimes purchased from those areas.[16]   [AR 33466; 31708; 57928].   However,

---

[16]        In fact, the total U.S. demand now exceeds U.S. production creating an increased dependency on imports.  This is due to the lack of additional reserves and resulting mine out and closure of producing mines, as well as regulatory delays resulting from litigation involving other Mosaic phosphate mining projects.  [AR 58150].

Greenberg Traurig, P.A.

dependence on foreign governments—as Plaintiffs apparently desire—is simply not feasible. *Jackson Hole Conservation Alliance v. Babbitt*, 96 F.Supp.2d 1288, 1298 (D. Wyoming 2000) (an agency is not required to consider possible alternatives if it has in good faith rejected them as too remote, speculative, or . . . impractical or ineffective.). As noted in the EA, such reliance could result in short-term or long-term supply shortages depending on the foreign suppliers' available capacity of phosphate rock and their willingness to sell phosphate rock to Mosaic. [AR 33466; 31708-09]. Moreover, plaintiffs have not provided any evidence that mining overseas would reduce environmental impacts and, conversely, importation would exacerbate the United States' trade deficit.[17] [AR 33466; 58150].

Additionally, in the Supplemental EA, the Corps expressly rejected the "no action" alternative because it would (i) "adversely impact the Four Corners production which would impact Mosaic's overall fertilizer production," (ii) adversely impact Four Corners' operating costs due to the operation of the plant at less than full capacity, and (iii) decrease the life of the overall mine. Decreasing the overall life of the mine would result in numerous detrimental effects, including an **increased dependence on foreign phosphate supplies, which would render the U.S. chemical fertilizer company noncompetitive in both the domestic and world markets**.[18] [AR 56978; 56989; 69025; 69018] (emphasis added).

The extent of the Corps' consideration of importing foreign phosphate rock in the EA was clearly sufficient. No rigorous or thorough analysis was required. Nevertheless, the

---

[17]    This statement, cited by the Corps in the EA, was based on testimony by Alan Greenspan, former Federal Reserve Chairman, before Congress in the late 1990s. [AR 58150]. When Mosaic submitted additional information after the permit was suspended, it further advised the Corps that Federal Reserve Chairman, Ben S. Bernanke stated that reduction in U.S. trade commodities (which would include domestic phosphate) will lead to greater dependence on foreign supplies and add to the imbalance with regard to the trade deficit. [AR 58150-51; 56978; 59621].

[18]    In addition, the no action alternative would not ensure future protection of the 550 acres proposed to be placed in a conservation easement and would preclude the stream restoration project from being conducted. [AR 69026]. Without this permanent protection, the land could be used for residential construction and agricultural uses, which could cause secondary impacts to the waters of the United States. [AR 69026].

Corps clearly considered the feasibility and potential negative effects of forcing increased reliance on foreign suppliers. [AR 69018]. Consequently, the Corps—which has considerable discretion limited only by the rule of reason—fulfilled its regulatory obligation in considering the no action alternative in this case.[19]

### 3. The Corps adequately considered the practicable alternatives under the CWA.

Under the CWA, there is a presumption that alternatives exist when the proposed project is not "water dependent." 40 C.F.R. §230.10(a)(3). In this circumstance, it is not sufficient for the Corps to consider a range of alternatives for the proposed project: the Corps must rebut the presumption that there are less practicable alternatives with less adverse environmental impact. *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1344 (8th Cir. 1994). The Corps clearly met this burden. The Corps carefully considered four specific alternate sites. [AR 69019-69034]. In fact, Mosaic provided detailed maps accompanied by a thorough analysis of the site alternatives. [AR 56984-88; 58208-35; 69076-102].

Ultimately, these sites were evaluated and rejected for various reasons, including the greater distance and greater cost to transport the ore to the processing plants (approximately 4-5 times greater), comparable or greater wetland impacts, the reduced quantity or quality of ore available from the sites, limitations imposed by land use restrictions, the inability to acquire the properties because of multiple owners, and the inability to construct infrastructure (pipeline) through adjacent parcels to deliver the ore to the plants. [AR 31705-08; 33510-14;

---

[19]    In their Complaint, Plaintiffs also allege that the Four Corners Mine has sufficient reserves without the Altman Tract to operate for over fourteen years. Accordingly, Plaintiffs suggest that there is simply no need for the project. [Cmplt. at p. 125]. This contention has no merit whatsoever. The record demonstrates that the Corps considered, in detail, the necessity to mine on the Altman Tract in order to extend the life of the Four Corners Mine. Indeed, the record evidence demonstrates adverse impacts will be incurred if mining on the Altman Tract is not permitted, including: (i) adversely impacting Four Corners' production (and, consequently, overall fertilizer production); (ii) adversely impacting Four Corners' operating costs due to the operation of the plant at less than full capacity; and (iii) decreasing the life of the mine and, consequently, accelerating the date for construction of a new mine. [AR 69013].

