## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

SIERRA CLUB, INC., MANASOTA-88, INC.,
GULF RESTORATION NETWORK, INC.,
PEOPLE FOR PROTECTING PEACE
RIVER, INC., and ENVIRONMENTAL
CONFEDERATION OF SOUTHWEST
FLORIDA, INC.,

     Plaintiffs,

v.                                 Case No. 3:08-cv-750-J-25TEM

U.S. ARMY CORPS OF ENGINEERS, and
COLONEL ALFRED A. PANTANO, JR.
Commanding District Engineer,
U.S. Army Corps of Engineers,
Jacksonville District,

     Defendants,

and

MOSAIC FERTILIZER, LLC,

     Intervenor Defendant.

_____/

### INTERVENOR, MOSAIC FERTILIZER, LLC'S REPLY TO PLAINTIFFS' RESPONSE TO CROSS-MOTION FOR SUMMARY JUDGMENT

     Intervening Defendant, Mosaic Fertilizer, LLC ("Mosaic"), by counsel, replies to Plaintiffs'

response to its cross-motion for summary judgment as follows:

**I.     THE CORPS HAS MADE A CONVINCING CASE FOR A FINDING OF NO SIGNIFICANT IMPACT.**

     **A.     The Corps Adequately Addressed the Findings Regarding Wetland Impacts.**

     Plaintiffs falsely state that the Corps completely ignored the alleged "substantial controversy" in

the 2007 Peace River Cumulative Impact Study (the "Study") when it made a finding of no significant

impact. That statement could not be farther from the truth. In fact, the Environmental Assessment

TPA 511,375,225

("EA") specifically states that "for the purpose of evaluating the proposed project, [it] will consider the findings from the Peace River CIS." [AR 33541]. The Corps then acknowledged that the Study stated that between 1979 and 1999 "13,397 acres of wetlands were lost to phosphate mining" and further noted that,

> [r]eclamation does not necessarily mean that disturbed land is restored to its predisturbance condition. Restoration is required for wetlands, uplands can be reclaimed to conditions suitable for agriculture, industry, or housing.

[AR33542; 33545; 28769]. In considering these findings, the Corps opined that the losses might be attributable to the fact that state regulations did not require mitigation for isolated wetlands until 1995. [AR 33545-56]. Since that time, however, as noted by the Corps, the State and the Corps have adopted a standardized procedure for assessing wetland function, additional regulations have been adopted, and continued advancements in reclamation techniques have been made that should lessen overall cumulative impacts. [AR 33546-33554]. Thus, Plaintiffs' assertion that the Corps failed to evaluate issues regarding wetland reclamation is flatly wrong. [Plaintiffs' Reply to Federal Defendants' Response to Plaintiffs' Summary Judgment Motion and Response to Federal Defendants' Cross Motion for Summary Judgment (Doc. #51) ("Plaintiffs' Reply") at p. 4]. It did so and its findings must be afforded deference. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency meets its "hard look" requirement if it has examined the relevant data and articulated a satisfactory explanation for its action including a "rational connection between the facts found and choice made"); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002).

Plaintiffs further argue that the Corps "cannot rely on [Mosaic's] conclusions concerning the functionality of wetlands . . . where the state agency that issues those permits currently has no idea whether those recreated wetlands will actually function like the wetlands they supposedly replace." [Plaintiffs' Reply at 4]. Plaintiffs' position is nonsensical and is nothing more than attempt to obfuscate the actual facts and law. There is no doubt that the Study notes that there had been wetland losses

before adoption of additional regulations and standardized methods of measuring wetland functions, and that there are some questions regarding the success of wetland reclamation plans. However, that clearly does not mean that every reclamation project must now necessarily fail—which is the standard Plaintiffs want this Court to adopt.

Here, the record is clear that the Corps conducted an independent evaluation of the information provided, which included scientific data and studies, as well as the Corps' Wetland Rapid Assessment Procedure, and reached a determination that "there would be no net loss to wetlands."[1] [AR 33528]. *Florida Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1156-57 (S.D. Fla. 2005) (Corps' assessment of wetland impacts supported where it relied on Estuarine Wetland Rapid Assessment Program). The mere fact the record contains some contrary evidence does **not** render the agency's finding arbitrary and capricious. *See Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F. 3d 1105, 1120-1121 (9th Cir. 2000).

