# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

SIERRA CLUB, INC., MANASOTA-88, INC.,
GULF RESTORATION NETWORK, INC.,
PEOPLE FOR PROTECTING PEACE
RIVER, INC., and ENVIRONMENTAL
CONFEDERATION OF SOUTHWEST
FLORIDA, INC.,

      Plaintiffs,

v.                                  Case No. 3:08-cv-750-J-25TEM

U.S. ARMY CORPS OF ENGINEERS, and
COLONEL ALFRED A. PANTANO, JR.
Commanding District Engineer,
U.S. Army Corps of Engineers,
Jacksonville District,

      Defendants,

and

MOSAIC FERTILIZER, LLC,

      Intervenor Defendant.

_____/

## INTERVENOR, MOSAIC FERTILIZER, LLC'S CROSS MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

      Intervening Defendant, Mosaic Fertilizer, LLC ("Mosaic"), by counsel and pursuant to Federal Rule of Civil Procedure 56, respectfully moves for summary judgment on all of Plaintiffs' claims. Based on the record evidence before this Court, there are no genuine issues of material fact in dispute and Mosaic is entitled to a judgment as a matter of law.

1

## INTRODUCTION

The United States Army Corps of Engineers (the "Corps") issued a permit (the "Altman Permit") to Mosaic under Section 404 of the Clean Water Act ("CWA"), which authorized Mosaic to extract phosphate from its 2,367-acre property in Manatee County, Florida (the "Altman Tract"). The Altman Tract is an expansion of Mosaic's existing Four Corners Mine in Manatee County Florida, which has been mined pursuant to Corps-issued permits since the 1980s. The Altman Permit was issued after an almost 10-year review process by state and federal agencies, which included a careful and thorough evaluation that (i) maximizes wetland avoidance through a mine plan that avoids 46% of the wetlands on the site; and (ii) requires Mosaic to comply with a comprehensive mitigation and reclamation plan that imposes special conditions tailored to ensure that unavoidable environmental impacts are reduced to a minimum. In fact, the Corps exhaustively reviewed the Altman Permit application—not once, but twice—which resulted in a comprehensive Environmental Assessment supported by an administrative record of over 69,000 pages substantiating an extensive process of fashioning the Altman Permit to maximize protection of wetlands and minimize impacts.

Nevertheless, Plaintiffs wrongly argue that the Corps' decision—which is entitled to great deference—is arbitrary and capricious. In doing so, Plaintiffs have (i) simply "cherry picked" isolated documents and findings from the extensive administrative record, (ii) misinterpreted the law, and (iii) ignored the critical role of phosphate-based crop nutrients and animal feed in the overall success of the agricultural industry. Thus, Plaintiffs hope to persuade the Court to overlook the record and the law, and to reach a different conclusion, which would require substituting its judgment for

2

that of the agency in direct contravention of Eleventh Circuit precedent. This Court should decline do so.

## FACTUAL BACKGROUND

### I. THE CRITICAL ROLE OF PHOSPHATE.

Phosphate—essential for plant growth, crop production, and livestock health—is a limited resource for which there is no substitute. (Administrative Record ("AR") 69017, 56976-77). Most of the world's food supply is derived from crops that have been nourished with manufactured fertilizer, in which phosphate is the major component.[1] (*Id.*). Mosaic—the world's leading producer and marketer of phosphate-based crop nutrients and animal feed ingredients—plays a vital role in this process. (AR 34224). Without sufficient resources to mine, the United States' supply of phosphate would be impacted, ultimately resulting in food shortages or substantial increases in price. (AR 69018). Moreover, dependence on foreign supply would render the U.S. chemical fertilizer industry noncompetitive in both the domestic and world markets. (AR 56978; 69018).

Only a limited number of mineable phosphate reserves have been identified in the U.S., with Central Florida having some of the most economically accessible reserves. (AR 56976-78; 69012). The Florida Legislature recognizes the global role of the phosphate market and has declared that "[t]he extraction of phosphate is important to the continued economic well-being of the state and to the needs of society." § 378.202(1), Fla. Stat. (2012); (AR 56978). Mosaic's mining operations provide thousands of jobs in this state and generate substantial revenue for Florida and its residents

---

[1]     Nobel Peace Prize winner, Dr. Norman Borlaug, made the following statement regarding the importance of fertilizer: "This is a basic problem, to feed 6.6 billion people. Without chemical fertilizer, forget it. The Game is over." The Fertilizer Institute, Fertilizer's Role in World Food Production (June 2008). (AR 56976).

Greenberg Traurig, P.A.

through taxes, salaries, and purchases of goods and services. (AR 69018-19). Allowing mining at the Altman Tract would, among other things, (i) maintain 520 jobs at the Four Corners plant with an annual payroll exceeding $23 million; and (ii) generate a total of approximately $17 million in severance taxes from mine-associated properties owned by Mosaic in Manatee, Polk, and Hillsborough Counties. (AR 56978-79; 69045).[2]

## II.     THE ALTMAN TRACT.

The Altman Tract expansion consists of 2,367 acres located in the Horse Creek Basin and is particularly valuable because it contains high-quality phosphate. (AR 04881; 33424; 69012-17). Mosaic's application sought to disturb 515 acres of wetlands and streams. (AR 33435). Mining reserves at the Altman Tract will facilitate the continued operation of the Four Corners Mine which, under the current mine plan, will conclude in 2019. (AR 56979; 69013). The Altman Tract is ideally situated adjacent to the Four Corners Mine, which allows Mosaic to utilize the draglines, processing sites, pipelines, plant, electrical transmission lines, clay settling areas, access roads, and other infrastructure that is already in place.[3] (AR 69013-16). Mined phosphate from the Altman Tract would provide fertilizer for 169 million acres of corn in the Midwestern United States. (AR 33465).

---

[2]     In addition, on an annualized basis, the phosphate fertilizer industry (i) is responsible for over 67,000 jobs generating $4.3 billion in personal income in the regional economy; and (ii) generates nearly $620 million in revenue to the Port of Tampa and an additional $5.2 billion in related output resulting in over $5.8 billion in total economic value to the region. (AR 56979); *see also* The Local and Regional Economic Impacts of the Tampa Port Authority, July 28, 2006 at pp. 24-25.

[3]     Conventional strip mining, which would be employed on the Altman Tract, requires a costly and extensive infrastructure to operate efficiently. (AR 03592; 69013-16). Mining at locations with no ready access to such infrastructure would present significant logistical problems and be prohibitively expensive. (AR 69014-16; 69021-22).

Greenberg Traurig, P.A.

## III.    THE PERMIT APPLICATION.

### A.    The Four Corners Mine Project.

On an as-needed basis throughout the early 1990s, Mosaic applied for and received numerous permits from the Corps for the Four Corners Mine. (AR 33424). In the late 1990s, to avoid piecemeal review, the Corps requested that Mosaic submit a cumulative review of all 30,000 acres remaining to be permitted at the Four Corners Mine, which included the Altman Tract. (AR 33424). After conducting a two-year review, the Corps issued permits for the Four Corners Mine in February of 2002, but was unable to include the Altman Tract due to a pending state administrative challenge by Charlotte County related to a Florida Department of Environmental Protection ("FDEP") permit for the Atman Tract based on an application submitted by Mosaic in 2000.[4]

### B.    The FDEP Permit Process

On September 15, 2003, after a three-week administrative hearing and recommendation by the Administrative Law Judge, the FDEP denied Mosaic's permit application. (AR 02343-516; 33425). In 2004, Mosaic submitted a revised application to FDEP, which, among other things, reduced impacts to herbaceous and forested wetlands by 34 and 22 percent, respectively. (AR 03642; 28415-16). Moreover, Mosaic would spend approximately $4.4 million to create 521.2 acres of jurisdictional mitigation wetlands and 41 acres of wetlands to compensate for isolated wetland impacts. (AR 03642; 03577; 03597). In addition, the revised application included (i) extensive additional wildlife surveys and fish samplings that provided assurances for preservation and availability of proper, sufficient habitats; (ii) a revised Wetland Rapid Assessment Procedure

---

[4]    The Peace River/Manasota Water Supply Authority also challenged the permit. However, it subsequently reached an agreement with Mosaic that addressed its concerns and, therefore, withdrew its petition. (AR 33425).

Greenberg Traurig, P.A.

("WRAP") of wetland functions, to ensure that there would be no net loss in wetland acres or function; (iii) a thorough description of how water quantity, quality, hydroperiod, and habitat would be maintained; and (iv) a comprehensive mitigation plan. (AR 03561-98). After a comprehensive review of the revised application, FDEP issued the permit on June 13, 2006. (AR 33427).

## C. The Corps' Review and Issuance of the CWA Permit.

On October 31, 2005, while the FDEP permit application was pending, Mosaic submitted a revised application seeking approval from the Corps to conduct phosphate mining operations on the Altman Tract over a 10-year period, with multiple attachments containing environmental data. (AR 02668-03664). In response to the public notice of the permit (AR 04880-95), Plaintiffs submitted approximately 22,000 pages, which included comments and voluminous attachments relating to environmental concerns and requested a public hearing. (AR 05025-30; 05484-89; 05491-28182; 28186-411; 28413-14; 28418-19). At the Corps' request, Mosaic provided a response to the public comments to assist the Corps in evaluating the issues raised. (AR 28594-675).

Over the next two years, the Corps evaluated the full record materials, including supplemental submissions from Mosaic and others, and conducted a thorough analysis to ensure proper avoidance and minimization of environmental impacts. (AR 33424-785). In the course of its review, the Corps requested additional information relating to environmental impacts and Mosaic responded in detail. (AR 31693-33231).

