# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

SIERRA CLUB, INC.; MANASOTA-88, INC.;      **CASE NO. 3:08-cv-750-HLA-TEM**
GULF RESTORATION NETWORK, INC.;
PEOPLE FOR PROTECTING PEACE RIVER,
INC.; and ENVIRONMENTAL
CONFEDERATION OF SOUTHWEST
FLORIDA, INC.,

        Plaintiffs,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS; and COLONEL ALFRED
A. PANTANO, JR., Commanding District
Engineer, U.S. Army Corps of Engineers,
Jacksonville District;

        Defendants,

and

MOSAIC FERTILIZER, LLC,

        Intervenor.

_____/

## PLAINTIFFS' COMBINED RESPONSE TO FEDERAL DEFENDANTS' AND MOSAIC FERTILIZER'S CROSS-MOTIONS FOR SUMMARY JUDGMENT

**A.** **The Corps' Admission that Phosphate Mining Must be Evaluated on a Peace River Watershed-Wide Basis Moots the Corps' and Mosaic's Claim That a Cumulative Impacts Analysis of Phosphate Mining on a Sub-watershed Wide Basis is Adequate.**

Plaintiffs asserted that the U.S. Army Corps of Engineers ("the Corps") fundamentally changed its position. The agency now admits that the past, present, and reasonably foreseeable cumulative impacts of phosphate mining in the Peace River watershed require a comprehensive, basin-wide evaluation in an Environmental Impact Statement ("EIS"). The Corps does not contest this point. Plaintiffs also asserted that this change of position mooted the Corps' and Mosaic's claim that a sub-watershed analysis of the Altman Tract adequately considered cumulative impacts—especially given that the mining projects that prompted the Corps' change of position all *pre-date* the Altman Project Supplemental Environmental Assessment ("SEA").[1]

The Corps and Mosaic argue that this Court recently rejected a similar argument in litigation involving the Ft. Meade Mine, and there is no reason to find differently here. Corps' Br. at 8-9; Mosaic Br. at 11; *see Sierra Club v. U.S. Army Corps of Eng'rs*, No. 3:10-cv-564-HLA-JBT at 12 n.6 (M.D. Fla. July 30, 2010) (Prelim. Inj. Order) (doc. 88). Defendants are wrong. In that case, the Corps and Mosaic both argued that a "speculative" region-wide EIS "of yet undetermined scope," which "might" be performed "at some point in the future" did not support a finding that an EIS was required. *See* Fed. Def. Br. at 18-19, *Sierra Club*, No. 3:10-cv-564-HLA-JBT (M.D. Fla. July 15, 2010) (doc. 56); Mosaic Br. at 13, *Sierra Club*, No. 3:10-cv-564-HLA-JBT (M.D. Fla. July 15, 2010) (doc. 51). This Court agreed, holding that while plaintiffs "may be able to eventually demonstrate that the Corps failed to take a hard look at direct and cumulative impacts and thus erred in its FONSI, the evidence produced at this stage in

---

[1] Mosaic asserts that the Corps' draft area-wide EIS actually examines different mining projects than those listed in the Notice of Intent, but does not attach the draft or argue its admissibility. Whether Mosaic changed its mining plans since the issuance of the Notice of Intent does not alter the fact that Corps voluntarily changed its position based on the facts set forth in the Notice.

the proceedings is insufficient."  Prelim. Inj. Order at 12.  In contrast to the "speculative" online article upon which plaintiffs relied in *Sierra Club*, the Corps' Notice of Intent (which post-dates this Court's order in the Ft. Meade Mine litigation) explicitly describes the Corps' firm commitment to prepare an area-wide EIS and the basis for its decision.

Defendants argue that the Ninth Circuit's decision in *Northern Alaska Environmental Center v. Hodel*, 803 F.2d 466 (9th Cir. 1986), does not support plaintiffs' position, and that plaintiffs' interpretation of that case is at odds with *Native Village of Point Hope v. Mineral Management Services*, 564 F. Supp. 2d 1077 (D. Alaska 2008).  *Native Village*, however, has nothing to do with *Hodel*, but rather the proper application of 40 C.F.R. § 1506.1(c), which provides an exemption for agencies to conduct "major Federal action" during the preparation of an EIS, so long as the specific activities are already covered by an adequate EIS.  *Native Village*, 564 F. Supp. at 1082-83.  Unlike the individually permitted seismic tests in *Native Village*, which the court allowed to proceed because they had *already* been evaluated in previous EISs and were being re-evaluated in a programmatic EIS, *id*. at 1083-84, the Altman Project has never been and (if the Corps prevails) never will be evaluated in any comprehensive EIS that examines the cumulative impacts of phosphate mining throughout the Peace River basin.

