UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**SIERRA CLUB**, *et al,*

Plaintiffs,

v.                                      Case No.: **3:08-cv-750-J-25TEM**

**UNITED STATES ARMY CORPS OF ENGINEERS**, etc., *et al,*

Defendants.
_____/

## ORDER

This Cause is before the Court on the Parties' Motions for Summary Judgment (Dkts. 66, 69 and 70).

## Background

Plaintiffs Sierra Club *et al* challenge the Corps' issuance of a Clean Water Act (CWA) Section 404 dredge and fill permit, which authorizes Intervenor Mosaic to strip mine a 2,367-acre area known as the Altman Tract in Manatee County, Florida for phosphate ore. The tract is part of a larger 30,000-acre phosphate mine known as Four Corners. The area contains uplands, wetlands and streams. The permit at issue authorizes the destruction of 480.1 acres of wetlands located on the headwaters of Horse Creek, which is the Peace River's second largest tributary.

According to Plaintiffs:

> Phosphate strip mining utterly destroys the local natural
> environment, permanently altering the natural topography,
> drainage patterns, and vegetation of the entire mine area often
> based on the promise of creating "reclaimed wetlands." There
> is a substantial dispute over whether "reclaimed wetlands" are
> the functional equivalent of the natural, high-quality wetlands
> destroyed by phosphate strip mining. In fact, as of 2007,
> Mosaic had successfully "reclaimed" and obtained
> releases from the Corps for only 1,903 of the 10,843 acres the
> company has mined in the Horse Creek watershed. Moreover,
> "recreating" diverse, high quality wetland marshes and forests
> can take as long as 15 to 40 years. The Environmental
> Protection Agency (EPA) has recognized the importance of the
> Peace River watershed, designating it as both a Priority
> Watershed and an Aquatic Resource of National
> Importance...Clean freshwater flows from the headwater
> wetlands and tributaries...[t]he Peace River watershed also
> supplies drinking water to over 250,000 people in southwest

2

Florida...EPA has suggested that phosphate mining projects

avoid all wetlands adjacent to and tributaries contributing to the

Peace River.

(record cites and some quotation marks omitted)

## Procedural Posture

On April 30, 2008, the Corps issued a 142 page Environmental

Assessment (EA) for the Altman Tract, concluding that "this permit action

will not have a significant impact on the quality of the human environment"

and, as a result, an Environmental Impact Statement (EIS) was not

necessary. The Corps further concluded that a public hearing on the

application was not needed because it had "sufficient information" to

evaluate the proposed project and "no new information would be obtained

which would assist in the decisionmaking process." On May 2, 2008, the

Corps issued the Altman Permit.

In response, Plaintiffs filed this action against the Corps for

declaratory and injunctive relief alleging violations of the Clean Water Act

(CWA), the National Environmental Policy Act (NEPA) and the

Administrative Procedures Act (APA).

On October 3, 2008, while this case was pending, the Corps

determined that it was "in the public interest to revisit the analysis in support of the [Altman] permit decision," and suspended the permit. The instant action was stayed pending the Corps' review.

The Corps generated a supplemental Environmental Assessment seven months later and reinstated the permit without additional conditions.

In sum, the main issues before the Court on summary judgment are: (1) whether the Corps conducted a proper alternatives analysis;[1] (2) whether the Corps properly analyzed cumulative impacts; (3) whether a public hearing and/or additional opportunity for comment was required; and (3) whether the Corps took the required "hard look" in its analysis and met its other obligations under the National Environmental Policy Act (NEPA) when it made its finding that there would be no significant environmental impacts; (4) whether the Corps properly defined the project purpose and independently verified Mosaic's information.

---

[1] Because Plaintiffs address some of the issues in this case- such as the sufficiency of the Corps' alternatives verification- under both the NEPA and the CWA, to streamline this Order, the Court will discuss those issues under both statutes in a single section when possible.

## Standard[2]

<u>Summary Judgment</u>

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  Issues are genuine if a reasonable jury could find for the non-movant and facts are material if they can affect the outcome.  *Scottsdale Ins. Co. v. Cutz, LLC*, 543 F. Supp. 2d 1310, 1313 (S.D. Fla. 2007) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact... Once the moving party has discharged its burden, the nonmoving party must designate specific facts showing that there is a genuine issue of material fact... All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. The court may not weigh the credibility of the parties on

---

[2] To streamline this Order, the Court will omit most internal citations and quotations.  In addition, it will often refer to an argument made by Mosaic and the Corps as an argument made by the "Defendants" rather than differentiating between the parties or referring to Mosaic as the intervenor.

summary judgment. *Id.* (internal citations omitted).