Greenberg Traurig, P.A.

56982-83; 69019-34; 59678-88; 58157-169].  Thus, the Corps concluded that mining on the Altman Tract was the "least environmentally damaging practicable alternative when taking into account the relative quality of the aquatic resources, costs, logistics and the technical feasibility of the proposal."  [AR 69026].  No abuse of discretion exists under these facts.

### D.   THE PUBLIC WAS AFFORDED AMPLE OPPORTUNITY TO PROVIDE INFORMED COMMENT DURING THE PERMIT REVIEW PROCESS.

NEPA requires agencies to "make diligent efforts to involve the public in preparing and implementing their NEPA procedures" and to "solicit appropriate information from the public."  40 C.F.R. § 1506.6.  When an agency—such as the Corps—is conducting an EA, it must "involve . . . the public, to the extent practicable."  40 C.F.R. § 1501.4(b).  Plaintiffs allege that the Corps violated NEPA because the agency (i) did not provide proper public notice of the proposed agency action and, consequently, did not afford an opportunity for adequate public participation, and (ii) did not publicly disseminate additional information it gathered after suspending the permit.  Neither of these contentions have merit.

### 1.   The Corps' Notice was adequate.

Public notices are adequate if sufficient environmental information, "considered in the totality of circumstances . . . permit[s] members of the public to weigh in with their views and thus inform the agency decision-making process."  *See Bering Strait Citizens for Responsible Resource Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008).  That standard was clearly met here.  Mosaic's revised application provided extensive documentation related to the potential environmental impacts of the project and its proposed mitigation plan.  The Corps' public notice[20] ("Notice"), which Plaintiffs now claim did not provide opportunity for meaningful public comment, provided a description of the proposed activity, its purpose, and intended use.  33 C.F.R. § 325.3 (agency must provide a brief

---

[20]    The Notice contained all the items of information required by the regulations.  33 C.F.R. § 325.3.

description of the proposed activity, its purpose and intended use, so as to provide sufficient information concerning the nature of the activity to generate meaningful comments).

Based on the Notice, there could be no doubt that it concerned Mosaic's request to obtain a CWA permit for the Altman Tract. This request was nothing new to the public. In fact, during the six year FDEP permit process for the Altman Tract, there was extensive public involvement and a three week evidentiary hearing. The point is this: concerned members of the public had been involved in the permitting process for the Altman Tract for six years prior to Mosaic submitting its revised application to the Corps. Nevertheless, Plaintiffs are now criticizing the Notice stating that,

> The notice did not include any information concerning potential alternatives, cumulative impacts, or any details of the Corps' mitigation requirements.

[Motion at p. 21; AR 34196]. Tellingly, however, for the next six months, the Corps received extensive comments from various organizations and individuals, including Plaintiffs. [AR 5025-30; 05484-89; 058491-28182; 28186-28411; 28413-14; 28418-19]. These comments, some of which were very lengthy and detailed, raised the exact concerns that Plaintiffs claim could not be addressed because of the purportedly defective Notice. Thus, the very nature of the comments refutes Plaintiffs' argument. Indeed, Plaintiffs' specious position is proven by the fact that Sierra Club's comments (which spanned 222 pages) addressed these very concerns.[21] [AR 28190-28411]. It is simply disingenuous for Plaintiffs to contend that the Notice prevented them from "weighing in" with their views on the proposed mining of the Altman Tract.

---

[21] The cases relied upon Plaintiffs' are simply inapposite. In those decisions, the court found that the public did not have an opportunity to provide meaningful comment because they were given no information regarding the proposed project and the information that formed the basis of the agency's decision was received after the comment period expired. *Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F.Supp.2d 984 (E.D. Cal. 2005); *Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs*, 2009 WL 4261321 (S.D. W.Va. 2009). That simply is not the situation here.

Greenberg Traurig, P.A.

2.      **The Corps was not obligated to solicit public comment after the Altman Permit was suspended.**

Plaintiffs assert that the Corps was required to afford the public an opportunity to provide comment after the permit was suspended.  There is no basis for this assertion.  Courts in this Circuit and others have held that no such participation is required.  In fact, in *Nat'l Parks Conservation Ass'n v. U.S. Army Corps of Eng'rs*, 446 F.Supp.2d 1322 (S.D. Fla. 2006), the court flatly rejected the exact argument that Plaintiffs espouse here.  The court stated that "NEPA procedural requirements were not triggered" when the agency conducted an additional review after permit suspension because "there was not a substantial change in circumstances, there was no modification of the permit, and . . . the Corps was not issuing a new permit."  *Id*. at 1340.  In another decision, the court similarly held:

> The EA Supplement merely amplified the issues that had been addressed in BIA's original 2001 EA, so the agency reasonably concluded that further public comment was unnecessary.  On this record, we find no merit in Tomac's claim that another round of public comment was required.  BIA acted appropriately given the prior public involvement, and no statute or regulation requires anything more.