Indeed, Plaintiffs avoid any meaningful discussion regarding the extensive mitigation required and special conditions that must be met to ensure the success of Mosaic's mitigation efforts. That is because these requirements and conditions are fatal to Plaintiffs' argument.[2] Courts, including the Eleventh Circuit, have repeatedly held that the Corps does not act arbitrarily or capriciously when it requires the applicant to implement a mitigation plan for creating wetlands and imposes special conditions to ensure that the mitigation goals are met. *See Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F. 3d 1242, 1248 (11th Cir. 1996); *Wetlands Action Network*, 222 F. 3d at 1120-1121. That is exactly what was done here.

---

[1]    Studies on wetland impacts are located throughout the record. [*See, e.g.,* AR 03383-471; 31692; 41208-221; 42051-52; 44905-912; 45665-66; 47622-25; 48079-126; 48147-57; 48552-663; 49394-99; 49689-700; 49952-59; 49960-65; 49966-76; 49977-80; 49995-50002; 50003-374; 50798-924].

[2]    Mosaic has a history of being able successfully reclaim wetlands, and has received numerous awards for its past successes. [AR 57017-18]. Moreover, since 1998, the Corps has released 1,903 acres of mitigation wetlands reclaimed by Mosaic following its mining activities. [AR 57019].

Plaintiffs have also grossly misstated and exaggerated the Study's findings. The purpose of the Study was to "objectively assess the individual and cumulative impacts" on the hydrology and ecology in the Peace River Watershed based on numerous stressors, including urban development, phosphate mining, agriculture and natural climate variability.[3] [AR 28717]. Based on the results of the Study, recommendations were made to minimize future impacts and mitigate past impacts to the Peace River watershed. [AR 28717]. Therefore, the Study was not directed solely to the impacts of phosphate mining but, instead, it was a much more comprehensive Study that evaluated past impacts from multiple sources. The purported "scientific debate" relied on by Plaintiffs is merely an isolated reference, which states as follows:

> In cases where habitat restoration is the goal, there is debate on the functional value of these restored areas.

[AR 28769]. This sentence falls far short of establishing a current "scientific debate surrounding the functionality of reclaimed wetlands" as a whole as a result of phosphate mining. [Plaintiffs' Reply at p. 2]. Regardless, courts hold that no substantial dispute exists—even if controversy is present—if the record demonstrates that the agency has considered the dispute. *Indiana Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 858 (7th Cir. 2003) (no controversy where scientific data addressed concerns related to reclamation). That was clearly done here.

### B. The Corps Took a Hard Look at Cumulative Impacts.

Plaintiffs' contention that the Corps failed to take a hard look at cumulative impacts is equally unavailing. Plaintiffs cannot refute the fact that the Corps evaluated much more than the Study in evaluating cumulative impacts.[4] Indeed, the Corps specifically acknowledged in its Supplemental Environmental Assessment ("Supplemental EA") that it should not have solely relied upon information in the Study and the Ona DEIS for its cumulative impact analysis. [AR69010]. Therefore, the Corps

---

[3]    The Study was prepared for the Florida Department of Environmental Protection and Southwest Florida Water Management District. [AR 28706].

[4]    Among other things, the Corps considered information from the South Florida Water Management District, the Charlotte Harbor National Estuary Program, and Mosaic.

4

undertook an extensive review of cumulative impacts (which included potential negative impacts) before reaching its conclusion that cumulative impacts would not be significant.[5]  [AR69041-69056, 56975-76; 58171-206].

Plaintiffs nevertheless contend that the Corps relied on the Study for its cumulative impact analysis but "failed to address findings from that study that refute the Corps' conclusion."  [Plaintiffs' Reply at pp. 6-7].  Plaintiffs are wrong.  The Corps did take into consideration concerns regarding past wetland losses, but concluded that mining the Altman Tract should not contribute or result in cumulative adverse impacts to the aquatic environment, particularly because of Mosaic's planned mitigation and reclamation.  And, the Study's recognition that the "current regulatory framework has failed to minimize cumulative impacts" was largely based on the state's "current practice of addressing cumulative impacts for each permit action."  [AR29075].  That, however, is not what the Corps did here.  Instead, it analyzed overall cumulative impacts—including Mosaic's planned future mining projects within the watershed—as it must do under the Clean Water Act ("CWA").  Plaintiffs have now addressed cumulative impacts twice and, in doing so, have failed to demonstrate how the Corps' partial reliance on the Study necessitates a finding that it failed to take a "hard look" at this issue as required under National Environmental Policy Act ("NEPA").  That is because it cannot do so.