On April 30, 2008, following its extensive review of the full record, the Corps issued a 142-page Environmental Assessment and Statement of Finding ("EA" or "original EA") for the Altman Tract, concluding that "this permit action will not have a significant impact on the quality of the

6

human environment" and, as a result, that an Environmental Impact Statement ("EIS") was not necessary. (AR 33424-785). The Corps further concluded that a public hearing on the application was not necessary because it had "sufficient information" to "evaluate the proposed project" and "no new information would be obtained which would assist in the decision making process." (AR 33561-62). On May 2, 2008, the Corps issued the Altman Permit, which included seven pages of special conditions setting forth compliance timelines and thresholds as additional measures to ensure the success of the mitigation efforts. (AR 33795-34122).

### D. The Corps' Subsequent Review of the Permit.

After the Altman Permit was issued, Plaintiffs filed this action against the Corps for declaratory and injunctive relief alleging violations of the CWA, the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). On October 3, 2008, while this case was pending, the Corps determined that it was "in the public interest to revisit the analysis in support of the permit decision," and suspended the Altman Permit. (AR 34220-23). This action was subsequently stayed pending the Corps' review. (Dkt. 22).

Over the next seven months, the Corps reevaluated its findings and analyzed additional information concerning four main areas that had been the focus of this case: (i) purpose and need of the proposed project; (ii) alternatives analysis; (iii) cumulative impact analysis; and (iv) reclamation standards and procedures. (AR 34225-69102). The Corps detailed its findings in a comprehensive 62-page supplemental Environmental Assessment and Statement of Finding ("Supplemental EA") issued on May 1, 2009. (AR 69008-102). After its extensive analysis considering, *inter alia*, "information provided by the applicant and all interested parties," the Corps (i) again found that "this

Greenberg Traurig, P.A.

permit action will not have a significant impact on the quality of the human environment," and (ii) reinstated the Altman Permit with no additional conditions. (AR 69069).

## IV.    PLAINTIFFS' CLAIMS.

Following the reinstatement of the Altman Permit, the stay of this action was lifted (Dkt. 26) and Plaintiffs filed a Third Amended Complaint ("Complaint") (Dkt. 36). Plaintiffs allege in Count I that the Corps violated NEPA and the APA when it issued the Altman Permit because it purportedly (i) failed to take a hard look at the problem; (ii) failed to provide the public with an adequate pre-decisional opportunity for informed comment; (iii) failed to properly define the project purpose and independently verify the information relied upon in determining the need for the project; (iv) failed to adequately analyze cumulative impacts; and (v) failed to make a convincing case that the proposed project would not significantly impact the human environment. Plaintiffs claim in Count II that the Corps violated the CWA because it (i) declined to provide a public hearing; (ii) purportedly failed to conduct an analysis of all practicable alternatives; and (iii) purportedly failed to analyze the cumulative impacts of the proposed action.

Plaintiffs filed a Motion for Summary Judgment and Defendants responded with Cross-Motions for Summary Judgment and Responses (collectively, the "pending motions"). The Court subsequently issued an Order deferring ruling on the pending motions based on this Court's conclusion that, in light of the pending South Fort Meade Mine litigation, no ruling should be issued this action until that case was resolved. (Dkt. 57). When the South Fort Meade litigation was concluded in 2012, the Court entered an Order allowing the parties to file new summary judgment papers. (Dkt. 62).

Greenberg Traurig, P.A.

## STANDARD OF REVIEW

The APA's "arbitrary and capricious" standard, which governs this action, provides the "least latitude in finding grounds for reversal." 5 U.S.C. § 706(2). Thus, a court cannot disturb an administrative decision merely because it "is unhappy with the result reached." *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1539 (11th Cir. 1990). Because of this "***exceedingly deferential***" standard, "[t]he court's role is to ensure that the agency came to a rational conclusion, '***not*** to conduct its own investigation and substitute its own judgment for the administrative agency's decision.'" *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (emphasis added). There are sound reasons for this well-established principle of deference. The Corps has been issuing section 404 permits for almost 40 years and has decades-long experience with permitting phosphate mining, which provides it with a detailed understanding of the industry. Indeed, particular deference must be given to the Corps' informed decision where, as here, that decision turns on an analysis of issues of science, technical expertise, and complex environmental statutes. *Sierra Club v. U.S. Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1182 (M.D. Fla. 2006), *aff'd*, 508 F.3d 1332 (11th Cir. 2007).

## ARGUMENT

### I. THE CORPS PROPERLY CONCLUDED THAT AN ENVIRONMENTAL IMPACT STATEMENT WAS NOT REQUIRED FOR THE ALTMAN TRACT.

Before the Corps acts on a permit application, NEPA requires that the Corps follow specified procedures; however, the statute does ***not*** mandate a particular substantive result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S. Ct. 1835, 1846 (1989). Under NEPA, agencies must take a "hard look" at environmental impacts and prepare an Environmental Assessment containing sufficient evidence and analysis to determine whether the project's effect on

Greenberg Traurig, P.A.

the human environment is significant. The Environmental Assessment will either (i) conclude that an EIS is necessary because the proposed project significantly affects the quality of the human environment; or (ii) make a finding of no significant impact ("FONSI"), in which case no further study of environmental consequences is necessary. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1214-15 (11th Cir. 2002). The NEPA regulations call for an Environmental Assessment that "[b]riefly provide[s] sufficient evidence and analysis" to allow an agency to make this determination and, where an agency determines no EIS is necessary, to facilitate agency compliance with NEPA. 40 C.F.R. § 1508.9(a)(1).[5]

The Corps' decision not to prepare an EIS is not arbitrary and capricious if it properly engaged in a "hard look" review by examining relevant data and articulating a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Sierra Club*, 295 F.3d at 1216. Hard look review is therefore satisfied unless (i) the decision does not rely on the factors that Congress intended the Corps to consider; (ii) the Corps failed entirely to consider an important aspect of the problem; (iii) the Corps offered an explanation which runs counter to the evidence; or (iv) the decision is so implausible that it cannot be the result of differing viewpoints or the Corps' expertise. *Id.* Plaintiffs have not demonstrated that the Corps did not fulfill its obligations under NEPA when it concluded that an EIS was not required for the Altman Tract.

---

[5]     The regulations also provide for agency consideration of applicant-provided materials, even expressly allowing agencies to use Environmental Assessments and EISs prepared by the applicant, provided the agency independently evaluates the information and the related environmental issues. *See id.* at § 1506.5(a)-(b).

Greenberg Traurig, P.A.

A. **The AEIS Is Outside the Administrative Record And Does Not Establish That An EIS Was Required In Connection With The Altman Permit Application.**

Plaintiffs assert that the Corps' decision in 2010 to undertake an area-wide EIS ("AEIS")—*after* it issued the Altman Permit—renders the defense of the Altman Permit moot. Not only is the purported effect of the AEIS not pled in the Complaint and thus improper on this basis alone,[6] but this Court previously rejected this *exact* contention involving the Section 404 CWA permit issued to Mosaic for its South Fort Meade Tract, which is also located in the Central Florida Phosphate District ("CFPD"), stating,

> [T]he fact that the Corps and EPA have *now* agreed to conduct an EIS on the cumulative impacts of phosphate mining . . . [does not] lead[]. . . the Court to conclude the Corps erred in making its FONSI finding.

(*See* Order and Preliminary Injunction; Case No. 3:10-cv-00564-HLA-JBT ("Dkt. 88") at p. 12, fn. 6).

Moreover, Plaintiffs misstate the purpose and scope of the AEIS. The Corps stated in its Notice of Intent ("NOI")[7] to prepare the AEIS for the CFPD and confirmed in the draft AEIS ("DAEIS"), "[T]he AEIS sets the foundation for review of the *four specific applications* under current [Corps] review as well as for [CWA] Section 404 permit applications for other phosphate mining projects in the CFPD *which might be received in the future*." (DAEIS at E-3) (emphasis added). As an existing mine, the Altman Tract, which the Corps has already fully evaluated, does not—as Plaintiffs have admitted—fall within the scope of the AEIS. (Dkt. 66 at p. 11).

---

[6]     *See generally Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (new claims cannot be raised for the first time at the summary judgment stage).

[7]     The NOI referenced three specific pending applications for mining projects which it stated would be included within the scope of the AEIS: Mosaic's Four Corners Surface Tract and Ona Mine and CD Industries' South Pasture Extension. 76 Fed. Reg. 9560, 9561 (Feb. 18, 2012). Following scoping, the DAEIS clarified that the AEIS would focus on the South Pasture Extension and Ona, as well as Mosaic's Desoto Mine and Wingate East Mine. (DAEIS at 1-1).

Greenberg Traurig, P.A.

Plaintiffs' claim of "mootness," which essentially suggests that the Corps' decision in 2010 to assess the cumulative impacts of four similar pending permit applications in a single AEIS somehow invalidates environmental reviews completed in connection with previously issued permits could not be more flawed. In the NOI for the AEIS, the Corps expressly stated "The Corps has issued CWA Section 404 permits for phosphate mining in the region since 1977, with some existing permits authorizing mining through 2028." 76 Fed. Reg. 9561 (Feb. 18, 2011). "**The Corps has determined as recently as June 2010 that the cumulative effects, past, present and reasonably foreseeable, of phosphate mining from 1977 to 2028 in the Peace River watershed, part of which lies within the CFPD Region, <u>had not reached the significance threshold</u>**." *Id.* (emphasis added). Therefore, the Corps itself has reiterated that there will be no cumulative impacts as a result of existing permits. Indeed, if Plaintiffs' reasoning were accepted, every new NEPA document—which of necessity addresses cumulative impacts—would have the perverse effect of potentially invalidating any previous, tangentially-related Corps' decisions. That, of course, cannot be so.