Contrary to defendants' arguments, *Hodel* is relevant and instructive.  There, an intervenor-defendant mining association continued to argue on appeal that a comprehensive EIS was not required for mining projects in Alaskan national parks, even though the permitting agency abandoned that position after the lower court's adverse ruling and decided to prepare a comprehensive EIS addressing the cumulative impacts of all past, present, and future mining in each of those national parks.  *Hodel*, 803 F.2d at 468.  The Ninth Circuit held that the permitting agency's voluntary change of position mooted the mining association's claim.  *Id*. at 469 n.3.

Like *Hodel*, the Corps' voluntary decision to prepare an area-wide EIS in this case moots defendants' claim that an EIS is not required. That the Corps voluntarily decided to prepare an area-wide EIS before any adverse court decision is irrelevant.

Mosaic argues that plaintiffs did not raise the area-wide EIS in its complaint and therefore, cannot raise the issue now. Mosaic Br. at 11. In their Third Amended Complaint, however, plaintiffs asserted that the Corps failed to make a convincing case that an EIS was not required in part because the agency "failed to consider the impact of this action with other pending and future mining operations outside the Horse Creek basin but within the Peace River and Charlotte Harbor watershed." Third Amend. Compl. at 32 (doc. 36). Those pending and future mining operations prompted the Corps to prepare the area-wide EIS, which supports plaintiffs' existing claim. Furthermore, mootness, by definition, relates to events occurring after the alleged violation,[2] and courts have recognized that mootness is a jurisdictional issue that the court must resolve even if it is raised for the first time at summary judgment. *Dittman v. California*, 191 F.3d 1020, 1025 (9th Cir. 1999).

The Corps argues that plaintiffs' position would undermine any Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") if the agency subsequently decided that cumulative impacts justified the preparation of an area-wide EIS, even if no significant impacts existed at the time of the earlier EA. The problem with this argument is that the Corps has no idea whether mining the Altman Tract would in fact produce significant impacts in the Peace River basin because it never conducted a cumulative impacts analysis of the Altman Tract within the context of the entire Peace River basin.

---

[2] This is why extra-record evidence is admissible to prove mootness. *S. Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 729 (10th Cir. 1997) (considering post-record agency letters). Further, the "contents of the Federal Register shall be judicially noticed." 44 U.S.C. § 1507.

Lastly, the Corps claims deference. Plaintiffs assert that the Court should give deference to the agency's most recent—and correct—position.

**B.      Plaintiffs Are Entitled To Summary Judgment Because the Corps Violated NEPA And the Clean Water Act.**

*1.      The Corps' Definition of Purpose Arbitrarily Limited its Consideration of Practicable Alternatives.*

Plaintiffs asserted that the Corps violated the Clean Water Act ("CWA") and the National Environmental Policy Act ("NEPA") by defining the "project purpose" in such a narrow manner that it excluded practicable alternatives from consideration. The project purpose is as follows:

> The overall project purpose is to extract phosphate ore from a tract of land within a 10-mile radius from the Four Corners Plan, Central Screening Station or South Fort Green Washer supporting the existing Four Corners Mine, sufficient to allow the Four Corners Plant to continue to process 7.2 million tons of recoverable phosphate per year.

AR69019. Defined in this restrictive manner, the purpose precludes: (1) any variation of a "no action" alternative involving the importation of phosphate even though such an alternative is indisputably practicable, AR57926 (describing Mosaic's use of imported phosphate); (2) consideration of viable phosphate reserves outside the ten-mile radius; and (3) mining of reserves within the ten-mile radius capable of producing slightly less phosphate than Altman. Combined, these restrictions produce only one outcome—that the Altman Tract is the only viable alternative. This is not discernibly different than the purpose Judge Kravitch's dissent found an abuse of discretion (*i.e.,* "mining *this* limestone from *these* wetlands"). *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1367 (11th Cir. 2008) (emphasis in original). On remand, the district court followed Judge Kravitch's reasoning, finding the Corps' definition of purpose arbitrary and capricious because the agency "uncritically accepted the miners' assertions that limestone mining required siting in these specific wetlands." *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d

1254, 1263, 1267 (S.D. Fla. 2009). The Eleventh Circuit affirmed, and this Court should reach a similar result. *Sierra Club v. Van Antwerp*, 362 F. App'x 100, 107 (11th Cir. 2010).

The Corps and Mosaic attempt to avoid this conclusion by arguing that the Corps found the project purpose in the original EA/SOF was "too narrow" and "unnecessarily limited the evaluation of alternatives," and therefore the agency "expanded" the project purpose in the SEA to properly evaluate alternatives. Corps' Br. at 27-28; Mosaic Br. at 35; AR69011.[3] The problem with this argument is that the specific alternatives analyzed under the Corps' purportedly "expanded" project purpose definition were *exactly the same* as the alternatives analyzed under the original project purpose definition. *Compare* AR33485-88; AR33508-13 (EA Alternatives Analysis); AR31700 (map of four alternative sites) *with* AR69019-27 (SEA Alternatives Analysis); AR58338 (map of identical four alternative sites).