## National Environmental Policy Act

NEPA establishes procedures that a federal agency must follow when analyzing the effects of proposed federal actions. The agency initially must determine whether the action constitutes a "major Federal action" defined as an action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332;  40 C.F.R. § 1508.18; *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1363 (11th Cir. 2008).

If the agency determines that a proposed activity is a "major Federal action," the agency must discuss certain environmental issues in a detailed document called an Environmental Impact Statement (EIS). *Id.* at 1360. On the other hand, if the agency determines that a proposed activity is not a "major Federal action," it produces a "finding of no significant impact" (FONSI), it produces a document "briefly presenting the reasons why an action ... will not have a significant effect on the human environment." 40 C.F.R. § 1508.13.

"Thus, an agency will reach one of two conclusions in an EA: either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact ...

6

necessitating no further study of the environmental consequences which would ordinarily be explored through an EIS." *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998).

In evaluating whether the effects on the quality of the human environment are significant, the federal agency should consider, among other things:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(3) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(4) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

40 C.F.R. § 1508.27(b).

A federal agency must analyze both the direct and the indirect effects. 40 C.F.R. § 1508.8. "[I]f a finding of no significant impact is made,

the agency must be able to make a convincing case for its finding." *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir.1998).

There are four criteria that a court should consider in determining whether an agency's decision not to prepare an environmental impact statement (EIS) is arbitrary and capricious: first, the agency must have accurately identified the relevant environmental concern; second, once the agency has identified the problem it must have taken a "hard look" at it in preparing the Environmental Assessment (EA); third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding; and last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum. 42 U.S.C.A. § 4332.

As stated in *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1214-5 (11th Cir. 2002):

> An agency has met its "hard look" requirement if it has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle*

*Mfrs.*, 463 U.S. at 43, 103 S.Ct. at 2866. The court will overturn an agency's decision as arbitrary and capricious under "hard look" review if it suffers from one of the following: (1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise. *Id.* at 2867.

NEPA does not mandate any particular result. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). It is not the role of the reviewing court to substitute its judgment for the judgment of the agency. *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir.1996).

Clean Water Act

Section 404 of the CWA authorizes the Secretary of the Army,

acting through the Corps, to issue permits for discharges of dredged or fill

material into the Nation's waters. 33 U.S.C. § 1344(a).

The Corps must base its discharge authorization decisions on

"an evaluation of the probable impacts . . . of the proposed activity and its

intended use on the public interest." 33 C.F.R. § 320.4(a)(1).  Assessing

the public interest often involves a "balancing process," *Envtl. Coal. of*

*Broward County v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987), in which

the Corps weighs "economic and environmental factors," *Town of Norfolk*

*v. U.S. Army Corps of Eng'rs*, 968 F.2d 1438, 1454 (1st Cir. 1992).

All appropriate and practicable steps must be taken to minimize

potential impacts to the aquatic ecosystem. 40 C.F.R. § 230.10(d).

The regulations provide that "no discharge or fill material shall be

permitted if there is a practicable alternative to the proposed discharge

which would have less adverse impact on the aquatic ecosystem, so long

as the alternative does not have other significant adverse environmental

consequences." 40 C.F.R. § 230.10(a).

A practicable alternative is one that "is available and capable of

10

being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

Where a project is not water-dependent, such as the one at issue in this case, it is presumed that practicable alternatives exist. 40 C.F.R. § 230.10(a)(3).

When this presumption applies, the applicant must rebut the presumption by "clearly demonstrat[ing]" that a practicable alternative is not available. *Id.* Specifically, the permit applicant bears the burden of providing "detailed, clear, and convincing information *proving* that an alternative with less adverse impact is impracticable." *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1269 (10th Cir. 2004)(emphasis in original).

Moreover, the Corps may rely on information submitted by the applicant, but the Corps' regulations do say that when information for an EA is prepared by the applicant, "the district engineer is responsible for independent verification and use of the data, evaluation of the environmental issues, and for the scope and content of the EA." 33 C.F.R. Part 230, App. B § 8(b). *See also* 40 C.F.R. § 1506.5(b).

The CWA requires the Corps to provide notice and an opportunity

11

for public hearings prior to issuing permits, 33 U.S.C. § 1344(a)and(b).

The regulations provide the Corps with discretion not to hold a hearing if

there is "no valid interest to be served by a hearing," 33 C.F.R. 327.4(b).