*Tomac, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 861-62 (D.C. Cir. 2006).  No different result should be reached here.  The public previously had a full and complete opportunity to comment on the environmental concerns being addressed in connection with the permit suspension.  The Supplemental EA merely "amplified the issues" that were addressed in the original EA.  Consequently, the Corps reasonably concluded that no further public comment was necessary.

E.      **THE CORPS' DECISION NOT TO HOLD A PUBLIC HEARING WAS NOT ARBITRARY OR CAPRICIOUS.**

Plaintiffs' criticism of the Corps' decision not to hold a public hearing is unfounded.  Under CWA regulations, "[i]f the Corps determines that it has the information necessary to reach a decision and that there is 'no valid interest to be served by a hearing,' the Corps has

28

the discretion not to hold one."  33 C.F.R. §327.4(b); *see also Fund for Animals*, 85 F.3d at 545 ("[t]he applicable regulations provide the Corps discretion to hold hearings on permit applications on an 'as needed' basis.").  Here, eight requests for a public hearing were received based on various environmental concerns.  In the EA, the Corps found that Mosaic "successfully addressed" all the issues stating:

> The Corps has determined that it has sufficient information to make a decision on this application, and that no new information would be obtained which would assist in the decision making process.[22]  Therefore, it has been determined a Public Hearing is not necessary.

[AR 33561].

This finding was well within the Corps' discretion.  Not only did the permit review process last more than two and a half years, but the Corps had the benefit of the state proceedings, which together have spanned 10 years.  During this time, extensive public comments were received and addressed.  *See Friends of the Payette,* 988 F.2d at 997 (holding that the Corps was not required to hold a public hearing when it had already received extensive comments and was "aware of strong support on both sides").  Plaintiffs nevertheless contend that a public hearing should have been held because cumulative impacts were not considered in the state proceedings.  This has no merit.  The public raised their concerns regarding cumulative impacts during the Corps' permit process and these concerns were thoroughly addressed in the EA and the Supplemental EA.  Therefore, the Court should defer to the Corps' decision not to hold a public hearing in this matter.[23]

---

[22]     Plaintiffs assert that this statement is "obviously and patently incorrect" because the Corps later determined it needed additional information and, as a result, suspended the permit.  Plaintiffs miss the point.  The Corps made the determination that the comments that it had received provided it with sufficient information on the public's sentiment such that **no public hearing** was necessary.  This issue is entirely separate from the Corps' decision to suspend the permit for the purpose of evaluating additional information.

[23]     Moreover, Plaintiffs simply have not shown that an additional opportunity to comment on the Permit "would have influenced the . . . Corps' decision to issue the [p]ermit."  *Sierra Club*, 450 F.Supp.2d at 536.

Greenberg Traurig, P.A.

## VI.   CONCLUSION

For the foregoing reasons, Mosaic Fertilizer, LLC respectfully requests that this Court (i) enter Summary Judgment in favor of Defendants; and (ii) deny Plaintiffs' Motion for Summary Judgment in its entirety.  *See Florida Fruit & Vegetable Ass'n v. Brock*, 771 F.2d 1455, 1459 (11th Cir. 1985) (the summary judgment procedure is particularly appropriate in cases in which the court is asked to review a decision of a federal administrative agency).

Dated:  March 1, 2010                              Respectfully submitted,

<div style="margin-left:40%">

*/s/ David B. Weinstein*
David B. Weinstein
Fla. Bar No. 604410
weinsteind@gtlaw.com
Kimberly S. Mello
Fla. Bar No. 002968
mellok@gtlaw.com
**GREENBERG TRAURIG, P.A.**
625 E. Twiggs St., Ste. 100
Tampa, FL  33602
Telephone: (813) 318-5700
Facsimile:  (813) 318-5900

*Counsel for Mosaic Fertilizer, LLC*

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 1, 2010 the foregoing was electronically filed with the Clerk of Court via the CM/ECF system, which will send a notice of electronic filing to counsel of record and that a true and correct copy of the foregoing was forwarded by U.S. Mail to **John F. Kasbar,** U.S. Army Corps of Engineers, Jacksonville District, 701 San Marco Blvd., P.O. Box 4970, Jacksonville, FL 32232-0019.

<div style="margin-left:40%">

*/s/ David B. Weinstein*
Attorney

</div>

Greenberg Traurig, P.A.