## II.     THE CORPS DID NOT VIOLATE NEPA OR THE CWA WITH REGARD TO THE NO ACTION ALTERNATIVE.

Plaintiffs' argument ignores the law and misstates the facts.  First, Plaintiffs disregard the fact that Corps has **no** obligation under the regulations to consider the "no action" alternative.  Instead, the Corps is only required to consider "reasonable alternatives" and the "reasonable alternatives" that the Corps considered are entirely within its discretion given the scope and overall purpose of the project. Here, the project purpose (which Mosaic clarified on February 27, 2009) is clearly stated: "**to extend**

---

[5]      As set forth in Intervenor, Mosaic Fertilizer, LLC's Cross Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. #50) ("Mosaic's Motion"), the Corps reviewed scientific data from multiple sources, which analyzed the overall impacts to wetlands, water quantity, groundwater, water quality, biological resources, land use, and related socioeconomics.  [Mosaic's Motion at pp. 18-19; AR56992-57020].

**the life of the Four Corners Mine and related infrastructure**—within the central Florida phosphate district—**by adding mining reserves within a practicable pumping distance (10 miles) of the Four Corners facilities.**" [AR69012]. Importing phosphate rock from Morocco does **not** meet this purpose.

In fact—in a desperate attempt to recast the project purpose—Plaintiffs rely on a stated project purpose that <u>predates</u> Mosaic's clarified project purpose and then proceeds to blatantly misquote it. Plaintiffs state that one of Mosaic's objectives is to,

> [P]rovide an uninterrupted source of phosphate rock to its chemical/fertilizer manufacturing plants . . .

However, in actuality, Mosaic's earlier stated project purpose was to "provide an uninterrupted source of phosphate rock to its chemical/fertilizer manufacturing plants (hereinafter fertilizer plant) **by extending the reserves for the Four Corners Mine.**" [AR69012]. It is clear that Plaintiffs deliberately omitted the phrase "to extend the life of the Four Corners Mine" because this fact is fatal to their entire argument.

<u>Second</u>, after distorting the project purpose, Plaintiffs attempt to distinguish the *Norton* decision. *Nat'l Wildlife Federation v. Norton*, 332 F.Supp.2d 170, 186 (D.D.C. 2004). Their attempt fails. Plaintiffs claim that Mosaic is a "vertically integrated" company, while Florida Rock Industries is not. That is not true. Mosaic does, in fact, mine phosphate and then processes it for sale as fertilizer. Florida Rock is no different. It mines the limestone rock and then processes it for sale as construction grade building materials or for use in road construction. And, even if there was such a distinction, it would not affect the applicability of *Norton* to this case. In *Norton*, the court held that the Corps did **not** abuse its discretion when it failed to consider a no action alternative—importing limestone rock from elsewhere—that was not within the scope of the project purpose. *Norton*, 332 F. Supp. 2d at 186. No different result should be reached here. The Corps simply had no obligation to consider whether Mosaic could import Moroccan phosphate rock because it would be contrary to Mosaic's stated project purpose—to extend the life of its Four Corners Mine. Plaintiffs have not cited a single decision that

6

holds otherwise.[6]

Third, even assuming arguendo, that the Corps was required to consider the "no action" alternative, it did, in fact, do so. Plaintiffs' assertions to the contrary are false. The Corps specifically analyzed the "no action" alternative in the alternatives section of the Supplemental EA but rejected it because, among other things, it would "increase foreign dependence on foreign phosphate supplies." [AR69025-69026]. The Corps also rejected it because it would (i) adversely impact Four Corners' operating costs due to the operation of the plant at less than full capacity; (ii) adversely impact Four Corners' production, which would impact Mosaic's overall fertilizer production, and (iii) decrease the life of the overall mine. No more was required of the Corps to satisfy its obligations under NEPA.