Moreover, Plaintiffs' argument wholly lacks legal support. *Hodel*, relied upon by Plaintiffs, involved an injunction obtained against the National Park Service ("NPS"), which required, among other things, that it "prepare EIS's considering cumulative environmental effects before approving or permitting any further mining operations in two of Alaska's national parks . . . ." *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 467 (9th Cir. 1986). NPS subsequently "confessed to NEPA violations and voluntarily . . . agreed to comply with the injunction order . . . ," *i.e.*, to prepare an EIS. *Id.* at 469. The appellate court—rejecting the mining groups' challenge—held that the issue, *i.e.*, whether the court could order preparation of an EIS where no EA had yet been prepared, was moot in light of the

Greenberg Traurig, P.A.

government's decision to prepare EISs.  *Id.*

This decision does not support Plaintiffs' contention that an agency's decision to prepare an AEIS relating to *different, unpermitted* proposed projects equates to "an admission that a 'comprehensive environmental impact statement'" is required for an already fully evaluated and permitted project.  (*See* Dkt. 66 at p. 11).  Rather, in direct contrast with *Hodel*, the Corps in this case has steadfastly maintained, even after suspending the Altman Permit and extensively reevaluating the impacts, that it complied with NEPA in finding that issuance of the permit would have no significant environmental impacts and, therefore, an EIS was not required.  Mootness simply does not apply under these facts.

**B.**     **The Comprehensive Mitigation and Reclamation Plan Fully Offset the Environmental Impacts And The Corps' Decision Not To Prepare An Environmental Impact Statement Was Not Arbitrary Or Capricious.**

An agency has broad discretion in determining the significance of a proposed project's potential environmental impacts.  *Skinner*, 903 F.2d at 1539.  Relevant case law has established, and the Council on Environmental Quality ("CEQ") has recently affirmed, that when agencies "develop … mitigation measures to avoid, minimize, rectify, reduce, or compensate for potentially significant adverse environmental impacts that would otherwise require full review in an EIS," and where "an agency commits to perform or ensure the performance of [these mitigation measures], then these mitigation commitments can be used to support a FONSI, allowing the agency to conclude the NEPA process and proceed with its action without preparing an EIS."  *See* 76 Fed. Reg. 3843, 3848 (Jan. 21, 2011); *see also C.A.R.E. Now*, *Inc. v. F.A.A.*, 844 F.2d 1569, 1575 (11th Cir. 1988).  This is in accord with binding Eleventh Circuit precedent, which has made it clear that if the Corps has "considered the impact on the wetlands, considered the [subject] mitigation plan, and reasonably

Greenberg Traurig, P.A.

concluded that the impact on wetlands would not be significant," its decision is not arbitrary and capricious. *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1248 (11th Cir. 1996).

That is exactly what the Corps did in this case. In the EA, the Corps extensively discussed the comprehensive mitigation plan, which states that the project will disturb 480.1 acres of jurisdictional wetlands. To mitigate, however, Mosaic will provide 521.2 acres of compensatory mitigation for unavoidable jurisdictional wetland impacts and 41 acres of wetlands to replace the isolated wetlands. (AR 33514; 56991). In addition, Mosaic is granting a perpetual conservation easement for approximately 560 acres on wildlife corridors that interconnect three counties: Hillsborough, Polk, and Manatee.[8] (AR 56992; 57112).

The Corps' thorough discussion of this plan in the EA demonstrates that it independently evaluated and verified a broad range of scientific data and studies and related information bearing on mitigation—not only information provided by Mosaic—but also relevant information and comments received from EPA and the public. (AR 33470-75; 33493; 33514-21; discussion of mitigation in EA; *see also*, *e.g.*, AR 05028-29, 28416-17). The Corps also considered a significant body of data demonstrating Mosaic's history of successful mitigation, including independent third-party reviews of such successful efforts. (AR 33472-75).[9] The totality of information in the record relevant to the sufficiency of Mosaic's comprehensive mitigation plan—including EPA's own acknowledgment that

---

[8]  The conservation easement will be done in two phases. The first phase consists of approximately 520 acres of unmined lands within the headwaters of the Horse Creek Basin and adjacent lands providing a wildlife corridor to Manatee County lands on the south border of the Altman Tract. The second phase consists of approximately 32 acres of reclaimed lands that will abut the first phase. (AR 56992)

[9]  *Citing* Andre F. Clewell, Ph.D., "Restoration of Riverine Forest at Hall Branch on Phosphate-Mined Land, Florida," *Restoration Ecology* (Mar. 1999).

Greenberg Traurig, P.A.

Mosaic had addressed EPA's previously voiced concerns regarding the effectiveness of mitigation by developing "a detailed mitigation plan"—led the Corps to conclude that "there will be **no** net loss of wetland function."[10]   (AR 28416; 33470-75; 33514-21).   Therefore, there is no credible basis to question the Corps' thorough review and adoption of the mitigation plan.  The details and supporting methodology of this plan are discussed in detail below.

### 1.      The Mitigation Plan is based on well-accepted methodology.

Because of the Corps' expertise with wetlands mitigation, which is central to this case, it is entitled to special deference when conducting its analysis.  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103, 103 S. Ct. 2246, 2255 (1983); *see also Envtl. Coal. of Broward County, Inc. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987).  In evaluating wetland impacts, the Corps relied on the Wetland Rapid Assessment Program ("WRAP"), which is recognized as a scientifically sound and appropriate method to evaluate mitigation measures under the CWA and NEPA.[11]   (AR 05032-481; 33527-28; 33569-82); *see* 40 C.F.R. § 230.93(a); 33 C.F.R. § 332.3(a); *Florida Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1156-57 (S.D. Fla. 2005) (Corps' assessment of wetland impacts was supported where it relied on Estuarine Wetland Rapid Assessment Procedure); *Sierra Club*, 464 F. Supp. 2d at 1214–15, 1225.  Under WRAP, wetland functions are evaluated and scored numerically, which enables the Corps to quantitatively compare existing wetlands to mitigation wetlands.[12]   Moreover, WRAP accounts for temporary losses in

---

[10]       The EA states that "[f]or wetlands the *objective* is to provide, at a minimum, one-to-one functional replacement," *i.e.*, no net loss.  (AR 33527).  This is consistent with the Corps' policy, which is to "*achieve a goal*" of no overall net loss of values and functions to wetlands.  55 Fed. Reg. 9210 (Mar. 12, 1990) (emphasis added).

[11]       *Raymond Miller & Boyd E. Gunsalus*, SWFWMD, WETLAND RAPID ASSESSMENT PROCEDURE (2d ed. 1999) [WRAP Procedure].  In addition, FDEP uses WRAP to evaluate wetlands impacts and mitigation.  A thorough explanation is available at http://www.sfwmd.gov/portal/page/portal/xrepository/sfwmd_repository_pdf/ wrap99.pdf.

[12]       This functional approach is well established in Corps' policy.  *See* Regulatory Guidance Letter 02-02, December

Greenberg Traurig, P.A.

wetland function associated with the lag time between when a wetland is impacted and when mitigation is complete. This is done by a downward adjustment of the WRAP score assigned to the mitigation; thus if mitigation is delayed, more mitigation is required.[13] WRAP also accounts for uncertainty over wetlands creation by discounting the value assigned to mitigation wetlands, which means that more mitigation is required where mitigation success is uncertain. WRAP scores are also calculated separately for herbaceous and forested wetlands to ensure that there will be no net loss for either.

The Corps, thus, rationally concluded, based on its experience with mitigation and the independently reviewed WRAP analysis, that a FONSI was warranted.[14]

### 2. Special conditions ensure that the mitigation requirements will be met.

The Altman Permit contains seven pages of conditions and compliance timelines for the mitigation. (AR 28434-40; 33515-21; 33797; 33804). These stringent checks and balances ensure that mitigation goals are met and include (i) meeting specified performance standards within a 10-year monitoring period, with failure to timely achieve those standards triggering a requirement that Mosaic undertake a remediation program approved by the Corps (AR 33517); (ii) monitoring the on-site mitigation area by submitting annual reports (*id.*); and (iii) submitting a mitigation proposal to fully offset the functional loss if the compensatory mitigation fails to meet performance standards ten

---

24, 2002 (available at http://www.usace.army.mil/CECW/Documents/cecwo/reg/rgls/RGL2-02.pdf ("Districts will determine what level of mitigation is "appropriate" based upon the functions lost or adversely affected"); *see also* Section 2.d (encouraging use of quantitative functional assessment methodologies in lieu of acreage).

[13]     Mosaic has made a commitment that at no tine shall more than 25% of the wetlands on the Altman Tract be in active mining at any one time. (AR 67937).

[14]     Studies on wetland impacts are located throughout the record. (*See, e.g.*, AR 03383-471; 31692; 41208-21; 42051-52; 44905-12; 45665-66; 47622-25; 48079-126; 48147-57; 48552-663; 49394-99; 49689-700; 49952-59; 49960-65; 49966-76; 49977-80; 49995-50002; 50003-374; 50798-924).

Greenberg Traurig, P.A.

years after the initiation of mitigation activities (AR 33519; 56991-92). *Wetlands Action Network v. U.S. Army Corp. of Eng'rs*, 222 F.3d 1105, 1121-22 (9th Cir. 2000) (noting that special conditions ensured mitigation goals would be met), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).