The Corps argues that it is inaccurate to characterize the project purpose as allowing the extraction of *all* available phosphate reserves within a 10-mile radius of Four Corners Mine because the *authorized* mining plan does not allow Mosaic to mine all recoverable phosphate on the Altman tract; the permit only authorizes the removal of 8 million of the nearly 12 million tons of phosphate available. Corps' Br. at 13-14 (citing AR69027). Similarly, Mosaic contends that the project purpose did not preclude the existence of any alternative sites because two of the proposed alternatives actually met the defined purpose. Mosaic Br. at 35. By defining the project purpose to require the production of 1 million tons of phosphate per year from within a ten-mile radius of the Four Corners Plant, however, the definition of the project purpose restricted the choice among alternatives and ensured that the alternative with the greatest

_____

[3] The original purpose was "To extract phosphate ore from a parcel of land within the existing Four Corners Mine and Lonesome Mine in proximity to existing mining infrastructures such as clay settling areas, beneficiation plants and transportation corridors located within Manatee County, Florida." AR33436.

percentage of ore recovery would be chosen. Indeed, the alternatives which had less recoverable ore per acre than the Altman tract were necessarily eliminated because those options would not meet the project purpose of recovering an "equivalent" amount of phosphate without vastly expanding their footprint and thus, making them impracticable and/or incurring greater environmental impacts. AR58158; AR69023-27. Moreover, the project purpose definition necessarily precluded any meaningful analysis of a "no action," importation alternative. Regardless of the final configuration of the plan the Corps chose to *permit*, the definition of purpose ensured that only the Altman tract would satisfy Mosaic's narrow project purpose— making the consideration of alternatives an impermissible "foreordained formality." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

> **2.      The Corps Violated the Clean Water Act by Failing to Require Mosaic to Clearly Demonstrate that an Alternative with Less Environmental Impact is Impracticable.**

The Clean Water Act Section 404(b) Guidelines are unequivocal: no discharge of dredged or fill material is permitted if a practicable alternative exists that would have less adverse impact on the aquatic ecosystem. 40 C.F.R. § 230.10(a). Where, as here, a proposed project is *not* water dependent, the Corps must presume that a less environmentally damaging practical alternative exists, and the *applicant* bears the burden by providing "detailed, clear and convincing information *proving*" that such an alternative is impracticable. *Van Antwerp*, 362 F. App'x at 106 (emphasis in original) (quoting *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004)). Here, Mosaic wholly failed to even consider any alternatives with *less* aquatic impacts, let alone prove such alternatives impracticable. Such an "analysis" is not a rational application of the plain meaning and purpose of the Section 404 Guidelines.

Mosaic contends that there is no support for the proposition that a proper alternatives analysis must consider an alternative with *lesser* environmental impacts.  Under the Section 404 Guidelines, however, the "test is whether the alternative with *less* wetlands impacts is impracticable," and the burden is on the applicant to provide "clear and convincing information *proving*" that alternative impracticable.  *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1186, 1189 (10th Cir. 2002) (emphasis added) (the Corps was required to clearly demonstrate that a "narrower" right of way for highway was impracticable, and could not justify wider width based on projected proposed benefits such as public trail, utilities corridors, etc.).

Here, as in *Utahns*, the Corps arbitrarily failed to consider narrower mine configurations or combinations of alternatives that impacted less wetland acreage.  As the Corps notes, Mosaic narrowed the scope of its original mining proposal.  Corps' Br. at 2; AR33514.  Although there are nearly 12 million tons of phosphate available on the Altman tract, limiting the project to the recovery of 8 million tons still results in an economically viable project.  AR69027.  That is an example of the practicability of mining with a smaller footprint, and it was arbitrary for the Corps not to consider similarly narrowing Mosaic's other alternatives.[4]  The Corps' refusal to consider narrowing the footprint demonstrates the inadequacy of the analysis.  *See Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 667, 670 (7th Cir. 1997) ("The existence of a viable but unexamined alternative renders an environmental impact statement inadequate.").

---

[4] By way of example, Alternatives 1 and 2 would provide approximately 14 and 11.5 million tons of phosphate, respectively.  AR69023-24.  The Corps does not explain whether those proposed alternatives could, like the preferred alternative, be practicably limited to the recovery of only 8 million tons and result in incrementally less wetland impact.  Similarly, each of the proposed alternatives contains large swaths of land where there are fewer wetlands, and the Corps failed to consider whether some combination of those alternatives would result in less environmental impact.  AR58339-53.