However, "[i]n case of doubt, a public hearing shall be held." *Id.* at (c).

## Analysis[3]

As mentioned above, Plaintiffs make several arguments to support

their position that the Corps' action in granting the permit violated either

the CWA or NEPA.[4] Specifically, Plaintiffs first claim that the Corps'

decision to prepare an area-wide EIS[5] invalidated the Corps' Finding of No

Significant Impact (FONSI) for the project. Second, Plaintiffs claim the

Corps did not adequately consider alternatives to Mosaic's preferred

project. Third, Plaintiffs claim the Corps was arbitrary and capricious in

---

[3]For some reason, Defendant and Intervenor's supplemental pleadings focus on
the fact that this case is at a different procedural posture than 3:10-cv-564 and must be
independently adjudicated.  The Court is well aware of this fact; the supplemental
pleadings were requested simply because the summary judgment pleadings did not
sufficiently and succinctly elaborate on the differences between the two cases.

[4] The Court generally will not refer separately to the APA and  NEPA except
when necessary.

[5]On February 18, 2011, the Corps issued a Notice of Intent to Prepare a Draft
Areawide
Environmental Impact Statement for Phosphate Mining Affecting the Waters of the
United States in the Central Florida Phosphate District.  The EIS did not include the
portion of the Four Corners mine that is at issue in this case.

concluding that the project would not result in significant impacts to the environment. Finally, Plaintiffs claim the Corps did not comply with the statute's public participation dictates.

<u>Public Participation</u>

As noted above, the NEPA requires agencies to involve the public "to the extent practicable" when making permitting decisions. Plaintiffs assert that "the Corps failed to divulge information it had at the time the initial notice was published, provided no information on cumulative impacts, relied extensively upon documents for its cumulative impacts analysis that were published post-notice and therefore could not have been commented upon, and relied heavily upon an additional 34,000 pages of documents from Mosaic to literally rewrite the substance of the entire EA after remand."

Plaintiffs cite *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers* to support their argument that the Corps violates the "extent practicable" requirement when it fails to disseminate detailed information, such as mitigation specifics, prior to making its decision. However, this case is not on point. Evidently, the *Ohio Valley* court was faced with a public notice that "contain[ed] little to no detail regarding the

nature of the expected environmental impacts or the character of the lands and waters to be affected by the project...[and] no information on proposed mitigation, or on how this mitigation is expected to account for the project's adverse environmental effects." *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers,* 674 F.Supp.2d 783, 794 (S.D. W.Va. 2009). This is clearly not the case here; the notice at issue provided specific information about the project.

Next, Plaintiffs argue that the fact that the state held an administrative hearing on the project was not a valid reason to deny a public hearing. Plaintiffs point out that most of the comments received by the Corps addressed cumulative impacts, which are not cognizable under state law.

Stated differently, Plaintiffs argue that the Corps improperly relied upon the state regulatory process for evaluating the mining and reclamation plans. According to Plaintiffs, this reliance was improper because Florida regulators are forbidden from considering cumulative impacts when making wetlands permitting decisions.

Plaintiffs concede that the Corps partially relied on the Peace River Cumulative Impact study, but point out the study was published after the

14

close of the public comment period; objecting parties were not given an opportunity to rebut the information contained therein.

Plaintiffs also use the fact that the permit was suspended to support their position.  Plaintiffs argue "[t]he Corps cannot reasonably claim that it has sufficient information to make a decision without a public hearing where that information is so woefully inadequate that the agency subsequently suspends the permit to obtain additional information 'necessary' to conduct an 'effective' analysis (while excluding the public throughout)."

Stated differently, Plaintiffs maintain that the Corps' assertion that it had sufficient evidence to evaluate the environmental issues when it granted the permit cannot be accurate if it later suspended the permit to receive additional information from Mosaic.

However, as Defendants note, there is no binding authority for the proposition that an agency is required to hold a hearing or solicit supplemental comments when it considers additional information after the comment period has closed.

The Corps also notes that it is not required to circulate a draft EA and it is not required to inform the public of final permit details.  Simply

put, the Corps maintains it solicited sufficient public input and when it determined it had received ample information to evaluate the project, it decided a public hearing was not required.

Further, as noted by Defendants, Plaintiffs have failed to identify any information that was not given to the Corps in public comments but would have been presented at a public hearing. Defendants point out that the Eleventh Circuit has held that agencies have discretion to hold hearings "as needed." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 545 (11th Cir.1996).