Plaintiffs further assert that the Corps failed to independently investigate the facts, and had it done so, it would have learned that "Mosaic is in fact buying Moroccan rock and expects to continue to do so in the future." [Plaintiffs' Reply to Mosaic Fertilizer's Response to Plaintiffs' Summary Judgment Motion and Response to Mosaic Fertilizer's Cross Motion for Summary Judgment (Doc. 52) ("Plaintiffs' Response") at p. 3]. Neither the Corps nor Mosaic has ever disputed that Mosaic sometimes purchases phosphate rock from foreign countries to supplement its operations. Mosaic does so to ensure that it has a sufficient quantity for fertilizer production. However, there is **no** evidence establishing that a **sufficient** quantity and quality of phosphate rock could, in fact, be purchased from foreign sources. And, if it could not, it would have devastating consequences. Plaintiffs either forget or deliberately ignore the fact that phosphate is "an essential requirement for life" for which "there is no substitute." Without sufficient quantity and quality of phosphate rock, Mosaic would not be able to

---

[6]    Plaintiffs erroneously rely on *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223 (9th Cir. 1988) to support its position. *Hodel* involved the issuance of oil and gas leases in an area known as Deep Creek located in Montana's Lewis and Clark National Forest. The Court conducted a 42 U.S.C. 4332(2)(e) alternatives analysis, which is inapplicable to this case. Thus, Plaintiffs' reliance on *Hodel* is nothing more than a "red herring." Regardless, contrary to Plaintiffs' assertions, the Corps did, in fact, consider the no action alternative. The remaining cases are inapposite because they either address the alternatives analysis in the context of an Environmental Impact Statement or do not involve the applicability of the no action alternative. *See North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533 (11th Cir. 1990); *S. Utah Wilderness Alliance v. Norton*, 237 F. Supp. 2d 48 (D.D.C. 2002).

support the needs of the agricultural industry with the fertilizer that is essential for maintaining the world's food supply. Under these facts, the Corps simply cannot be found to have to have acted arbitrarily or capriciously when it rejected the no action alternative.

## III. THE CORPS COMPLIED WITH NEPA'S PUBLIC PARTICIPATION REQUIREMENT.

There is no dispute that NEPA requires agencies to provide the public with sufficient information, considered in the totality of circumstances, to permit members of the public to present their views and thus inform the agency decision-making process. *See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 511 F.3d 1011 (9th Cir. 2008). The Corps did so here. What Plaintiffs have not refuted, and cannot refute, is the fact that the public had been involved in the permitting process for the Altman Tract for six years before the issuance of the 2006 Public Notice, which Plaintiffs contend is inadequate. Nor can Plaintiffs disavow the fact that the comments received from the public were detailed and extensive, demonstrating that the public clearly had sufficient information to provide meaningful comment.

Instead, Plaintiffs attempt to obfuscate these facts by focusing on an inapposite district court decision. That decision found that the information provided to the public was inadequate because it provided no details of the planned compensatory mitigation extensively relied on by the Corps in reaching its finding of no significant impact. *See Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 2009 WL 4261321 (S.D. W. Va. 2009). Here, however, the public was provided with facts regarding the compensatory mitigation plan. Moreover, the mitigation plan and special conditions had already been adopted in connection with the FDEP permit, and, consequently, its terms were well known to concerned members of the public that had been involved in the permitting process for years.

Finally, Plaintiffs argue that the public was not provided with an opportunity to comment on documents submitted after the public comment period expired. There is, however, no requirement that the public be provided with an opportunity to comment on all the information submitted to the Corps.

8

Rather, the test is whether the public had enough information to provide meaningful comment. Clearly it did. Therefore, Plaintiffs' complaints do not even come close to demonstrating that they did not have opportunity to "weigh in" with their views on the proposed mining of the Altman Tract.

## IV.  THE CORPS' DECISION NOT TO HOLD A PUBLIC HEARING WAS NOT ARBITRARY OR CAPRICIOUS.

Plaintiffs advance no cogent argument or case law demonstrating that the Corps' decision not to hold a public hearing was arbitrary and capricious. Indeed, the decisions from the Eleventh Circuit cited by Plaintiffs establish that the Corps' decision was proper.[7] Plaintiffs cannot escape the fact that all the issues addressed in the Section 404 permit had been fully vetted in the state administrative proceeding—except for cumulative impacts. However, the mere fact that cumulative impacts were not addressed in those proceedings does not mandate that the Corps hold a public hearing or be found to have abused its discretion.