In addition, the special conditions are consistent with the regulations which direct agencies preparing mitigated FONSIs to "clearly identify commitments to mitigation measures designed to achieve environmentally preferable outcomes in their decision documents … [and] identify mitigation commitments necessary to reduce impacts … to a level necessary for a mitigated FONSI." 76 Fed. Reg. at 3848. Plaintiffs cannot establish an abuse of discretion regarding the Corps' FONSI given the stringent conditions required to assure successful mitigation. *See Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993) (Corps did not act arbitrarily or capriciously when it required applicant to implement mitigation plan that would create new wetlands and also required monitoring and supplemental mitigation measures if goals were not met); *Kentucky Riverkeeper, Inc. v. Midkiff*, 800 F. Supp. 2d 846, 871-74 (E.D. Ky. 2011) (concluding that the Corps' reliance on environmental mitigation and imposition of significant conditions on mining companies was not arbitrary and capricious).

## C. The Corps Properly Evaluated the Significance Factors In The CEQ Regulations.

In determining "significance," to decide if an EIS is needed, agencies must consider both context[15] and intensity, as described in the CEQ regulations. 40 C.F.R. § 1508.27. The CEQ

---

[15] Plaintiffs have not claimed that the Corps failed to consider "context," which involves the potential impacts with "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a).

Greenberg Traurig, P.A.

regulations list ten "intensity" factors that agencies should take into account when taking a "hard look" at whether a project will have "significant environmental impacts." *Heartwood, Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 431 (8th Cir. 2004); 40 C.F.R. § 1508.27. These factors, however, are not dispositive. *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 233 (5th Cir. 2006) (intensity factors listed in regulations are not "categorical rules that determine by themselves whether an impact is significant") (quoting *Spiller v. White*, 352 F.3d 235, 243 (5th Cir. 2003). Instead, the regulations require that an agency "in some way address[ ] and evaluate[ ]" these factors; an agency's approach to this evaluation in any particular case, including "whether this was done in a factor-by-factor fashion[,]" is irrelevant. *Id.* at 233-34 (quoting *Spiller*, 352 F.3d at 243). The key inquiry is whether the Corps addressed and evaluated the relevant factors and whether its ultimate decision, in light of the record and ***considering mitigation***, is well-reasoned and rational, which it clearly was here. *C.A.R.E. Now*, 844 F.2d at 1575 (when mitigation compensates for otherwise adverse environmental impacts, the significance threshold is not reached); *CEQ Guidance, Mitigation*.[16]

All Plaintiffs have done is improperly "cherry pick" documents from the record relating to cumulative impacts, mitigation, and reclamation which express different opinions than those reached by the Corps. Cherry picking information and data out of the administrative record to support a contrary position from an agency clearly does not make a project highly controversial or uncertain. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005).

---

[16] http://ep.hss.doe.gov/current-developments/docs/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf.

Greenberg Traurig, P.A.

1. **The Corps Properly Evaluated Cumulative Impacts of the Altman Permit.**

The Corp is required to take a "hard look" at whether "the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(7). A cumulative impact is the "impact on the environment which results from the incremental impact *of the action* when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." 40 C.F.R. § 1508.7 (emphasis added). "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

Even though the Altman Tract is located in the Horse Creek Basin, the original EA focused its cumulative impacts analysis on impacts to both the larger Peace River Basin and the Horse Creek Basin, which is situated within the Peace River Basin. The cumulative impact analysis evaluated information provided in the then-draft Ona EIS and the Peace River Cumulative Impact Study (PRCIS),[17] a 2007 FDEP study broadly considering environmental impacts in the 2,350-square-mile Peace River Watershed. (AR 31702-05; 33524-62). Using these sources, the Corps concluded that there would be no cumulative impacts in the Peace River Basin as a result of mining the Altman Tract. Thus, Plaintiffs' contention that the Corps did not evaluate the entire Peace River Basin is misleading and flatly wrong.

After the Corps suspended the Altman Permit, it revisited its analysis stating,

[T]he Corps should not have solely relied upon the information contained in the PRCIS and the Ona DEIS for the cumulative impact analysis.

---

[17]     The PRCIS was undertaken by the FDEP as a result of a legislative directive and evaluated not only the cumulative impacts of mining in the Peace River Basin, but also urban development, agriculture, and natural climate variability. (AR 56992). The complete PRCIS is contained in the record. (AR 28705-30949).

Greenberg Traurig, P.A.

(AR 69010). In addition, the Corps determined that the Horse Creek Basin provided the more appropriate geographic scope for the cumulative impact analysis.[18] (AR 33428; 69010; 69057-66). The Horse Creek Basin consists of 128,435 acres,[19] of which 2,367 acres comprise the Altman Tract (approximately 1.8%). (AR 33428; 69057). Contrary to Plaintiffs' assertions, the Corps did not err when it focused on the Horse Creek Basin in the supplemental EA instead of evaluating the Peace River Basin.

The Corps stated that the "rationale for defining the scope of the cumulative analysis was that the proposed project would not likely have a direct or indirect effect upstream from the confluence . . . ." (AR 69057). The Corps concluded that protection of the Horse Creek watershed, which ultimately flows to the Peace River and Charlotte Harbor watershed, would protect downgradient water flow and levels. (AR 33456, 69057). In explaining the basis for and impacts to this refined cumulative impacts territory in the Supplemental EA, the Corps cited to a significant body of third-party data regarding regional water flow in and around the Horse Creek watershed, including various segments of the Peace River as well as the Charlotte Harbor Watershed. (AR 69057-59).[20] Scientific data was also considered that analyzed impacts to wetlands, water quantity, water quality, groundwater, biological resources, land use, and related socioeconomics as result of

---

[18]     The Horse Creek Basin is part of the larger Peace River Basin. The Peace River watershed covers an area of approximately 2,350 square miles in nine counties. (AR 56992).

[19]     In contrast, the Peace River Watershed is 1,504,000 acres. (AR 69057).

[20]     *Citing* Southwest Florida Water Management District ("SWFMD"), <u>Proposed Minimum Flows and Levels for the Lower Peace River and Shell Creek Peer Review Draft</u> (Aug. 24, 2007) (AR 56998); SWFMD, <u>Proposed Minimum Flows and Levels for the Middle Segment of the Peace River, from Zolfo Springs to Arcadia</u> (Oct. 2005) (AR 36176-352); SWFMD, <u>Upper Peace River: An Analysis of Minimum Flows and Levels Draft</u> (Aug. 25, 2002) (AR 44642-885); Charlotte Harbor National Estuary Program ("CHNEP"), <u>Synthesis of Existing Information, Vol. 1: A Characterization of Water Quality, Hydrologic Alterations, and Fish and Wildlife Habitat in the Greater Charlotte Harbor Watershed</u> (April 1999) (AR 56999).

Greenberg Traurig, P.A.

past, present, and planned future mining activities.[21]  (AR 56992-57020; 58204-06; 68202-03; 69043-68).

Among other things, the Corps considered a U.S. Geological Survey report entitled "*Hydrology and Water Quality of Unmined and Reclaimed Basins in Phosphate-Mining Areas, West-Central Florida*" (AR 69052); regulatory materials from the Southwest Florida Management District ("SWFMD") and other state agencies; and the Horse Creek Stewardship Program.  The Program was created to ensure the mining activities do not adversely affect the Horse Creek, Peace River, or Charlotte Harbor.  It involves, among other things, (i) monitoring water quality and quantity; (ii) biological sampling; (iii) investigating adverse conditions or significant trends; and (iv) implementing corrective action, if necessary.  (AR 69048-49, 69051-53.)

The Corps' comprehensive cumulative impact analysis in both the EA and Supplemental EA demonstrates that the Corps independently evaluated all relevant information to support its conclusion that mining on the Altman Tract "should not contribute or result in cumulative adverse impacts to the aquatic environment or the human environment."  (AR 56975-76; 58171-206; 69041-56; 69043-68).  This was certainly not arbitrary, capricious, or an abuse of agency discretion.

---

[21]    *See generally* SWFMD, Upper Peace River: An Analysis of Minimum Flows and Levels Draft (Aug. 25, 2002) (AR 56998); SWFWMD, Proposed Minimum Flows and Levels for the Middle Segment of the Peace River, from Zolfo Springs to Arcadia (Oct. 2005) (AR 36176-352); SWFWMD, Proposed Minimum Flows and Levels for the Lower Peace River and Shell Creek Peer Review Draft (Aug. 24, 2007) (AR 56998); CHNEP, Synthesis of Existing Information, Volume 1: A Characterization of the Water Quality, Hydrologic Alterations, and Fish and Wildlife Habitat in the Greater Charlotte Harbor Watershed (April 1999) (AR 56999); Durbin, Surface Water Quality and Aquatic Habitat Considerations (PowerPoint Presentation before the Manatee County Planning Commission) (Nov. 29, 2007) (AR 41153-59); Garlanger, Planning Commission Meeting (PowerPoint Presentation before the Manatee County Planning Commission) (Nov. 29, 2007) (AR 56955, 57000); SWFWMD, Florida River Flow Patterns and the Atlantic Multidecadal Oscillation, (August 10, 2004, p 6) (AR 42702-781); 2006 HCSP Historical Information (AR 57001); Letter from John E. Garlanger, Ardaman & Associates, to Dee M. Allen, Mosaic Fertilizer, LLC (June 28, 2007) (AR 49384-393); Fishkind & Assoc., Inc., The Fiscal & Economic Benefits of Mosaic Fertilizer to Manatee County, (PowerPoint presentation, Sept. 16, 2008) (AR 41356-64).

Greenberg Traurig, P.A.

## 2. Wetland reclamation is not highly controversial or uncertain.

Under the CEQ regulations, an EIS rather than an EA may be warranted based on agency consideration of the degree to which (i) the effects on the quality of the human environment are likely to be highly controversial; and (ii) the possible effects on the human environment are highly uncertain and involve unique or unknown risks. 40 C.F.R. § 1508.27(4), (5). A project is not highly controversial simply because it has opposition, nor does an agency have to eliminate all uncertainty prior to issuing a FONSI. *Indiana Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 857-58 (7th Cir. 2003) (mere opposition to a proposed action does not make a project "highly controversial"); *Nw. Envtl. Def. Ctr. v. Wood*, 947 F. Supp. 1371, 1385 (D. Or. 1996), *aff'd*, 97 F.3d 1460 (9th Cir. 1996) (NEPA regulations do not require an agency to eliminate all uncertainty prior to issuing a FONSI).