Moreover, as explained in plaintiffs' opening brief, it was arbitrary for the Corps to summarily eliminate from the alternatives analysis any consideration of the so-called 1,754-acre parcel, which was the *only* available tract within ten miles of the Four Corners Plant with less total acreage impact than the Altman tract. AR58160. Based on Mosaic's self-serving, unverified representations, the Corps now suggests it had "sufficient information" to establish that alternative was "not practicable." Corps' Br. at 29 (citing AR69022). The Corps is wrong. As an initial matter, there is no support in the record for the Corps' assertion in the SEA that the route necessary to take those reserves to the Four Corners Plant would be 27 miles. AR69022. Moreover, the entirety of Mosaic's "analysis" of the 1,754-acre parcel consists of three sentences, in which Mosaic indicates that the 1,754-acre parcel is "less than the 2,500 acres needed to be a replacement for Altman," "completely isolated," and there is "no connection between this parcel and any Mosaic owned property." AR58160. This conclusory explanation simply does not constitute "detailed, clear and convincing information *proving*" that the alternative is impracticable. *Van Antwerp*, 362 F. App'x at 106.[5] The Corps' blind acceptance of such facile explanations would have obviated the need for *any* analysis of three of Mosaic's proposed alternatives. Indeed, following the Corps' newly-minted approach to the Section 404 alternatives analysis, Mosaic could have simply (and factually) stated that Alternatives 2, 3, and 4 are all isolated from current Mosaic holdings, would require the purchase of lands, and/or are subject to use restrictions, and that would have been the end of the matter. *See* AR58347 (map of Alternative 2 non-owned parcels); AR58350 (map of Alternative 3 non-owned parcels);

---

[5] That a particular alternative is inconvenient or requires the purchase of additional land to conduct the proposed activities does not clearly demonstrate infeasibility. *See* 40 C.F.R. § 230.10(a)(2) (An alternative may be practicable even if it is "an area not presently owned by the applicant which could reasonably be obtained."); *see also* 45 Fed. Reg. 85336, 85339 (Dec. 24, 1980) ("mere fact of ownership or lack thereof, does not necessarily determine reasonable availability").

AR58353 (map of Alternative 4 non-owned parcels); AR58338 (map of alternatives); AR58164-66. The Clean Water Act requires more. Because the Corps' suggested 1,754-acre alternative plainly fell within the definition of the project purpose and would have had less total acreage impact on the environment, Mosaic was obligated to provide the Corps with "detailed, clear and convincing information *proving*" that it was impracticable. *Van Antwerp*, 362 F. App'x at 106. Mosaic's conclusory rejection of the 1,754-acre parcel fails to satisfy that burden.

Finally, defendants argue that they appropriately rejected the "no action" importation alternative because there is "no evidence" that importation of phosphate results in lesser environmental impacts, and because if Mosaic cannot recover 1 million tons of phosphate annually from the Altman tract, the price and availability of phosphate would be severely impacted. Corps' Br. at 28; Mosaic Br. at 39. As an initial matter, the Corps' reliance on the "absence of evidence" of lesser environmental impacts from overseas mining inverts the rule. The presumption is that the no action alternative is less environmentally harmful unless the applicant *clearly demonstrates* otherwise. Further, the Corps' and Mosaic's speculation about potential political conflicts with international suppliers of phosphate, or residential or agricultural development that might occur in the absence of strip mining simply does not constitute clear and convincing information *proving* that the no action alternative is impracticable. *See Alliance to Save the Mattaponi v. U.S. Army Corps of Eng'rs*, 606 F. Supp. 2d 121, 130 (D. S.C. 2009) (the Corps acted arbitrarily where alternatives analysis was based on "assertions that other alternatives *may* not meet needs and *could* be more damaging") (emphasis in original).

**3.** ***The Corps Violated NEPA and the CWA by Failing to Independently Verify and Evaluate the Information it Received from Mosaic Regarding the "No Action," Importation Alternative.***

Plaintiffs identified record facts proving that Mosaic has an established, routine business practice of purchasing imported phosphate rock on an as-needed basis and thus, the Corps failed to verify Mosaic's assertion that there is no reasonable, no-action alternative to strip-mining the Altman Tract. Pls.' Br. at 16-18 (citing to Mosaic's own SEC10K Report). The Corps and Mosaic argue that the Corps did all that was required given that the project purpose is to extract phosphate ore, not to buy it. The Corps lacks discretion, however, to ignore reasonable alternatives that at least partially meet the applicant's goal, which in this case, is to allow the Four Corners Plant "to continue to process 7.2 million tons of recoverable phosphate per year." AR69019; *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1542-43 (11th Cir. 1990) (agency should consider alternatives that partially satisfy the project's purpose and need).

Examination of the importation alternative as a means to partially fulfill Mosaic's project purpose would further three fundamental NEPA goals. It would allow the Corps to evaluate: (1) different mining plans for the Altman Tract given that some of the phosphate ore could be imported, rather than mined from beneath wetlands; (2) alternative mining sites that were rejected because they do not produce the total 7.2 million-ton goal; and (3) alternative sites that result in less wetlands destruction because at least some of the phosphate under those wetlands could be supplied through importation, rather than extraction. It would also advance Mosaic's goal of continuing to process 7.2 million tons of phosphate per year at the Four Corners Plant.