For the record, like Plaintiffs, the Court is troubled by the fact the Corps did not disseminate more information in its notice, hold a public meeting/hearing or circulate a draft EA. However, as noted, Plaintiffs have failed to provide any on point case law to support their argument that a hearing or an opportunity for additional public comment was required before or after the Corps decided to revisit its decision. Nor have Plaintiffs provided on point, binding case law to support their argument that the notice to the public was *legally* deficient.

Thus, Plaintiffs have not met their burden to demonstrate that the Corps failed to provide an adequate opportunity for meaningful public

comment under the CWA or failed to satisfy NEPA's public involvement requirements.

Cumulative Impacts

Plaintiffs first argue that the scope of the Corps' cumulative impact analysis was improper because it confined the geographic scope to the Horse Creek basin rather than the entire Peace River basin; the ongoing phosphate mining operations are indisputably related to each other. Defendants counter that the geographic limitation was based on, *inter alia*, water flow data and note the EIS did not address permits that had been previously issued, such as the one here.

The Court agrees with Defendants that the fact that an EIS was eventually ordered, standing alone, does not demonstrate the Corps erred in its FONSI.[6] As argued by the Corps, its decision to conduct an EIS of the area,[7] as well as its decision to limit its geographical scope, does not,

---

[6] Plaintiffs cite a Ninth Circuit case to support their position that an agency's change of position regarding the preparation of an EIS moots its argument that an EIS is not required.  That case, *Northern Alaska Environmental Center v. Hodel,* 803 F.2d 466 (9th Cir.1986), is clearly distinguishable.  There, the agency agreed to conduct an EIS based upon a district judge's order. *Id.* at 469.

[7] When ordering the EIS, it stated that as of June 2010, the cumulative effects of mining in the area had not reached the threshold of significance.

without more, demonstrate its finding of no significant impact was either incorrect or arbitrary and capricious.

Cumulative Impacts and Reclamation/ Mitigation

The Plaintiffs next contest the Corps' conclusion that Mosaic's future wetlands reclamation efforts would mitigate the amount of damage to a level of insignificance and point to the controversy concerning the ability to return lands that have been strip mined to any semblance of functional wetlands within a reasonable period of time.  In addition, only a small percentage of the lands mined by Mosaic in the past have actually been reclaimed.  Further, Plaintiffs note that the EPA has questioned the efficacy of wetlands reclamation as it relates to mitigating phosphate mining impacts.

Defendants assert that Mosaic's reclamation and mitigation plans are relevant to the significance of the environmental impacts; sufficient mitigation measures can support a FONSI.  Specifically, Defendants argue that the Corps considered the impacts, analyzed the mitigation plan and reasonably concluded the impacts are not significant.  Defendants argue that the EA thoroughly discussed this issue, including reference to third party evidence.

18

The Defendants are correct that this Court must consider mitigation measures that were imposed as conditions of the Corps' action. *C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1575 (11th Cir.1988).

Plaintiffs have amply demonstrated a controversy exists regarding the efficacy of wetlands reclamation.  However, the controversy around this issue does not, by itself, support a finding that the Corps' failure to prepare an EIS was arbitrary and capricious or demonstrate it failed to take a hard look at the impacts.  Because the Corps's EA specifically addresses the reclamation/mitigation issue, and the Corps notes that it requested additional information from Mosaic regarding reclamation, Plaintiffs have not met their burden. Here, the Corps' EA concluded the project wouldn't significantly impact the environment and therefore found an EIS wasn't required.

In sum, regardless of whether the Court agrees with the Corps' FONSI, it cannot find that the Corps failed to take a hard look at the issue and articulate a satisfactory explanation for its action.  Whether or not it agrees with the Corps' conclusion, it must grant the Corps the required due deference.

Plaintiffs have not met their burden regarding cumulative impacts

and the Corps' FONSI.

Alternatives Analysis and Project Purpose

Plaintiffs next argue that the Corps' restrictive definition of the Altman project's purpose arbitrarily limited its consideration of practicable alternatives including the no-action alternative.

The Corps defined the project purpose as follows: "to extract phosphate ore from a tract of land within a 10-mile radius from the Four Corners Plant, Central Screening Station or South Fort Green Washer supporting the existing Four Corners Mine, sufficient to allow the Four Corners Plant to continue to process 7.2 million tons of recoverable phosphate per year."