Instead, if the Corps "has the information necessary to reach a decision" and there is "no valid interest to be served by a hearing," it has the discretion not to hold one. That is clearly the case here. The issue of cumulative impacts was raised in the public comments and responded to in detail by Mosaic. [AR05025; AR05484; AR05489; AR05876; AR05880; AR05902; AR28186; AR28191; AR28414; AR28594-671]. Moreover, the potential cumulative impacts from mining in the Peace River Watershed were nothing new to the Corps or the public. Mining has been taking place for decades, along with the requisite permit reviews and attendant public involvement. Thus, over the years, cumulative impacts have been considered on numerous occasions and have been the subject of environmental assessments and the more detailed environmental impact statements. [AR05491-5874; AR52650-53830]. No error can be found under these circumstances.

---

[7]     Two of the decisions from the Eleventh Circuit cited by Plaintiffs hold that the Corps' decision not to hold a public hearing was not arbitrary and capricious. *See Fund for Animals Rice v. Rice*, 85 F.3d 535 (11th Cir. 1996); *Water Works & Sewer Bd. of the City of Birmingham v. U.S. Dep't of Army Corps of Eng'rs*, 983 F. Supp. 1052 (N.D. Ala. 1997), *aff'd* 162 F.3d 98 (11th Cir. 1998).

Finally, Plaintiffs' position that Corps' decision to suspend the permit demonstrates that it did not have sufficient information to reach a decision is equally meritless. The Corps made the determination that the public comments it had received prior to issuing the EA provided it with sufficient information on the public sentiment that no public hearing was necessary. The fact that the Corps later made the decision to suspend the permit has no bearing whatsoever on its earlier decision not to hold a public hearing.

## CONCLUSION

Plaintiffs have done nothing more than continue to "cherry pick" isolated references and findings in this massive administrative record and mischaracterize facts and authorities in an attempt to achieve their objective—to halt Mosaic's phosphate mining activities that support the world's need for essential phosphate based crop and animal feed nutrients. Their efforts must fail. The record clearly demonstrates that the Corps did not act "arbitrarily or capriciously" when it issued the Altman Permit. In fact, the record is replete with detailed analyses related to the potential wetland impacts, the mitigation requirements, and the conditions mandated by the Corps to ensure its success. These findings must be accorded particular deference because the Corps has the requisite expertise to evaluate these technical scientific issues. To set aside the Corps' decision under these facts would disregard its extensive analysis undertaken over a three year period—not once, but twice—before reaching the conclusion that Mosaic's mining activities would not have a significant environmental impact. This Court should not do so. Instead, this Court should decline Plaintiffs' ill-conceived invitation to (i) overlook the deference that must be afforded to the Corps, and (ii) improperly substitute its judgment for that of the agency.

For the foregoing reasons, Mosaic Fertilizer, LLC respectfully requests that this Court (i) enter Summary Judgment in favor of defendants, and (ii) deny Plaintiffs' Motion for Summary Judgment in its entirety.

Dated:  April 29, 2010

Respectfully submitted,

_/s/ David B. Weinstein_
David B. Weinstein
Fla. Bar No. 604410
weinsteind@gtlaw.com
Kimberly S. Mello
Fla. Bar No. 002968
mellok@gtlaw.com
**GREENBERG TRAURIG, P.A.**
625 E. Twiggs St., Ste. 100
Tampa, FL  33602
Telephone: (813) 318-5700
Facsimile:  (813) 318-5900

_Counsel for Mosaic Fertilizer, LLC_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 29, 2010 the foregoing was electronically filed with the Clerk of Court via the CM/ECF system, which will send a notice of electronic filing to counsel of record and that a true and correct copy of the foregoing was forwarded by U.S. Mail to **John F. Kasbar,** U.S. Army Corps of Engineers, Jacksonville District, 701 San Marco Blvd., P.O. Box 4970, Jacksonville, FL 32232-0019.

/s/ David B. Weinstein
Attorney

11