Plaintiffs' claim that "concerns" regarding wetland reclamation should have required the preparation of an EIS is wrong. Multiple scientific studies have confirmed that disturbed wetlands on the Altman Tract can be successfully reclaimed.[22] (AR 57007-20; 57108-111; 58185; 58187-89; 59673; 59675-76).[23] Importantly, Mosaic has a long history of being able to successfully reclaim wetlands after mining,[24] (AR 57017-18; 58196-58203) (describing other reclamation projects), and

---

[22] Reclamation studies include Biological Research Associates, Wildlife Utilization of Phosphate Mined Lands, 23rd Annual Phosphate Conference (Oct. 9, 2008) (AR 55250-71); Plant Species Composition and Diversity Comparisons Between Natural and Reclaimed Herbaceous Wetlands in Central Florida's Phosphate Mining Region (July 2007) (AR 36019-175); *Restoration of Riverine Forest at Hall Branch on Phosphate-Mined Land, Florida*, Restoration Ecology, Vol. 7, No. 1, p. 1-14, Andrew F. Clewell, Ph.D (AR 49981-94). In addition, the record from the administrative proceeding in *Peace River/Manasota Regional Water Supply Authority v. IMC-Phosphates Co.*, DOAH Case No. 03-0791, contains extensive data supporting Mosaic's ability to reclaim wetlands.

[23] Pages AR 58187-89 and 59675-76 contain references to testimony by scientists at other administrative hearings in which cumulative impacts were assessed. This testimony is in the administrative record and was considered by the Corps.

[24] The greatest distinction between early reclamation practices and those of today is technology, including the availability of hydrology models for reclamation and wetland hydroperiod design, as well as a number of techniques used in native habitat construction. (AR 58173). In addition, advanced hydrologic models, along with machinery equipped with global positioning systems, have provided wetland designers with the tools needed for wetland mitigation. (AR 58173).

Greenberg Traurig, P.A.

has demonstrated success in reclaiming all wetland types represented on the Altman Tract. (AR 57008). Herbaceous wetlands, which comprises 85% of the wetlands on the Altman Tract, have been demonstrated to be some of the easiest and quickest wetlands to reclaim and restore. *Id.* In addition, a July 2007 study that compared existing wetlands on the Altman Tract with reclaimed wetlands within the Four Corners Mine demonstrated that natural and reclaimed systems were "closely related" with respect to the high amount of species diversity, having a "close range of dominance by a species." (AR 57008; 33440).

Plaintiffs ignore this record evidence, and instead rely on limited public and EPA comments, and isolated references to studies in the administrative record, in attempting to demonstrate that wetland reclamation was highly controversial and uncertain enough to undercut the Corps' decision. Public comments do <u>not</u> create a "substantial dispute" necessary for a project to be "highly controversial" if the record demonstrates, as it does here, that the agency has considered the dispute and addressed the public concerns.[25]  *Indiana Forest Alliance, Inc.*, 325 F.3d at 857-58 (no controversy where scientific data addressed concerns related to proposed project); *Wetlands Action Network*, 222 F.3d at 1122 (public comments do not render the effects of a proposed action "controversial"); *see also Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 183-84 (3d Cir. 2000) (same).

Nor is the project "highly controversial" based on EPA comments contained in a letter cited by Plaintiffs concerning to the South Fort Meade application—which involved a different permit

---

[25]     Plaintiffs' comments state that the proposed wetland reclamation plan is "uncertain" relying on the ALJ's findings and a draft EIS for a different project. (AR 28190-93). Ignored by Plaintiffs is the fact that after the ALJ issued its findings, Mosaic submitted its revised application that significantly reduced impacts to the wetlands and included additional preservation measures, as well as a comprehensive mitigation plan. (AR 03577, 03597).

Greenberg Traurig, P.A.

relating to a different mine in a different location. (AR 34169-72) (letter from EPA to Corps discussing concerns regarding compensatory mitigation related to South Fort Meade application). Notably, Plaintiffs fail to mention that the EPA was largely satisfied with the Mitigation Plan for the Altman Tract and did *not* express a belief that an EIS was required. (AR 28415-17; 33440-41; 33453-62). And even if they were not satisfied, the Corps—not the EPA—is the decision maker and EPA's comments do *not* merit special weight or deference. *See Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 957 (9th Cir. 2008) (fact that EPA disagreed with Corps' mitigation assessment does not create a substantial issue requiring an EIS); *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1275 (10th Cir. 2004) (EPA concerns about project's impact did not obligate Corps to conduct an EIS).[26]

Perhaps Plaintiffs' most misleading argument is their out of context reliance on a single sentence in the 2,245 page PRCIS which stated that the "current regulatory system has failed to minimize cumulative impacts."[27] (Dkt. 66 at p. 22). Taken in context, the PRCIS studied "cumulative impacts" in the entire Peace River Basin beginning in the 1940s, and evaluated the impacts from mining, urban development, agriculture, and natural climate variability. (PRCIS at 1-1). The PRCIS concluded that many regional causes—other than mining—were primarily to blame for the impacts in Peace River Basin.

---

[26] Plaintiffs, nevertheless, state the EPA concerns "alone should raise sufficient controversy and uncertainty about the environmental impacts to trigger the preparation of an EIS." (Dkt. 66 at p. 22). The only decision they rely upon for this statement is *Blue Mountains BioDiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998), which is inapposite. In that case, the Blue Mountains BioDiversity Project contended that the Forest Service "failed to evaluate" the CEQ factors. *Id.* at 1212. The district court concluded, among other things, that (1) there was *no* documentation of the estimated sediment that would result from the logging and potential impacts of increased sedimentation on the fisheries habitat; and (2) mitigation measures involved past observations of logging on unburned areas, *not* best management practices for severely burned areas where increased levels of sedimentation had already occurred. *Id.* at 1213-14. Those facts are not present here.

[27] Plaintiffs' suggestion that the Corps relied on the state regulatory system for its evaluation of cumulative impacts is false. Nothing in the record substantiates this assertion.

Greenberg Traurig, P.A.

## II. THE CORPS PROPERLY INDEPENDENTLY EVALUATED INFORMATION RECEIVED FROM MOSAIC.

The Corps must independently evaluate information submitted by an applicant and be responsible for the accuracy of the information. 40 C.F.R. § 1506.5(a); 33 C.F.R. Part 325, Appendix B, Sec. 8(f). Plaintiffs claim that the Corps' analysis fell short on this requirement, specifically (and solely) due to an alleged failure "to [independently] verify that there is no reasonable no-action alternative of Mosaic continuing to purchase phosphate rock from Morocco on an as-needed basis." (Dkt. 66 at p. 16).

As a threshold matter, even though the regulations governing Environmental Assessments do not *obligate* an agency to discuss the "no action alternative," the Corp nevertheless did so. 40 C.F.R § 1508.9(b). In the EA, the Corps acknowledged that not mining the Altman Tract would not meet the project purpose.[28]  (AR 33513).  Expanding on its analysis in the Supplemental EA, the Corps explained that not mining the Altman Tract would decrease the overall life of the Four Corners mine and have numerous detrimental effects,[29] including an increased dependence on foreign phosphate

---

[28]     In their Complaint, Plaintiffs also allege that the Four Corners Mine has sufficient reserves without the Altman Tract to operate for over fourteen years.  Accordingly, Plaintiffs suggest that there is simply no need for the project.  (Dkt. 66 at ¶ 125).  This contention has no merit.  The record demonstrates that the Corps considered, in detail, the necessity to mine on the Altman Tract in order to extend the life of the Four Corners Mine.  Indeed, adverse impacts will occur if mining on the Altman Tract is not permitted, including (i) adversely impacting Four Corners' production (and, consequently, overall fertilizer production); (ii) adversely impacting Four Corners' operating costs due to the operation of the plant at less than full capacity; and (iii) decreasing the life of the mine and, consequently, accelerating the date for construction of a new mine. (AR 69013).

[29]     For instance, the No-Action Alternative would not ensure future protection of the 550 acres proposed to be placed in a conservation easement and would preclude the stream restoration project from being conducted.  (AR 69026).  Without this permanent protection, the land could be used for residential construction and agricultural uses, which could cause secondary impacts to the waters of the United States.  (AR 69026).

Greenberg Traurig, P.A.

supplies that would render the company non-competitive in both the domestic and world markets and would exacerbate the United States' trade deficit.[30]  (AR 56978; 56989; 58150; 69018; 69025).

With respect to importing rock from Morocco as a viable no-action action alternative, the Corps acknowledged that areas outside the U.S. have phosphate rock deposits, and that phosphate rock is sometimes purchased from those areas, but that sole reliance on foreign rock was not feasible due to uncertainties regarding foreign suppliers' available capacity of phosphate rock and their willingness to sell phosphate rock to Mosaic.  (AR 31708-09; 33466; 57928; 58150).  Therefore, while the Corps did not expressly consider importing rock from Morocco as one of its alternatives, it did not, as Plaintiffs indicate, ignore it altogether.  Instead, after full consideration, the Corps determined that it would not meet the project purpose and rejected importing rock as not practicable.[31] (AR 33513; 69025-26).