Unlike the Corps (which simply argues that verification was unnecessary), Mosaic argues that the Corps did look at information that came from sources other than Mosaic. As proof, it cites to a speech by Ben Bernanke, the current chairman of the Federal Reserve. Mosaic Br. at

27 n.32 (citing AR58354-64). Ben Bernanke did not submit a copy of his speech to the Corps; it was submitted by Mosaic as part of a 1,472-page response to a Corps' request for additional information. AR58150- 59621. The Corps did exactly what plaintiffs asserted—it relied upon (and failed to independently verify) information submitted by Mosaic and as a result, overlooked a reasonable alternative that not only *could* be used to partially satisfy Mosaic's need, but actually is being used for that purpose.

### 4. The Corps Failed to Take the Requisite Hard Look at Cumulative Impacts.

#### a. The Corps Violated NEPA Regulations When it Restricted Its Cumulative Impacts Analysis to the Horse Creek Basin Rather Than the Peace River Watershed As a Whole.

Plaintiffs asserted that the Corps failed to take a "hard look" at the cumulative impacts of the Altman project by restricting its cumulative impacts analysis to the Horse Creek basin rather than the entire Peace River watershed. Defendants respond that because the Altman project is "south of the confluence" of Horse Creek and the Peace Rivers, the Corps reasonably concluded it "would not likely have a direct or indirect effect upstream from the confluence." Corps' Br. at 18; Mosaic Br. at 20; AR69057. [6] This argument is fundamentally incompatible with the plain meaning of NEPA regulations.

---

[6] Mosaic also suggests that the Corps adequately evaluated the cumulative impacts of the Altman project because the original EA focused its cumulative impacts analysis on impacts on the entire Peace River Basin. This argument is foreclosed by the SEA, which found that the original cumulative impacts analysis was flawed. *See* AR69010 (noting "the Corps should not have solely relied" on the non-NEPA Peace River Cumulative Impact Study and the Ona Draft EIS for its previous cumulative impacts analysis, and that the Corps reevaluated its analysis in order to "adequately address" cumulative impacts). Furthermore, a federal agency cannot satisfy its obligations under NEPA by relying solely upon draft NEPA documents or non-NEPA documents prepared by a state. *Klammath Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 998 (9th Cir. 2004) (non-NEPA documents prepared by state cannot satisfy NEPA); *Conservation Law Found. v. Fed. Highway Admin.*, 24 F.3d 1465, 1475 (1st Cir. 1994) (because a draft EIS "has no legal effect," an agency cannot rely on it in a separate NEPA analysis).

The question under the NEPA regulations is not whether water from Horse Creek can flow upstream. Rather, the relevant inquiry is whether the proposed "action is *related* to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7).[7] If so, an EIS is required.

Here, Mosaic's several phosphate mining operations throughout the Peace River basin are indisputably interrelated and interdependent. *See* AR57927-28 (describing phosphate operations throughout Peace River basin); AR57951 ("Any disruption of operations at one of these facilities has the possibility of significantly affecting our production or our ability to distribute our products extracted."); AR57953 (noting a decision by a government agency to deny or revoke any of our permits would have a "material adverse effect on our business"); AR58152 (Mosaic plant facilities are "integrated," and excluding Altman reserves will adversely impact Mosaic's overall fertilizer production and U.S. phosphate production, and decrease life of the Four Corners Mine). Where, as here, "a proposal itself is regional or systemic in scope, or where the proposal is one of a series of interrelated proposals that will produce cumulative systemwide effects that

---

[7] Cumulative impacts are those which "result from the incremental impact of the action when *added* to other past, present, and reasonably foreseeable future actions" undertaken by *any* governmental or private entity. 40 C.F.R. § 1508.7 (emphasis added). The Council for Environmental Quality Guidelines for Considering Cumulative Effects also make clear that "the boundaries for evaluating cumulative effects should be expanded to the point at which the resource is no longer affected significantly or the effects are no longer of interest to affected parties." *Habitat Education Ctr., Inc. v. U.S. Forest Serv.*, 593 F. Supp. 2d 1019, 1029 (E.D. Wis. 2009); *see also* Council on Environmental Quality, *Considering Cumulative Effects Under the National Environmental Policy Act* 8 (Jan. 1997), *available at* http://ceq.hss.doe.gov/nepa/ccenepa/ccenepa/sec1.pdf (last viewed Nov. 14, 2012).

can be meaningfully evaluated together," an EIS must be prepared. *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 375 (D.C. Cir. 1981) (citation omitted). [8]

The Corps' reliance on *Georgia River Network v. U.S. Army Corps of Engineers*, 334 F. Supp. 2d 1329, 1342 (N.D. Ga. 2003), is misplaced. Corps' Br. at 18-19. In that case, plaintiffs challenged a Corps' permit authorizing the construction of a reservoir without preparing an EIS. The court found that the Corps' decision not to prepare a comprehensive EIS evaluating all 42 separate reservoirs in the region was reasonable because the plaintiffs "never challenge[d] the Corps['] decision to limit" the geographical scope of the analysis. *Georgia River Network*, 334 F. Supp. 2d at 1343. Moreover, the reservoirs were "not part of a regional plan"; each of the projects was "proposed and funded separately and ha[d] independent utility." *Id*. That is plainly not the case here.