Plaintiffs cite *Sierra Club v. Van Antwerp,* 709 F. Supp. 2d 1254 (S.D. Fla. 2009) to support their argument that an agency cannot define a project purpose so narrowly that it forecloses a reasonable consideration of alternatives. *Id.* at 1264.

However, in *Van Antwerp,* the court noted that the Corps "uncritically accepted" the miner's assertions regarding the project purpose. *Id.* at 1267. Here, the agency expanded Mosaic's preferred project purpose.

Plaintiffs maintain that the change in definition did not result in a

20

practical difference; after the purpose was altered, the exact same alternatives were examined and the Corps reached the same conclusion. Stated differently, Plaintiffs' position is that despite the fact that the Corps modified Mosaic's proposed purpose, the expanded purpose still ensured the alternative with the greatest ore recovery would prevail.

Further, Plaintiffs assert the alternatives analysis was not thorough; the Corps failed to explain why, for example, two alternatives which would provide more ore could not be limited in geographic scope, thereby resulting in reduced impact to wetlands.   Plaintiffs also cite several instances where the Corps' analysis of an alternative was cursory at best.

As an example, Plaintiffs contend that the Corps rejected the no action alternative without discussion even though Mosaic had a routine business practice of purchasing imported phosphate rock on as needed basis.   Plaintiffs argue that the "Corps accepted – without verification or evaluation – Mosaic's rejection of the importation as needed alternative because 'there is no substitute for phosphate'... [it] failed to evaluate the possibility that Mosaic mine fewer wetlands on either Altman or the alternative tracts and make up the difference...by using imported rock on an as-needed basis."

Plaintiffs also assert that the Corps accepted, without verification, Mosaic's assertions that certain smaller acreage sites weren't practicable because the site was either too small, isolated, and/or not connected to other Mosaic property.

Mosaic counters that the relevant regulations do not require the Corps evaluate no action alternatives but note that the Corps did indeed address importation as well as other alternatives and found that the options did not meet the project purpose for various reasons.  According to Mosaic, the Corps reasonably found that the permitted project was the least damaging *practicable* alternative.

Mosaic notes that the 5th Circuit has stated that the Corps has a duty to take an applicant's objectives into account when defining the project purpose. *Louisiana Wildlife Federation, Inc. v. York,* 761 F.2d 1044, 1048 (5th Cir.1985).   Mosaic again points out that it modified its project purpose, at the Corps' request, to expand the range of alternatives.

Plaintiffs also assert that the Corps failed to independently verify Mosaic's information regarding certain alternatives including the no action alternative, and failed to discuss alternatives that only partially met the project purpose.  However, the Court notes that the Corps need only

22

consider reasonable alternatives. *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1542-43 (11th Cir.1990) ("We agree with the district court's conclusion that an alternative partially satisfying the need and purpose of the proposed project may or may not need to be considered depending on whether it can be considered a 'reasonable alternative'").

The Plaintiffs have failed to cite binding case law to support their points regarding alternatives and verification of same. In sum, the Corps determined that certain alternatives were not reasonable.   Regarding the fact the Corps did not, for example, analyze certain combinations that would reduce the mine's footprint, Plaintiffs make a logical point but fail to cite case law that demonstrates these omissions demonstrate a legally insufficient analysis under the relevant statutes.

### Conclusion

The Court finds that Plaintiffs have cited legitimate concerns regarding mining reclamation.   In addition, in this case, the Court shares Plaintiffs' concerns regarding the Corps' generous statement of project purpose and its FONSI. However, it appears that the Corps did follow the required NEPA/APA procedure.   In addition, although a close call under the summary judgment standard, it appears that the Corps abided by the

23

CWA's dictates.

Given the Supreme Court's directive in *Baltimore Gas & Electric Company v. Natural Resources Defense Council*, 462 U.S. 87,103(1983) that a court must be at its "most deferential" when reviewing agency decisions involving complex predictions based on specialized, technical expertise, the Court must find that the Plaintiffs have failed to demonstrate not only a genuine issue of material fact that would allow the Court to grant summary judgment in their favor but also preclude a summary judgment finding in Defendants' favor.   Thus, it is **ORDERED**:

Mosaic and the Government's summary judgment motions (Dkt. 69 and 70) are **GRANTED**; Plaintiffs' summary judgment motion (Dkt. 66) is **DENIED**. The clerk is directed to enter judgment in favor of Defendants and against Plaintiffs.

**DONE AND ORDERED** this  30ᵗʰ day of September, 2013.


HENRY LEE ADAMS, JR.
UNITED STATES DISTRICT JUDGE


Copies to:  Counsel of Record