Plaintiffs nevertheless assert that, had the Corps independently verified the information submitted by Mosaic by considering other documents in the administrative record, it would have learned that the information regarding importation of rock from Morocco was wrong, invalid, or otherwise unreliable.  Plaintiffs point to the fact that the record establishes that (1) other companies import Moroccan rock, and (2) Mosaic has used and contemplates using imported rock in the future

---

[30]     In fact, the total U.S. demand now exceeds U.S. production, creating an increased dependency on imports.  This is due to the lack of additional reserves and resulting mine-out and closure of producing mines, as well as regulatory delays resulting from litigation involving other Mosaic phosphate mining projects.  (AR 58150).

[31]     Moreover, Plaintiffs have deliberately ignored the Corps' duty to consider Mosaic's overall project purpose, which is "[t]o extend the life of the Four Corners Mine and related infrastructure—within the central Florida phosphate district—by adding mining reserves within a practicable pumping distance (10 miles) of the Four Corners facilities."  (AR 69012).  Importing phosphate rock from Morocco—even if it was practicable—would not satisfy the overall project purpose and, thus, could not be deemed to be a reasonable or appropriate alternative.  *Native Ecosystems Council*, 428 F.3d at 1247 (alternatives that do not advance the project purpose will not be considered reasonable or appropriate); *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170, 186 (D.D.C. 2004) (Plaintiffs' contention that "Florida Rock could transport the [lime]stone from elsewhere" was rejected because the "Corps has a duty to take into account the *applicant's* objectives for the project" which was to "provide a source of limestone for its existing mining operations") (original emphasis).

to maintain production capacity.  In fact, Plaintiffs' undercut their argument that the Corps failed to independently verify information provided by Mosaic.  The Corps' review included record evidence that, as Plaintiffs concede, comes from sources other than Mosaic, including evidence that Plaintiffs point to in their attempt to argue that the Corps considered *only* information provided by Mosaic.  *See* Dkt. 66 at pp. 17-18; (AR 53853; 57926; 58150-51).[32]  This information, which was ***verified*** by the Corps, established that reliance on imported rock could result in short-term or long-term supply shortages depending on both the foreign suppliers' available capacity of phosphate rock and their willingness to sell phosphate rock to Mosaic.  (AR 31708-09; 33466; 57928; 58150).

This is not an example of the Corps failing to consider issues raised by Plaintiffs.  Instead; the agency simply reached a conclusion different than that which Plaintiffs would have preferred.  NEPA requires agencies to independently verify applicant-submitted information, but that requirement does mandate that the agency discount or write off applicant-submitted information if someone opposed to the project offers a different opinion or even conflicting information.  Thus, the Corps did not err by agreeing with Mosaic's position that importing Moroccan rock was not a viable alternative.  Rather, the Corps considered the record evidence regarding the availability, advantages, and limitations of an importation alternative and decided that Mosaic was correct in its assessment that importing phosphate rock was not a reasonable alternative to the proposed action.  The Corps did not act arbitrarily or capriciously in doing so.

---

[32]     *See, e.g.*, Ben S. Bernanke, September 2007, Global Imbalances:  Recent Developments and Imbalances.  (AR 58354-64).

Greenberg Traurig, P.A.

## III. THE CORPS COMPLIED WITH THE PUBLIC PARTICIPATION REQUIREMENTS UNDER NEPA AND THE CWA.

### A. The Corps did not violate NEPA's public participation requirements.

When an agency such as the Corps is conducting an Environmental Assessment, it must "involve . . . the public, to the extent practicable." 40 C.F.R. § 1501.4(b); *see also* 40 C.F.R. § 1506.6. Plaintiffs argue that the Corps violated NEPA because it "arbitrarily failed to disclose material information to the public before making its final decisions." (Dkt. 66 at p. 24).

### 1. The Corps' public notice was adequate.

Public notice is adequate under NEPA if sufficient environmental information, "considered in the totality of circumstances . . . permit[s] members of the public to weigh in with their views and thus inform the agency decision-making process." *See Bering Strait Citizens*, 524 F.3d at 953. That standard was met here. As required under the applicable regulations, the Corps' public notice ("Notice") provided a description of the proposed activity, its purpose, and intended use. 33 C.F.R. § 325.3(a)(5) (agency must provide "[a] brief description of the proposed activity, its purpose and intended use, so as to provide sufficient information concerning the nature of the activity to generate meaningful comments").[33] The full application materials were available for review and Plaintiffs did, in fact, provide extensive comments, all of which are addressed in the EA. (*See generally*, *e.g.*, AR 33446-50, 33454-69).

Plaintiffs, however, incorrectly assert they were entitled to more. According to them, the "Corps failed to disclose the applicant's summary of its application at the time the public notice was issued," which "included information on alternatives, mitigation, and the public interest review . . . ." (Dkt. 66 at p. 25). Plaintiffs are flatly wrong. The letter from Mosaic enclosing the revised

---

[33] The Notice contained all the items of information required by the regulations. 33 C.F.R. § 325.3.

Greenberg Traurig, P.A.

application specifically states "[t]o assist with your review, we have also attached a *Summary of ACOE Application* (both hard copy and computer diskette.").  (AR 02668-69).  The record reflects that the Summary was filed the same day as the application, (AR 03642-64) and was, therefore, part of the Application in the public record.  Consequently, Plaintiffs' argument on this point is disingenuous.  Moreover, Plaintiffs failed to identify any information that they would have presented had they received Mosaic's Summary.  (AR 03642-664).

In fact, the Corps received public comments with voluminous attachments (totaling 22,000 pages) from Plaintiffs and others.  (AR 05025-30; 05484-89; 05491-28182; 28186-411; 28413-14; 28418-19).  These comments and attachments, some of which were lengthy and detailed, raised the **exact** concerns that Plaintiffs claim could not be addressed because of the purportedly insufficient Notice, *i.e.*, alternatives, mitigation, reclamation, and public interest review.  (*See*, *e.g.*, AR 5028-29; 5485; 5489; 5885-5902).  Plaintiffs' specious position is proven by the fact that Sierra Club's comments addressed these very concerns.[34]  (AR 28190-411).

### 2. A public hearing was not necessary because the Corps received additional information after closure of the comment period.

There is no law which supports Plaintiffs' contention that the public should be entitled to a public hearing so that it can comment on every piece of factual information submitted to the agency after the closure of the comment period.  The law does not entitle Plaintiffs to sit at the Corps' table as it evaluates its administrative record, including Plaintiffs' own lengthy comments.  It is well-settled

---

[34]     The cases relied upon by Plaintiffs are inapposite.  In those decisions, the court found that the public did not have an opportunity to provide meaningful comment because they were given no information regarding the proposed project and the information that formed the basis of the agency's decision was received after the comment period expired.  *Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984 (E.D. Cal. 2005); *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783 (S.D. W.Va. 2009).  That simply is not the situation here.

Greenberg Traurig, P.A.

that an agency, including the Corps, is not obligated to hold public hearings when it will not yield new information. *See, e.g., Friends of the Ompompanoosuc v. Fed. Energy Regulatory Comm'n*, 968 F.2d 1549, 1557 (2d Cir. 1992). In fact, courts have squarely rejected the need for additional public involvement even where there are changes to the proposed action after the conclusion of the public comment period. *See Biodiversity Conservation Alliance v. U.S. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212, 220 (D.D.C. 2005) (recognizing that there is no "binding authority" which "require[s] an agency to solicit supplemental public comments when there are changes to the proposed action before the EA has been issued"); *Bering Straits Citizens*, 524 F.3d at 951-52 (circulation of EA not required); *Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 115 (1st Cir. 2005) (same); *Greater Yellowstone Coal.*, 359 F.3d at 1279 (same).

Therefore, the mere fact that the Corps considered additional information after closure of the comment period—as it often does—does not entitle Plaintiffs to a public hearing. Here, the Corps specifically determined that it had sufficient information to evaluate the project without a public hearing, and Plaintiffs have offered no facts to the contrary.

> **3.      The Corps was not obligated to solicit public comment after the Altman Permit was suspended.**

Plaintiffs wrongly assert that the Corps was required to afford the public an opportunity to provide additional comments after the Altman Permit was suspended. Courts in this circuit and others have held that no such participation is required. In fact, in *National Parks Conservation Association v. United States Army Corps of Engineers*, 446 F. Supp. 2d 1322 (S.D. Fla. 2006), the court flatly rejected the exact argument that Plaintiffs espouse here. The court stated that "NEPA procedural requirements *were not* triggered" when the agency conducted an additional review after

Greenberg Traurig, P.A.

permit suspension because "there was not a substantial change in circumstances, there was no modification of the permit, and . . . the Corps was not issuing a new permit." *Id.* at 1340 (emphasis in original). In another decision, the court similarly held,

> The EA Supplement merely amplified the issues that had been addressed in BIA's original 2001 EA, so the agency reasonably concluded that further public comment was unnecessary. On this record, we find no merit in TOMAC's claim that another round of public comment was required. BIA acted appropriately given the prior public involvement, and no statute or regulation requires anything more.

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 861-62 (D.C. Cir. 2006). No different result is supported here. The public previously had ample opportunity to comment on the exact environmental concerns that were addressed when the Corps revisited its analysis, including cumulative impacts.[35] Under these circumstances, the Corps reasonably concluded that no further public comment was necessary.