The Corps continues to maintain that it appropriately relied on the Florida Department of Environmental Protection's admittedly "incomplete and insufficient" Peace River Cumulative Impact Study and other information in reaching its conclusion that the Altman project would not result in significant cumulative impacts. Corps' Br. at 17 (quoting AR69056). [9] Because the

---

[8] Relying on *City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1353-54 (11th Cir. 2005), the Corps argues that it need only consider the cumulative impacts of "foreseeable future" actions, not the possible impacts of less imminent actions. Corps' Br. at 16-17. The Corps fails, however, to identify *any* "less imminent" actions or impacts that should be excluded from the analysis. To the extent the Corps suggests that additional phosphate mining in the Horse Creek or Peace River basins is not reasonably foreseeable, that argument is foreclosed by the record, which describes several pending phosphate mining proposals in those basins. AR58204-05; AR69062-63.

[9] The Corps notes that it considered information provided by the South Florida Water Management District and the Charlotte Harbor National Estuary Program, but those documents concern water quality issues, not cumulative impacts stemming from unreclaimed wetlands. *See* AR69059 (water management district report cited for improvements in water quality); AR69059 (Charlotte Harbor study cited for water quality issues). To support the Corps' cumulative impacts analysis, Mosaic cites numerous documents in the record relating to the impact of mining on water flow and quality. Mosaic Br. at 20-21. None of those documents, however,

Peace River study suggests that the "most adverse impacts" of past phosphate mining occurred before Florida implemented a mandatory reclamation requirement, the Corps argues it was reasonable to conclude the Altman project and mitigation plan would not result in significant cumulative impacts. Corps' Br. at 18 (quoting AR69065). This argument fails to address the fact that the Peace River Cumulative Impact Study actually refutes the Corps' central conclusions.[10] *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 811 (9th Cir. 1999) (agency could not reasonably rely on non-NEPA watershed report to find no cumulative impacts from land exchanges where the report found the watershed was already degraded, and cautioned that future exchanges could cause additional degradation).

### b. The Corps' Determination that Wetlands Reclamation Would Reduce Cumulative Impacts to a Level of Insignificance is Arbitrary and Capricious Because the Efficacy of Reclamation Activities is Highly Controversial and Uncertain.

As explained in plaintiffs initial brief, the Corps' conclusion that wetlands reclamation will reduce the cumulative impacts of the Altman Project to a level of insignificance wholly fails to address the substantial uncertainty and controversy surrounding the state regulation of reclamation activities in Florida, and the mining industry's ability to recreate and restore the full range of functionality of *all* wetland types after phosphate strip-mining. Pls.' Br. at 21-23. Defendants respond that the state regulatory process for analyzing cumulative impacts (upon

---

address the efficacy of wetland reclamation or the cumulative impacts stemming from unreclaimed or unsuccessfully reclaimed wetlands.

[10] Contrary to the Corps' contention, the Peace River Cumulative Impact Study actually found extensive cumulative impacts from past actions. AR28962. Moreover, approximately 15,000 acres of wetlands have been lost due to phosphate mining since the establishment of mandatory reclamation requirements. *Id*. Consequently, the study concluded that state mining and reclamation plans had failed to minimize cumulative impacts, questioned the functionality of reclaimed lands, and called for a study of all recreated wetlands on mined out phosphate lands. AR29075; AR28769; AR29078.

which the Corps admittedly relied) is irrelevant.[11]  Pointing to modest successes reclaiming a particular kind of wetland, defendants urge the Court to ignore the Environmental Protection Agency's ("EPA") concerns about the efficacy of wetland reclamation as a means to restoring the full range of wetlands function and to defer to the Corps.  These arguments are misguided.

The Corps admits it relied on required reclamation planning under Florida law to avoid cumulative impacts.  Corps' Br. at 21-22.  The EA/SEA failed, however, to acknowledge (much less analyze) the fact that Florida law prohibits regulators from considering the past, present, and reasonably foreseeable cumulative impacts of phosphate mining and reclamation activities when evaluating reclamation plans like the one at issue.  *Peace River/Manasota Reg. Water Supply Authority v. IMC Phosphates Co.*, 18 So.3d 1079, 1088-89 (Fla. 2d DCA 2009).  As a result, the state regulatory process (upon which the Corps relies to avoid cumulative impacts) continues to approve reclamation plans like the Altman Project without accounting for the 15,000 acres of wetlands have been lost due to phosphate mining *despite* the existence of "mandatory" reclamation.  AR58873.  Indeed, only 41 percent of all mined-out wetlands in Florida have actually been successfully reclaimed since the state's implementation of mandatory reclamation.  AR58249.  That abysmal record led the state agency responsible for enforcing reclamation activities to question the reclamation program's efficacy and conclude that the "current regulatory framework has failed to minimize cumulative impacts."  AR29075-78.  The Corps cannot rationally assert that the existence of a state regulatory system will adequately protect