## B. The Corps had no obligation to hold a public hearing pursuant to the CWA.

Plaintiffs' criticism of the Corps' decision not to hold a public hearing is unfounded. Under CWA regulations, "[i]f the Corps determines that it has the information necessary to reach a decision and that there is 'no valid interest to be served by a hearing,' the Corps has the discretion not to hold one." *See* Dkt. 88 at pp. 17-18; 33 C.F.R. § 327.4(b); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 545 (11th Cir. 1996) ("The applicable regulations provide the Corps discretion to hold hearings on

---

[35]     Plaintiffs mistakenly believe that because the final state permit and PRCIS was not published until after the public comment period was closed the Corps was required to provide an additional public comment period after it suspended the permit. According to Plaintiffs, because these documents were issued after the closure of the comment period they did not have "any opportunity to provide information about the state's investigation into the functionality of reclaimed wetlands, or to rebut Mosaic's supplemental information regarding the efficacy of Mosaic's mitigation plans on which the Corps relied in the SEA." (Dkt. 66 at p. 26). Plaintiffs, thus, continue to improperly advocate that they are somehow entitled to actively participate throughout the entire review process. That is not law. Plaintiffs expressed their concerns regarding reclamation and mitigation in their public comments and provided support for their concerns, which the Corps considered.

Greenberg Traurig, P.A.

permit applications on an 'as needed' basis.").  Here, eight requests for a public hearing were received

based on various environmental concerns.  In the EA, the Corps concluded that all relevant issues had

been "successfully addressed," stating:

> The Corps has determined that it has sufficient information to make a decision on this application, and that no new information would be obtained which would assist in the decision making process.  Therefore, it has been determined a Public Hearing is not necessary.

(AR 33561).  This finding must be given deference.  *Envtl. Coal. of Broward Cnty.*, 831 F.2d at 986;

*Fund for Animals,* 85 F.3d at 545 (Corps not required to hold a public hearing when it determines that

a hearing is "unlikely to generate any new information that was not already in the Corps'

possession").  This Court considered NEPA's public hearing provisions in the South Fort Meade

litigation, recognizing "the Corps' considerable discretion in this area."  (Dkt. 88 at pp. 17-18).[36]  In

fact, cases cited by Plaintiffs recognize this discretion in refusing to find that the Corps acted

arbitrarily or capriciously when it failed to hold a public hearing.  *Water Works & Sewer Bd. of the

City of Birmingham v. U.S. Dep't of Army, Corps of Eng'rs*, 983 F. Supp. 1052 (N.D. Ala. 1997),

*aff'd*, 162 F.3d 98 (11th Cir. 1998).

As summarized above, the Corps had the benefit of its own two-and-a-half-year process and

the state proceedings, which together have spanned 10 years.  During this time, the Corps received,

reviewed, and addressed extensive public comments to meet the test of whether it needed more

information.  *See Friends of the Payette,* 988 F.2d at 997 (holding that the Corps was not required to

---

[36]     While this Court did state that a public hearing should be conducted in conjunction with the remand in the South Fort Meade litigation, it noted in that order that "Plaintiffs have failed to demonstrate that they were unable to submit their comments or evidence" to the Corps but that it "need not decide whether the Corps' refusal to conduct a hearing [on the South Fort Meade permit] would by itself necessitate a stay of the permit because a remand is otherwise necessary."  (Dkt. 88 at p. 18).

Greenberg Traurig, P.A.

hold a public hearing when it had already received extensive comments and was "aware of strong support on both sides"). Plaintiffs nevertheless contend that a public hearing should have been held because cumulative impacts were not considered in the state proceedings. This argument has no merit. The public raised concerns regarding cumulative impacts during the Corps' permit process and the Corps thoroughly addressed these concerns in the EA and the Supplemental EA. In light of the relevant regulations and this thorough review, the Corps is entitled to deference regarding its decision that no valid interest would be served by a public hearing in this matter.

## IV. THE CORPS COMPLIED WITH THE CWA IN ISSUING THE ALTMAN PERMIT.

CWA claims are viewed through the deferential lens that is afforded to the Corps in issuing permits under Section 404. *Van Antwerp*, 526 F.3d at 1363. The Corps may grant a permit to place fill in waters when, after considering a wide range of factors, it determines that the benefits of the project outweigh any harm to the resource. 33 C.F.R. § 320.4(a). In making this public interest determination, the Corps' role is to balance the need for the project, as defined by the applicant, against the environmental harm. *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989). The agency is in the best position to determine which impacts are relevant to performing the balance. *Kleppe v. Sierra Club*, 427 U.S. 390, 414, 96 S. Ct. 2718, 2732 (1976). If the Corps finds that the permit application complies with Section 404(b)(1) guidelines, the Corps must issue the permit "unless the district engineer determines that it would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1).

The CWA issue presented is whether the Corps properly selected the least environmentally damaging practicable alternative ("LEDPA"), in compliance with EPA's Section 404(b) Guidelines

Greenberg Traurig, P.A.

("Guidelines"). 40 C.F.R. § 230.10(a). The Guidelines afford flexibility for the exercise of judgment on a case-by-case basis. 45 Fed. Reg. 85336 (Dec. 24, 1980).[37] LEDPA involves two separate determinations: the selected alternative must be practicable and the least environmentally damaging. There is no question that the Corps conducted a proper LEDPA analysis.

### A. The project purpose was properly defined.

Determining the project purpose is central to the practicable alternatives analysis. *Nat'l Wildlife Fed'n v. Whistler*, 27 F.3d 1341, 1345 (8th Cir. 1994). The Corps has discretion to characterize the project purpose. In doing so, however, the Corps must consider the applicant's objective, *i.e.*, its goals and purpose. *Fla. Clean Water Network, Inc. v. Grosskruger*, 587 F. Supp. 2d 1236, 1243-44 (M.D. Fla. 2008) (noting Corps' obligation to consider project purpose in issuing section 404 permits); *see also Greater Yellowstone Coal.*, 359 F.3d at 1270 (recognizing that "the Corps, in determining whether to issue a § 404 permit, has a duty to take into account the objectives of the applicant's project, as long as this objective is legitimate.") (internal citation and quotation marks omitted); *La. Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1048 (5th Cir. 1985) ("[N]ot only is it permissible for the Corps to consider the applicant's objective; the Corps has a duty to take into account the objectives of the applicant's project."). The Corps initially defined the project purpose in the EA as follows:

> To extract phosphate ore from a parcel of land within the existing Four Corners Mine and Lonesome Mine in proximity to existing mining infrastructures such as clay settling areas, beneficiation plants and transportation corridors located within Manatee County, Florida.

---

[37] *See also* Corps and EPA 1993 Memorandum: Appropriate Level of Analysis Required For Evaluating Compliance with the Section 404(b)(1) Guidelines for Alternatives Requirements, Section 3.

Greenberg Traurig, P.A.

(AR 33436). The Corps later determined that the definition of the project purpose was "to [sic] narrow and therefore limited the evaluation of alternatives." (AR 69009). According to the Corps, the purpose and need of the original EA "focused within one County without fully evaluating the concept of the 10 mile radius around identified plants." (AR 69011). In 2009, in response to a request from the Corps, Mosaic clarified its overall project purpose, which it restated as follows:

> To extend the life of the Four Corners Mine and related infrastructure - within the central Florida phosphate district - by adding mining reserves within a practicable pumping distance (10 miles) of the Four Corner facilities.

(AR 59677, 68198).

This project purpose formed the basis of the Corps' expanded alternatives analysis that it performed in the Supplemental EA. (AR 58151-53; 58157-67; 58168-70; 69019-34). The record demonstrates that the Corps, after a thorough review and considering Mosaic's objectives (*i.e.*, to mine phosphate ore where reserves are located within a practicable pumping distance of the Four Corner facility), established a legitimate project purpose against which alternatives could be measured. *Sylvester*, 882 F.2d at 409 (where project purpose is legitimate, Corps must be afforded the deference it is due.).[38] No more is required.

Plaintiffs wrongly contend that this redefined "project purpose" "preclude[d] the existence of *any* alternative sites..." (Dkt. 66 at p. 13) (quoting *Sylvester*, 882 F. 2d at 409) (emphasis added). Of the four alternatives the Corps evaluated that did not involve mining the Altman Tract, two of them met the defined project purpose. The project purpose was, therefore, not crafted to ***only*** allow for

---

[38] Plaintiffs have offered no other plausible "project purpose," given that the Application sought authorization to mine phosphate ore where reserves are located. This is not a situation where an applicant might have a wide range of locations for its enterprise such as, for example, building a shopping center. Because phosphate is found in limited locations, it is perfectly rational that the project purpose would relate to that area.

Greenberg Traurig, P.A.

phosphate mining under the wetlands in the Altman Tract.[39]   Had it been so defined no other

alternative would have met the project purpose.

**B.**     **The Corps did not violate the CWA in issuing the Altman Permit because Mosaic demonstrated that there were no other less environmentally damaging practicable alternatives.**

Under the CWA, if the project is, as here, not "water dependent," the Section 404 Guidelines

require the Corps to presume that a practicable alternative available that has less adverse

environmental impacts on the wetland.  40 C.F.R. § 230.10(a)(3).  The applicant must rebut this

presumption by "clearly demonstrat[ing]" that a practicable alternative is not available.  *Id.*  "An

alternative is practicable, if it is available and capable of being done after taking into consideration

costs, existing technology, and logistics in light of the overall project purposes."  *See* 40 C.F.R.

§ 230.10(a)(2).  The record demonstrates that the Corps conducted a proper CWA analysis when it

concluded that Mosaic met its burden of establishing that there was no less environmentally

damaging *practicable* alternative.

The Corps conducted its alternatives analysis not once, but twice.  The Corps' LEDPA

analysis performed in connection with the Supplemental EA consisted of evaluating four specific

alternative sites and the No-Action Alternative.  (AR 69019-34).  To facilitate the Corps' review,

Mosaic provided detailed maps accompanied by a thorough analysis of the site alternatives.  (AR

56984-88; 58208-35; 69076-102).