---

[11] Mosaic curiously argues there is "nothing in the record to substantiate" plaintiffs' assertion that the Corps relied on the state regulatory system for its cumulative impacts analysis.  Mosaic Br. at 24 n.27.  Mosaic itself, however, cites to several state law administrative hearings involving disputes over the efficacy of mandated wetlands reclamation to support its assertion that "extensive data" supports its mitigation plan.   Mosaic Br. at 22 n.22.  Moreover, the Corps explicitly acknowledges that it did rely on the existence of mandatory reclamation on future project to avoid cumulative impacts.  Corps' Br. at 21-22.

against the cumulative impacts of mining and reclamation activities where the regulatory agency implementing that system actually ignores cumulative impacts and concedes that the system does not work. *See O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 235 (5th Cir. 2007) (agency must provide a rational basis for concluding that the combined effects of separate permits and individual mitigation activities will not result in cumulatively significant impacts).

Defendants attempt to dismiss EPA's concerns regarding the efficacy of wetlands reclamation because the agency provided those comments in the context of a different strip-mining project in the Peace River basin. However, the EPA letter urges the Corps to avoid phosphate strip mining on wetlands in general, "because mitigation in the form of recreating wetlands and tributary systems is *rarely* able to replace the full range of functions and value of the impacted aquatic resources." AR34170 (emphasis added). As the agency that shares responsibility for implementing the CWA and protecting aquatic resources, EPA's opinions are relevant to whether wetland reclamation activities are controversial or uncertain.

Finally, Defendants cite cases where courts found mere public opposition to a project insufficient to render the effects of the proposed action "controversial." Corps' Br. at 21; Mosaic Br. at 23. This is not a case involving mere public opposition or disagreement. Plaintiffs cited specific contradictory evidence that casts serious doubts on the Corps' reliance on state regulatory protections and wetlands reclamation to restore the full range of functionality of *all* wetland types affected by the Altman Project, as required by the Corps' own "no net loss" policy. AR33527. The Corps does not even acknowledge this dispute in its EA or SEA, which renders the Corps' mitigation conclusions arbitrary and capricious. *See Georgia River Network*, 334 F. Supp. 2d at 1338 (if a showing of a substantial dispute is made, the agency must consider the dispute and address those concerns in its final decision).

**5.**	***The Corps Violated the Procedural Requirements of NEPA and the Clean Water Act.***

    **a.**	***The Corps Violated the Procedural Requirements of NEPA When it Failed to Disclose Sufficient Information to Allow the Public to Meaningfully Comment on the Agency's Decision-Making Process.***

Based on extensive record evidence, plaintiffs asserted that the Corps denied them meaningful participation in the decision-making process. Pls.' Br. at 24-27. The Corps' answer, in short, is that while it didn't do much in the way of public participation, it did enough, and plaintiffs have not identified any reason why they could not have presented information relevant to the cumulative impacts analysis during the initial public comments. As explained in plaintiffs' initial brief, however, two of the documents upon which the Corps relied in its cumulative impacts analysis—the Florida Peace River Cumulative Impact Study and the Final State Permit—were published *after* the public comment period ended. Pls.' Br. at 26. Thus, plaintiffs never had an opportunity to challenge the Corps' findings based on those documents.

NEPA regulations require involvement of the public to the extent practicable. 40 C.F.R. § 1501.4(b). The Corps does not argue that it was not practicable to disclose Mosaic's summary of its application, a draft EA, or volumes of information from Mosaic—all of which the agency had in hand. It merely argues that it had no duty to do so. Given the totality of the circumstances as set forth in plaintiffs' initial brief, it was an abuse of discretion for the Corps not to provide at least some opportunity for informed public participation on cumulative impacts, alternatives, and the mitigation analysis (all of which were significant issues) in some manner before the EA and/or the SEA were finalized.

In response to plaintiffs' argument that the Corps never disclosed Mosaic's Summary of Application to the public, Mosaic argues the summary was actually made public because the Corps had it. Mosaic Br. at 28-29. The problem with this argument is that the public has to

know a document exists before it can comment on it.  Here, the public never knew the Corps had the summary or the information the summary disclosed until the administrative record was filed in this proceeding—a little late for meaningful participation in the decision-making process.

Mosaic contends that the Corps is not required to hold a public hearing simply because it considered additional information after the close of comment period, Mosaic Br. at 29-30, and is not required to solicit additional public comment when the agency conducts an additional review of a permit.  Mosaic Br. at 30-31.  In each of the cases Mosaic cites, however, the agency either: (1) disclosed the additional information to the public or held a public hearing; (2) the plaintiff actually received the information through other means; or (3) the agency's review did *not* result in any "substantial change" in the analysis or the project.  *See Friends of Ompompanoosuc v. Fed. Energy Regulatory Comm'n*, 968 F.2d 1529, 1557 (2d Cir. 1992) (where plaintiffs "received" the supplemental EA through a Freedom of Information Request "two months in advance of the Order licensing the Project, [plaintiffs] had ample time to comment" and could not demonstrate prejudice); *Biodiversity Conservation Alliance v. U.S. Bureau of Land Mgmt.*, 404 F. Supp. 2d 212, 220 (D.D.C. 2005) (agency advised public of proposal to expand the project, "allowed a thirty-day public comment period," and did not make "substantial changes" to the proposal); *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 ("Information about the project was widely disseminated," and the agency "made substantial efforts to provide additional information to the public"); *Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 115 (1st Cir. 2005) (Corps met the "practicable" requirement by issuing public notice of application, providing a five month comment period, conducting two public hearings, noting and responding to public comments in the EA, and conferring with federal and state environmental agencies); *Greater Yellowstone*