---

[39]     Plaintiffs' reliance on Judge Kravitch's dissent in *Van Antwerp*, 526 F.3d 1353, is misplaced (and has no precedential value).  In discussing the overall project purpose, which was to provide for "construction-grade limestone from Miami-Dade County," Judge Kravitch agreed with the district court's conclusion that it was "artificially narrow."  *Id.* at 1366,-67.  Her conclusion was prompted by the fact that the ***only*** available limestone in Miami-Dade County was the tract of land at issue, which was situated in wetlands.  That is not the case here.  There were other available reserves within the 10 mile radius noted in the project purpose that were evaluated as possible alternatives.

Greenberg Traurig, P.A.

### 1. The Corps Engaged In A Comprehensive Review Of Practicable Alternatives.

In considering the off-site alternatives, the Corps "recognize(d) that projects which involve the extraction of phosphate ore must operate under different constraints than most development projects due to (1) the need for the mining site to be within a ten mile radius to the beneficiation plant,[40] (2) access and availability to existing clay settling areas and pipeline/transportation corridors, (3) the large expanse of land needed to efficiently extract phosphate ore, and (4) the nature of the equipment required to access phosphate ore." (AR 69020-21). Because of these parameters, the Corps noted that it is "difficult to choose sites and design plans that can easily avoid or minimize impacts to aquatic resources." (AR 69021).

As part of its analysis, the Corps extensively evaluated costs, existing technology, and logistics.[41] This analysis revealed that multiple challenges were present in the four off-site alternatives that met or slightly exceeded the 10 mile radius, including the following: (i) greater distance and greater cost to transport the ore to the processing plants (approximately 4-5 times greater); (ii) comparable or greater wetland impacts; (iii) the reduced quantity or quality of ore available from the sites;[42] (iv) limitations imposed by land use restrictions; (v) the expected inability or difficulty in acquiring the properties because of multiple owners;[43] and (vi) the inability or

---

[40]     For instance, distances greater than 10 miles between ore deposits and beneficiation plant cost more than $20 million for electrical gear pipelines, pumps, and setup. (AR 56982).

[41]     These factors are thoroughly discussed in Mosaic's 2008 and 2009 submittals to the Corps. (AR 56975-57107; 57108-57628; 58150-59621, 59671-67920; 68198-69001). Among other things, the existing beneficiation plant and mine infrastructure cost over $600 million dollars. (AR 56978).

[42]     Neither sites 3 nor 4 contain sufficient resources to supply the amount of ore need to satisfy the project purpose of processing 7.2 million tons of recoverable phosphate per year.

[43]     Because of location of Site 1 (within the Peace and Manatee River Watershed Overlay Protection Districts), it is unlikely the site could be permitted. And, even it could be permitted, that could not be accomplished in time to meet the

Greenberg Traurig, P.A.

difficulty in obtaining the rights to construct infrastructure (pipeline) through adjacent parcels to deliver the ore to the plants. (AR 31705-08; 33510-14; 56982-83; 56987-88; 58157-169; 59678-88; 69019-34 (listing factors that make each of the alternative sites not practicable).

These metrics are the exact considerations that are appropriate when undertaking an alternatives analysis for phosphate mining. *See Pamlico-Tar River Found. v. U.S. Army Corps of Eng'rs,* 329 F. Supp. 2d 600, 614-15 (E.D.N.C. 2004). In *Pamilco-Tar River Foundation*, the court upheld a Section 404 permit for phosphate mining activities as the LEDPA to allow the applicant to "use its phosphate reserves, and the resources acquired to mine those reserves, in a cost effective manner . . . ." *Id.* at 613; *see also* 45 Fed. Reg. 85359, 85343 (Dec. 24, 1980) (an alternative is not practicable if it is "unreasonably expensive to the applicant"). In addition, the court considered the increased costs associated with the various alternatives and found that the longer pumping distance, lower quality of ore, highway access issues, and increased impacts to nearby properties, made the other alternatives unreasonably expensive. *Pamlico-Tar River Found.* 329 F. Supp. 2d at 613 (costs associated with rejected alternative estimated to be $444.4 million more than the proposed action and $354 million more than the alternative ultimately selected for the permit); *see also Conservation Law Found. v. Fed. Energy Regulatory Comm'n*, 216 F.3d 41, 46 (D.C. Cir. 2000) (FERC appropriately considered costs of alternatives with increased environmental protection).

---

operational needs of the Four Corners Plant. Inability to obtain permits within the necessary time frame also made the remaining sites unavailable. It was also anticipated that there would be significant public opposition because of neighboring residential properties on Sites 3 and 4. Moreover, it was unlikely that there was a willing seller for Site 2. (AR 69030-31).

Greenberg Traurig, P.A.

The Corps also considered a No-Action Alternative, which would consist of not extracting phosphate ore to allow for the extension of the life of the Four Corners Plant.[44] Not allowing mining would impact overall fertilizer production, increase operating costs, decrease the life of the mine, result in the loss of jobs and taxes, and would not provide for the future protection of 550 acres that otherwise would be placed into a conservation easement.[45] Adopting the No-Action Alternative would not prevent development, *i.e.*, residential and agriculture, or the impacts resulting from it. (AR 56989; 69025-26). Thus, the record clearly demonstrated that the No-Action Alternative was not feasible.

Given this analysis, the Corps properly concluded that Mosaic demonstrated that mining in compliance with the Altman Permit was the "least environmentally damaging practicable alternative when taking into account the relative quality of the aquatic resources, costs, logistics and the technical feasibility of the proposal." (AR 69026).[46]

---

[44] Not mining the any of the jurisdictional wetlands would result in a loss of 2,118 acres (89% of the land) or approximately 11.8 million tons of phosphate rock reserves, which could provide fertilizer for over 169 million acres of corn. (AR 56988). It would also render 83% of the uplands inaccessible for mining. *Id.*

[45] A stream restoration project has already been completed on the Altman Tract, consistent with the special conditions imposed in the Altman Permit.

[46] Plaintiffs allege in their Complaint that the alternatives analysis under both NEPA and the CWA was flawed. Their Motion, however, does not address NEPA, indicating they have abandoned this point. Regardless, under NEPA, agencies must only consider a reasonable range of alternatives and it is entirely within the agency's discretion, which is governed only by the "rule of reason" given the scope and purpose of the project under consideration. *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1172 (10th Cir. 2002), as modified, 319 F. 3d 1207 (10th Cir. 2003) (a reasonable alternative must be non-speculative and bounded by some notion of feasibility); *Skinner*, 903 F.2d at 1541; *Gouger v. U.S. Army Corps of Eng'rs*, 779 F. Supp. 2d 588, 618 (S.D. Tex. 2011) (the regulation does not require that all proposed alternatives, no matter their merit, be discussed in an EA). Here, the Corps' thorough consideration of alternatives, discussed above, cannot be said to have violated NEPA.

### 2. **Plaintiffs' argument misapplies the presumption that a least environmentally damaging practicable alternative exists**.

Plaintiffs—with no sound explanation—describe the Corps' alternatives analysis as "irrational on its face." It is the Plaintiffs' argument, however, that is irrational. Plaintiffs assert that the fact that the alternatives evaluated had "greater" adverse impacts renders the analysis arbitrary and capricious. The alternatives analysis is intended to help an agency identify alternatives that are available "in light of the overall project purposes" and to determine whether any of those alternatives would have lesser environmental impacts than the preferred alternative. 40 C.F.R. § 230.10(a)(2) ("[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes."). *Id.*

The thrust of Plaintiffs' argument is that the Corps cannot demonstrate compliance with the CWA where it has not evaluated an alternative with lesser environmental impacts. If that were the law—which it is not—then the preferred alternative (*i.e.*, the applicant's proposed project) would never be the least environmentally damaging practicable alternative. Moreover, in certain situations—particularly where, as here, an applicant has already considered environmental impacts and proposed a plan that both avoids and minimizes them, then seeks to mitigate the balance of the impacts—it may be that alternatives that are both practicable and have less adverse impacts simply do not exist. Plaintiffs do not cite a single decision to support their argument because there is none.

### CONCLUSION

For the foregoing reasons, Mosaic Fertilizer, LLC respectfully requests that this Court (i) enter Summary Judgment in favor of Defendants; and (ii) deny Plaintiffs' Motion for Summary Judgment in its entirety.

Dated: October 15, 2012                          Respectfully submitted,

                                                 /s/ David B. Weinstein
                                                 David B. Weinstein
                                                 Fla. Bar No. 604410
                                                 weinsteind@gtlaw.com
                                                 Kimberly S. Mello
                                                 Fla. Bar No. 002968
                                                 mellok@gtlaw.com
                                                 **GREENBERG TRAURIG, P.A.**
                                                 625 E. Twiggs St., Ste. 100
                                                 Tampa, FL 33602
                                                 Telephone: (813) 318-5700
                                                 Facsimile: (813) 318-5900

                                                 and

                                                 John A. DeVault, III
                                                 Fla. Bar No. 103979
                                                 jad@bedellfirm.com
                                                 **BEDELL, DITTMAR, DEVAULT,
                                                 PILLANS & COXE, P.A.**
                                                 101 East Adams Street
                                                 Jacksonville, Florida 32202
                                                 Telephone: (904) 353-0211
                                                 Facsimile: (904) 353-9307
                                                 *Counsel for Mosaic Fertilizer, LLC*

## CERTIFICATE OF SERVICE

I CERTIFY that on October 15, 2012 the foregoing was electronically filed with the Clerk of

Court via the CM/ECF system, which will send a notice of electronic filing to counsel of record and

that a true and correct copy of the foregoing was forwarded by U.S. Mail to **John F. Kasbar,** U.S.

Army Corps of Engineers, Jacksonville District, 701 San Marco Blvd., P.O. Box 4970, Jacksonville,

FL 32232-0019.

                                                 /s/ David B. Weinstein
                                                 Attorney

*TPA 511,713,270*

Greenberg Traurig, P.A.