*Coal.*, 359 F.3d at 1278-79 (agency held "facilitation meetings with members of the public who had expressed opposition to the project," including plaintiffs, to develop alternatives); *Nat'l Park Conservation Ass'n v. U.S. Army Corps of Eng'rs*, 446 F. Supp. 2d 1322, 1340-41 (S.D. Fla. 2006) (no obligation to reinitiate public participation process after suspension where there is no "substantial change in circumstances" and plaintiffs concerns about future development were "speculative"); *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 861-62 (D.C. Cir. 2006) (no obligation to allow further public comment where agency sought comment on original draft and "provided detailed responses" and supplement "merely amplified the issues addressed" in original EA. Here, by contrast, the Corps accepted an additional 34,000 pages of information from Mosaic and then rewrote the entirety of the EA without ever disclosing any of that information to the public, or providing an opportunity for involvement. Pls.' Br. at 25-26.

### b. The Corps Violated the Requirements of the CWA by Failing to Provide a Public Hearing.

Plaintiffs asserted that the Clean Water Act "mandates an opportunity for public hearings" on proposed Section 404 dredge and fill permits. *Fund for Animals v. Rice*, 85 F.3d 535, 545 (11th Cir. 1996) (quotation marks omitted); *see also* 33 U.S.C. § 1344 ("The Secretary may issue permits *after notice and opportunity for public hearings* for the discharge of filled material into the waters of the United States.") (emphasis added). The Corps and Mosaic answer that Corps' regulations give the Corps discretion not to hold a public hearing whenever it determines that it has sufficient information to reach a decision and there is no valid interest to

be served by a hearing.[12] Corps' Br. at 25-26; Mosaic Br. at 31-32. As set forth in the plaintiffs' original brief, however, there is no factual support in the record for that determination. Pls.' Br. at 25-26. The Corps cannot reasonably claim that it has sufficient information to make a decision without a public hearing where that information is so woefully inadequate that the agency subsequently suspends the permit to obtain additional information "necessary" to conduct an "effective" analysis (while excluding the public throughout). AR69009.[13]

Mosaic attempts to argue that the state hearing process satisfies federal CWA requirements. Plaintiffs' responded to this argument in their initial brief, explaining that cumulative impacts are not cognizable under state law and thus, state permit proceedings cannot be substituted for the hearing mandated by the CWA. See Pls.' Br. at 29 (citing *Hough v. Marsh*, 557, F. Supp. 70, 80 (D. Mass. 1982)).

## C.  Conclusion

For the reasons set forth above, plaintiffs respectfully request that the Court enter summary judgment in their favor and against the Corps, and that the Corps' CWA Section 404 permit for the Altman Tract be vacated.

---

[12] In a footnote, the Corps asserts that there is no merit to plaintiffs' claim that the Corps refused to hold a public hearing following the permit suspension as no commentator renewed their request. Corps' Br. at 26, n.7. The Corps cites to no legal authority for this requirement because there is none.

[13] The Corps and Mosaic argue that *Water Works & Sewer Bd. v. U.S. Dep't of Army*, 983 F. Supp. 1052 (N.D. Ala. 1997), supports their position. It does not. In *Water Works*, the court held that if a member of the public appropriately requests a hearing, then the Corps can *either* (1) engage the requestor in informal discussions and then provide the commentator with a written statement reflecting the Corps' analysis of the issues raised and the factors the agency considered in concluding that a public hearing and/or additional information is unnecessary, *or* (2) hold a public hearing as requested. *Id*. at 1060-61. Here, the Corps did neither.

Dated: November 14, 2012. /s/ Monica K. Reimer

Monica K. Reimer
Fla. Bar No. 0090069
Earthjustice
111 S. Martin Luther King, Jr. Blvd.
Tallahassee, Florida  32301
(850) 681-0031
(850) 681-0020 fax
mreimer@earthjustice.org
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on November 14, 2012 the foregoing was electronically filed with the Clerk of Court via the CM/ECF system, which will send a notice of electronic filing to counsel of record.  I also certify that a copy of the foregoing was forwarded by U.S. Mail to John F. Kasbar, U.S. Army Corps of Engineers, Jacksonville District, 701 San Marco Blvd., P.O. Box 4970, Jacksonville, FL 32232-0019.

/s/ Monica K. Reimer
Attorney